IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **Brian Humphrey**, on behalf of himself and all similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>**James LeBlanc**,<br><br>Defendant. | No. 3:20-cv-JWD-SDJ<br><br>Hon. John W. deGravelles, District Judge<br><br>Hon. Scott D. Johnson, Magistrate Judge<br><br>**Plaintiff's Motion to Compel the Production of CAJUN Data** |

# Exhibit C

## Transcript of the Rule 30(b)(6) Deposition of Melanie Gueho

## November 13, 2020

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA


Brian Humphrey, on behalf of      NO. 3:20 C 233
himself and all similarly situated
individuals
                         Hon. Judge W. DeGravelles
            Plaintiff            District Judge

    V.                      Hon. Scott Johnson,
                           Magistrate Judge
James LeBlanc,

         Defendant



        30(b)(6) DEPOSITION OF LOUISIANA

DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS,

through its designated representative, MELANIE

GUEHO, given via videoconferencing in the

above-entitled cause, pursuant to the following

stipulation, before Raynel E. Schule, Certified

Shorthand Reporter in and for the State of

Louisiana, commencing at 10:10 o'clock a.m., on

Friday, the 13th day of November, 2020.

```
1                    I N D E X

2                                      Page

3   Caption                            1

4   Appearances                        3

5   Agreement of Counsel               4

6   Examination

7         MR. MOST                     7

8         EDDIE KEITH                  68

9   Reporter's Certificate             74

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    APPEARANCES (Via Videoconferencing):
2
     For the Plaintiff:
3
     LAW OFFICES OF WILLIAM MOST
4    Attorneys at Law
     BY:  WILLIAM MOST, ESQ.
5    201 St. Charles Avenue, Suite 114#101
     New Orleans, Louisiana   70170
6
     And
7
     THE PROMISE OF JUSTICE INITIATIVE
8    Attorneys at Law
     BY:  EDDIE KEITH, ESQ.
9    1024 Elysian Fields Avenue
     New Orleans, Louisiana   70117
10
11   For the Defendants:
12   MESSRS. KEOGH, COX & WILSON
     Attorneys at Law
13   BY:  ANDREW BLANCHFIELD, ESQ.
     701 Main Street
14   Baton Rouge, Louisiana  70802
15
     For the Department of Pubic Safety &
16       Corrections:
17   LOUISIANA DEPARTMENT OF JUSTICE
     OFFICE OF THE ATTORNEY GENERAL
18   LITIGATION DIVISION, CIVIL RIGHTS SECTION
     BY:  JONATHAN VINING, ESQ.
19       HEATHER HOOD, ESQ.
     1885 Third Street, Fourth Floor
20   Baton Rouge, Louisiana   70802
21
22
     Reported By:  Raynel E. Schule
23                 Certified Shorthand Reporter
                   State of Louisiana
24
25
```

```
1              S T I P U L A T I O N
2              It is stipulated and agreed by and
3      among Counsel for the parties hereto that the
4      deposition of LOUISIANA DEPARTMENT OF PUBLIC
5      SAFETY & CORRECTIONS, through its designated
6      representative, MELANIE GUEHO is hereby being
7      taken pursuant to the Federal Rules of Civil
8      Procedure for all purposes in accordance with
9      law;
10             That the formalities of reading and
11     signing are specifically waived;
12             That the formalities of sealing,
13     certification, and filing are hereby
14     specifically waived.
15             That all objections, save those as to
16     the form of the question and responsiveness of
17     the answer, are hereby reserved until such time
18     as this deposition or any part thereof is used
19     or sought to be used in evidence.
20                    * * * * *
21             Raynel E. Schule, Certified
22     Shorthand Reporter in and for the State of
23     Louisiana, officiated in administering the oath
24     to the witness.
25
```

```
 1                    PROCEEDINGS
 2            THE COURT REPORTER:
 3            Will counsel please identify
 4       themselves and their affiliations
 5       and also stipulate that by agreement
 6       of all parties this deposition is
 7       being held via videoconferencing,
 8       and there is no objection to the
 9       witness being sworn in remotely.
10            MR. MOST:
11            This is William Most on behalf of
12       the Plaintiff.  No objections to
13       that stipulation.  We agree.
14            MR. BLANCHFIELD:
15            Andrew Blanchfield on behalf of
16       the Defendants.  We also agree with
17       that stipulation as outlined.
18            MR. VINING:
19            Jonathan Vining on behalf of the
20       Department of Public Safety &
21       Corrections, and we have no issues
22       with the stipulation.  And Heather
23       Hood is also here.
24            MS. HOOD:
25            Heather Hood on behalf of the
```

1          Department of Public Safety &

2          Corrections.

3               MR. BLANCHFIELD:

4               Can we identify, who -- who's

5          Eddie Keith?

6               EDDIE KEITH:

7               Right, yeah.  My name is Eddie

8          Keith.  I'm also here on behalf of

9          the Plaintiff with the Promise of

10          Justice Initiative.

11               MR. BLANCHFIELD:

12               Okay.  You're not enrolled as

13          counsel?

14               EDDIE KEITH:

15               No, I'm -- I'm not.  I'm hoping

16          to just second chair this deposition

17          with Mr. Most so --

18               MR. MOST:

19               Drew, Eddie just -- just joined

20          The Promise of Justice Initiative

21          and is jumping onto this case and

22          will be enrolling, and so I wanted

23          to ask if it's okay with you if

24          Eddie just does Topic No. 7 at the

25          end of the deposition, and I'll do

```
 1              all the other topics.  It's up to
 2              you if you're okay with that.
 3                   MR. BLANCHFIELD:
 4                   Yeah, I'm -- I'm all right with
 5              that.  I mean, if -- if -- so Eddie
 6              is going to enroll at some point?
 7                   MR. MOST:
 8                   Yeah, very shortly.
 9                   MR. BLANCHFIELD:
10                   Okay.
11                   MR. MOST:
12                   We can get that done early next
13              week.
14              MELANIE GUEHO, having been first duly
15         sworn by Raynel E. Schule, Certified
16         Shorthand Reporter, was examined and
17         testified on her oath as follows:
18                        EXAMINATION
19    BY MR. MOST:
20    Q.   Good morning, Ms. Gueho.
21    A.   Good morning.
22    Q.   You may remember me.  I'm -- my name is
23         William Most.  I represent the Plaintiff in
24         this case, and I think we met once before
25         when we did the deposition in person last
```

```
 1        time, not -- not via Zoom if you recall
 2        that.
 3   A.    Yes, sir.
 4   Q.    Could you give us your name and title for
 5        the record.
 6   A.    Melanie Gueho, Director of Data & Research
 7        for the Department of Corrections.
 8   Q.    Thank you.
 9              MR. MOST:
10              And this is a question for Mr.
11         Blanchfield.  Mr. Blanchfield, can
12         we stipulate that this deposition
13         was properly noticed and the court
14         reporter is duly qualified?
15              MR. BLANCHFIELD:
16              Yeah.  We don't actually have a
17         Notice.  We had a draft notice that
18         was undated, but we can -- we can
19         certainly make that agreement.  I --
20         I assume it's the Notice that we had
21         circulated the last go-around before
22         we had to bump it because of the
23         storm.
24              MR. MOST:
25              Let me see.  I think we sent out
```

1          one earlier this week.
2               MR. BLANCHFIELD:
3               I've got one with a Certificate
4          of September 21 that you signed.
5               MR. MOST:
6               There's -- there's a subsequent
7          one on -- let me see if I can share
8          --
9               MR. BLANCHFIELD:
10              Sure.
11              MR. MOST:
12              -- my screen.  There's a
13         subsequent one on September 28th.
14         Let's see.  Is this appearing for
15         you on your screen?
16              MR. BLANCHFIELD:
17              Yes.
18              MR. MOST:
19              Okay, great.  This one is dated
20         October 28th.  I feel like we sent
21         out another one after that, because
22         we got your responses and
23         objections.  Hold up real quick.
24         Yeah,  I think you're right, Drew.
25         We -- the last one was October 28th,

```
 1              and then we adjusted the time of the
 2              deposition without sending out
 3              another Notice.
 4                   MR. BLANCHFIELD:
 5                   Okay.  That's fine.  It still the
 6              same 11 topics.  Is that --
 7                   MR. MOST:
 8                   It's the same topics.  So we'll
 9              enter this into the record.  Okay.
10              So I will mark this as Exhibit --
11              I'll mark this as "Exhibit K," which
12              is the Notice of 30(b)(6)
13              Deposition.
14      BY MR. GUEHO:
15      Q.  Do you see this, Ms. Gueho?
16      A.   Yes.
17      Q.   Great.  And this has been amended by
18          agreement to just change the date and time.
19                   MR. MOST:
20                   Is that correct, Drew?
21                   MR. BLANCHFIELD:
22                   That will work.  Thank you.
23                   MR. MOST:
24                   Okay.
25      BY MR. MOST:
```

```
 1    Q.   All right.  Ms. Gueho, have you ever given
 2         a deposition before?
 3    A.   Yes.
 4    Q.   And so you realize you're under oath today,
 5         correct?
 6    A.   Yes.
 7    Q.   You understand that your answers here today
 8         have the same force as if we're in a
 9         courtroom with a Judge and Jury?
10    A.   Yes.
11    Q.   Is there anything that will prevent you
12         from giving me your full attention and
13         truthful and complete answers today?
14    A.   No.
15    Q.   Are you taking any medications or suffering
16         from any illness that will prevent you from
17         understanding my questions or answering
18         them fully and truthfully?
19    A.   No.
20    Q.   Okay, and I know you've been through this
21         before, so if you need to take a break at
22         any point, feel free to just say so to me
23         or to Mr. Blanchfield, and we'll take a
24         break.  It's no problem at all.  I -- I
25         will, however, ask you after each break
```

| | |
|---|---|
| 1 | whether you talked to anybody and whether |
| 2 | you looked at any documents during that |
| 3 | break. |
| 4 | A.   Okay. |
| 5 | Q.   And this is something I know you are |
| 6 | excellent at because we've done a |
| 7 | deposition before, but if you will please |
| 8 | wait for me to finish my question before |
| 9 | you answer, I will, in turn, do my best to |
| 10 | wait for you to finish your answers before |
| 11 | I ask the next question.  Will that work |
| 12 | for you? |
| 13 | A.   Okay. |
| 14 | Q.   And if I ask a question that you don't |
| 15 | understand, will you agree to let me know |
| 16 | that you don't understand rather than try |
| 17 | and answer it? |
| 18 | A.   Yes. |
| 19 | Q.   Ms. Gueho, do you know what case you're |
| 20 | here for today? |
| 21 | A.   Is it Humphrey? |
| 22 | Q.   Yes. |
| 23 | A.   Okay. |
| 24 | Q.   And am I -- I just want to make sure.  I'm |
| 25 | pronouncing your name correctly? |

```
1    A.    Gueho, yes.

2    Q.    Gueho.  Okay.  Ms. Gueho, you understand

3          that you're the -- here today as a witness

4          designated to speak for the Department of

5          Public Safety & Corrections?

6    A.    Yes.

7    Q.    And so you realize when I'm asking a

8          question of you today, I'm really asking a

9          question of the Department of Public Safety

10         & Corrections, and when you give an answer

11         today, you're really giving the answer of

12         the Department of Public Safety &

13         Corrections?  Do you understand that?

14   A.    Yes.

15   Q.    And today I may use the abbreviations DOC,

16         Department, DPS&C, and by all those things

17         I'll mean the Department -- the Louisiana

18         Department of Public Safety & Corrections.

19         Will you understand me if I use those

20         abbreviations?

21   A.    Yes.

22   Q.    And if you use those abbreviations, is that

23         also what you mean?

24   A.    Yes.

25   Q.    Okay, and this deposition because you're
```

```
 1        representing an entity is a little bit
 2        different than some depositions in that, "I
 3        don't know" is generally not a sufficient
 4        answer here today since the Department of
 5        Corrections has an obligation to produce
 6        someone knowledgeable.  Do you understand
 7        that?
 8   A.   Yes.
 9   Q.   Okay.  Ms. Gueho, when did you begin
10        preparing for this deposition?
11   A.   I don't know.  I prepared a little bit
12        before it got cancelled the last time, and
13        then I hadn't looked at it again, and then
14        I kind of looked at a few things again this
15        morning before I got here.
16   Q.   Okay, and I apologize that we had to
17        reschedule it at the last minute.  Everyone
18        in New Orleans, we lost our power, so me,
19        the court reporter, Eddie as well.  Okay.
20        So you said you looked at a couple of
21        things today before this deposition.  Is
22        that correct?
23   A.   Yes.
24   Q.   What were those things you looked at?
25   A.   My last deposition and just my -- yeah, my
```

```
 1        last deposition and the little deposition
 2        that he showed me this morning.
 3                    MR. BLANCHFIELD:
 4                    She read -- just so for the
 5                record, William, she read some of
 6                the Answers to Interrogatories that
 7                you had sent in the dropbox.
 8                    MR. MOST:
 9                    Huh-huh.
10                    MR. BLANCHFIELD:
11                    I don't think she read all of
12                them, but a few of them.
13                    MR. MOST:
14                    Sure.
15   BY MR. MOST:
16   Q.   Okay.  I'm just going to pull those up one
17        at a time, make sure we're on the same
18        page.  So when you say you looked at your
19        deposition, is -- is this what you're
20        talking about, Ms. Gueho, this 72-page
21        deposition of -- of you from February 3rd,
22        2020?  Is that correct?
23   A.   Yes.
24                    MR. MOST:
25                    Okay, and this is the document we
```

1          have designated as "Exhibit C" and

2          are attaching to this deposition.

3   BY MR. MOST:

4   Q.   Did you look at any deposition other than

5        this one in preparation for this

6        deposition?

7   A.   No.  Just the one he just mentioned this

8        morning.

9   Q.   Sure.

10              MR. MOST:

11              I'm attaching as "Exhibit I" to

12          this deposition a document.

13   BY MR. MOST:

14   Q.   Do you see that this document is entitled

15        "Answers and Objections to Plaintiff's

16        First Set of Interrogatories" in Humphrey

17        v. LeBlanc, Ms. Gueho?

18   A.   Yes.

19   Q.   Is this the other document you reviewed in

20        part prior to this deposition?

21   A.   Yes.

22   Q.   Okay.  Were there any other documents you

23        reviewed to prepare for this deposition

24        other than these two documents we've just

25        looked at?

1    A.    Nope.

2    Q.    Okay.  Did you talk to anybody aside from

3          your lawyer to prepare for today's

4          deposition?

5    A.    No.

6    Q.    Did you take any notes to prepare for

7          today's deposition?

8    A.    No.

9    Q.    Okay.  Ms. Gueho, do you see this document

10         which I'm sharing on my screen, which we're

11         labeling as "Exhibit J," and it's entitled,

12         "Notice of 30(b)(6) Deposition"?

13   A.    Yes.

14   Q.    Okay.  Do you see that on Pages 2 to 3 it

15         lists 11 deposition topics?

16   A.    Yes.

17   Q.    Okay.  Have you reviewed these deposition

18         topics at some point?

19   A.    No.

20   Q.    Okay.  Okay.  Had you ever seen this

21         document before or one that looks like it?

22   A.    I don't think so.

23   Q.    Okay.

24   A.    If they sent it to me, I forgot to look at

25         it.  I apologize.

1    Q.   That's okay.  There's substantial overlap

2         between this and -- and our prior

3         deposition, so you may -- that may be just

4         fine.  I'm going to run through these

5         topics and requests real quickly, and then

6         I will ask you whether you're prepared to

7         testify today about these topics.  Topic

8         No. 1 is, "The DOC's process of overwriting

9         the database used to generate the February

10        2019 'pull' document and what would be

11        necessary to preserve that data."  Are you

12        prepared to testify today about this topic?

13                  MR. BLANCHFIELD:

14                  For the record, we -- we have

15             filed a written objection to -- to

16             the Notice, and I don't mean -- I

17             don't want to make an objection to

18             each of the categories.  Maybe we

19             can just attach the objections.

20             MR. MOST:

21             Yeah.

22             MR. BLANCHFIELD:

23                  For instance, we -- we object to

24             the term "overwriting."  I don't

25             want to interrupt you, William, but

```
 1                let's just agree that we'll attach
 2                our objections so the record is
 3                complete.
 4                     MR. MOST:
 5                     Yeah, I -- I will.  That's fine
 6                with me.  I'll include these.  I'm
 7                putting in the dropbox as "Exhibit
 8                I" is the Department of Public
 9                Safety's Response and Objections to
10                the deposition topics, and I will
11                agree with you that all those
12                objections are considered raised
13                during this deposition.
14                     MR. BLANCHFIELD:
15                     Okay.  Thank you.
16     BY MR. MOST:
17     Q.   All right.  Ms. Gueho, are -- are you
18          prepared to testify about Topic No. 1?
19     A.   Yes.
20     Q.   Topic No. 2 is, "The DOC's data underlying
21          the February 2019 'pull' document."  Are
22          you prepared to testify about that topic?
23     A.   Yes.
24     Q.   Topic No. 3 is, "The steps necessary to
25          take the DOC's raw data and turn it into
```

| 1 | | the February 2019 'pull' document."  Are |
|---|---|---|
| 2 | | you prepared to testify about that topic? |
| 3 | A. | Yes. |
| 4 | Q. | Topic 4 is, "The steps necessary to take |
| 5 | | the DOC's raw data and turn it into a |
| 6 | | document like the February 2019 'pull' |
| 7 | | document, but for a different month."  Are |
| 8 | | you prepared to testify about that topic? |
| 9 | A. | Yes. |
| 10 | Q. | And I'll speak quickly since you're reading |
| 11 | | along, but tell me to slow down or stop if |
| 12 | | -- if you need me to.  Topic No. 5 is, |
| 13 | | "Whether or not the DOC's data underlying |
| 14 | | the February 2019 'pull' document is |
| 15 | | overwritten or made more difficult to |
| 16 | | compile as time goes on."  Are you prepared |
| 17 | | to testify about that topic? |
| 18 | A. | Yes. |
| 19 | Q. | Topic No. 6 is, "How the data underlying |
| 20 | | the February 2019 'pull' document is |
| 21 | | stored, how it might be preserved, and how |
| 22 | | it might be conveyed to a third party." |
| 23 | | Are you prepared to testify about that |
| 24 | | topic? |
| 25 | A. | Yes. |

```
 1    Q.   Topic No. 7 is, "Other pull documents that
 2         have been generated, even if using criteria
 3         not identical to the February 2019 'pull'
 4         document."  Are you prepared today to
 5         testify about that topic?
 6    A.   Yes.
 7    Q.   Topic No. 8 is, "The meaning of each of the
 8         columns of the February 2019 'pull'
 9         document and where the data in that column
10         is sourced from."  Are you prepared to
11         testify today about that topic?
12    A.   Yes.
13    Q.   Topic No. 9 is, "The criteria for inclusion
14         of inmates in the February 2019 'pull'
15         document."  Are you prepared to testify
16         today about that topic?
17    A.   Yes.
18    Q.   Topic No. 10 is, "Who requested the
19         generation of the February 2019 'pull'
20         document and for what purpose."  Are you
21         prepared to testify today about that topic?
22    A.   Yes.
23    Q.   Topic No. 11 is, "The overall meaning of
24         the February 2019 'pull' document (E.g,
25         Vining's statement that it shows persons
```

```
 1         held 'after a judge ordered them free'.)"
 2         Are you prepared to testify today about
 3         that topic?
 4    A.   Yes.
 5    Q.   Great.  And have -- Ms.Gueho, have you
 6         brought any documents today to this
 7         deposition?
 8    A.   No.
 9    Q.   Okay, and you mentioned that you understood
10         that this was for the Humphrey case, this
11         deposition?
12    A.   Yes.
13    Q.   Could you give me your -- your big picture
14         sense of what the Humphrey case is.
15    A.   Another case involving an offender who got
16         over-detained.
17    Q.   Okay.  Melanie, did you say your job title
18         is Director of Data Research?
19    A.   Yes, in civil service, though, it's -- what
20         is it?  Business analyst, yeah.
21    Q.   Okay.  So your title is Director of Data
22         Research, and it may b classified as a
23         business analyst for civil service
24         purposes.  Is that accurate?
25    A.   Yes.
```

```
 1   Q.   Okay, and in terms of your educational and
 2        professional background, I understand you
 3        have a Bachelors in Business Management,
 4        and you've worked at the DOC since about
 5        four months after college.  Is that
 6        correct?
 7   A.   Yes.
 8   Q.   Okay, and the following is a question I ask
 9        of everybody.  It's not specific to you,
10        but have you ever been arrested?
11   A.   Yes.
12   Q.   Okay, and what was your arrest for?
13                 MR. BLANCHFIELD:
14                 Hold it.  Let -- let -- let me go
15            off the record.  I'm not sure you're
16            entitled to this information.
17                 (Off the record.)
18                 MR. MOST:
19                 Can we go back on the record,
20            Raynel.
21                 MR. BLANCHFIELD:
22                 Yes.
23   BY MR. MOST:
24   Q.   Okay.  Ms. Gueho, have you been arrested
25        since February 3rd of this year, 2020?
```

```
 1   A.    No.
 2   Q.    Okay.  Ms. Gueho, could you describe for us
 3         briefly what your job responsibilities are
 4         as the Director of Data Research.
 5   A.    To oversee any and -- what do you call it
 6         -- to oversee any modifications,
 7         enhancements to our systems, to create the
 8         statistics and data for the Department of
 9         Corrections and to work on any new systems
10         technology for the Department of
11         Corrections.
12   Q.    Okay, and who do you report to at the
13         Department of Corrections?
14   A.    Angela Whittaker.
15   Q.    And who does Ms. Whittaker report to?
16   A.    Secretary James LeBlanc.
17   Q.    Has your job responsibilities changed since
18         February 3rd, 2020?
19   A.    No.
20   Q.    Has -- has your reporting structure of who
21         you report to changed since February 3rd of
22         2020?
23   A.    No.
24   Q.    Has anything really substantial about your
25         job changed since February 3rd of 2020?
```

1  A.    No.

2  Q.    Okay, and the reason why I'm asking you

3        about February 3rd, 2020, is you were

4        deposed on that date.  Do you remember you

5        and I had a deposition on February 3rd,

6        2020?

7  A.    I remember the deposition, but no, I didn't

8        remember the exact date.

9  Q.    Sure.  You remember that you and I had a

10        deposition earlier this year.  Is that

11        fair?

12  A.    Yes.

13  Q.    Okay, and you've seen the transcript of

14        that deposition, which we just looked at

15        and identified as "Exhibit C."  Is that

16        correct?

17  A.    Yes.

18  Q.    Okay.  Have you read that deposition

19        transcript?

20  A.    I -- yeah, I skimmed it.  I wouldn't say I

21        read the whole thing, but yes, I read it.

22  Q.    Had you seen that deposition transcript

23        prior to today?

24  A.    I skimmed it when we originally had this

25        date set about, what, a month ago, couple

```
 1         of weeks ago, yes.
 2    Q.   Okay, and had you looked at it prior to
 3         that?
 4    A.   No.
 5    Q.   Okay.  When you reviewed the deposition
 6         transcript of February 3rd, 2020, did you
 7         see any mistakes in it?
 8    A.   No.
 9    Q.   Okay.  Did you truthfully answer my
10         questions at that deposition?
11    A.   Yes.
12    Q.   Okay.  Did you after that deposition maybe
13         later remember that you misspoke or got
14         anything wrong in that deposition?
15    A.   No.
16    Q.   So we can rely in this case on the answers
17         in that deposition, correct?
18    A.   Yes.
19    Q.   And so your answers to questions in that
20         deposition is also your testimony in this
21         case as well, correct?
22    A.   I would say yes if it's the same questions.
23    Q.   Yeah, and that's going to make today much
24         easier.  Thank you.  Okay.  I'm going to
25         pull up a document that was attached to the
```

1       Deposition Notice as "Exhibit A" which I'm
2       attaching to this deposition and labeling
3       as "Exhibit A."  Do you see this document,
4       Ms. Gueho?
5   A.  Yes.
6   Q.  Does this appear to you to be a PDF version
7       of an Excel spreadsheet that you created?
8   A.  Yes.
9   Q.  And have you heard the phrase, "February
10      2019 pull document" before?
11  A.  Yes.
12  Q.  Okay, and is this one version of the
13      document that you've heard described as the
14      February 2019 pull document?
15  A.  Yes.
16  Q.  Okay.  I'm going to label as "Exhibit D"
17      for this deposition an Excel spread sheet.
18      Do you see this Excel spread sheet, Ms.
19      Gueho?
20  A.  Yes.
21  Q.  Is this another version, an Excel version
22      of what you called the February 2019 pull
23      document?
24  A.  Yes.
25  Q.  I'm now showing what we've labeled as

1      "Exhibit E," which is a .txt document.  Is

2      this another version in a txt form of what

3      we've refer to as the February 2019 pull

4      document?

5   A.   Yes.

6   Q.   Okay, and this version has -- has all the

7      data from one of tabs of the Excel spread

8      sheet with the exception that the names are

9      redacted, correct?

10  A.   Yes.

11  Q.   And this document is a list of 231 DOC

12      inmates and then at the end, it says, "Day

13      Over Average 44.688311688," correct?

14  A.   Yes.

15  Q.   Okay, great.  And so will you understand me

16      if I refer to the February 2019 pull

17      document, I mean the document that is

18      reflected in three different forms that

19      we've just looked at.  Will you understand

20      that?

21  A.   Yes.

22  Q.   Is that what you mean if you refer to the

23      February 2019 pull document?

24  A.   Yes.

25  Q.   Is there any other form of the February

1       2019 pull document that we haven't looked

2       at here?

3   A.   No.

4   Q.   Okay.  So Topic No. 1 for today is, "The

5       DOC's process of overwriting the database

6       used to generate the February 2019 'pull'

7       document, and what would be necessary to

8       preserve that data," and you're prepare to

9       talk about that today, right?

10  A.   Yes.

11  Q.   Okay.  The February 2019 pull document

12      contains data drawn from the DOC's Cajun

13      system, correct?

14  A.   Yes.

15  Q.   And Cajun is an electronic data management

16      system?

17  A.   Yes.

18  Q.   And Cajun is a somewhat older system.  It's

19      from the '70s or '80s?

20  A.   Yes, sir.

21  Q.   Okay, and so for a particular inmate if

22      they have new data coming in about that --

23      that inmate, often old data will be

24      overwritten by that new data.  Is that

25      correct?

30

```
1   A.   I prefer to use the term updated.

2   Q.   Okay.

3   A.   It's updated with whatever new case

4        information or docket information comes

5        through, yes.

6   Q.   So there might be a -- a particular spot

7        that a piece of data would be for a given

8        inmate, and if there's new information,

9        that old data point will be updated with

10       the new data.  Is that correct?

11  A.   Correct.

12  Q.   Okay, and -- and you used the word updated.

13       I use the word overwritten.  Is there a

14       meaningful difference between those words

15       in your mind?

16  A.   No.  It's just how I like to think about

17       it.  I don't know.  It's updated, because

18       the data is still there.  It's just there

19       in other forms.

20  Q.   Okay.  So I'm not wrong to say it's

21       overwritten, but you just -- you just

22       prefer to use the word updated instead.  Is

23       that correct?

24  A.   Correct.

25  Q.   Okay, and when you say the data isn't lost;
```

31

1          it's still there in others forms, you mean

2          it's -- it might not still be in Cajun, but

3          it would be in some other form in some

4          other system.  Is that what you mean?

5     A.   Yes.

6     Q.   Okay.  Because that data that has been

7          updated in Cajun, the old data is no longer

8          in Cajun, correct?

9     A.   Yes.

10    Q.   And over time more and more data in Cajun

11         is updated or overwritten because new data

12         comes in, correct?

13    A.   Yes.

14    Q.   And that's why the more time that goes by,

15         the less you can rely on Cajun to generate

16         an accurate pull document for a given month

17         in the past.  Is that correct?

18    A.   Correct.

19    Q.   So talk about the ways that that data is

20         perhaps preserved in other forms.  My

21         understanding is that one way that some

22         Cajun data is preserved in other forms is

23         that Cajun screens are printed out, and

24         then those printouts are scanned into and

25         Oracle system.  Is that right?

1    A.    Yes.

2    Q.    And those scans once they are in Oracle,

3          they're not searchable, right?  You can't

4          search by name or by number because it's

5          just scanned copies of paper.  Is that

6          right?

7    A.    Well, I don't actually use Oracle, so I'm

8          not sure, but I thought you could search it

9          by DOC number.

10   Q.    Okay.  Do you know what OCRing is?

11   A.    No.

12   Q.    Okay.  Optical character recognition, is

13         that a phrase you've heard?

14   A.    Yes.

15   Q.    Okay.  So sometimes when a computer scans a

16         piece of paper, it will sort of recognize

17         the words and turn that into text, right?

18   A.    Yes.

19   Q.    And that's -- that's called optical

20         character recognition?

21   A.    Yes.

22   Q.    And the DOC's system of scanning into

23         Oracle does not do that, correct?

24   A.    Again, I'm not really for -- familiar with

25         Oracle and how it works.  That's one of the

1              systems that I do not oversee for the

2              Department.  That is more OTS related so

3              I'm not really comfortable speaking in

4              detail on how Oracle actually works.

5         Q.   Okay.  You are able to create a pull

6              document from Cajun, right?  You've done

7              that in the past?

8         A.   Yes.

9         Q.   You would not be able to create a pull

10             document from the Oracle scanned papers,

11             correct?

12        A.   Correct.

13        Q.   If you wanted to populate the equivalent of

14             a pull document for a given period of time

15             using the Oracle scanned paper, it would be

16             enormously laborious, correct?

17        A.   Yes, it would be manual basically.

18        Q.   You'd need a whole team of people looking

19             through hundreds if not thousands if not

20             tens of thousands of pages of documents to

21             find the information needed to populate a

22             pull document?

23        A.   Correct.

24        Q.   Are there other ways that the data in Cajun

25             that may be updated or overwritten is

```
1        preserved other than through the Oracle
2        paper scanning process?
3   A.   So can I ask a question?
4   Q.   Please do.  Actually, I'm sorry.  You can
5        ask me a question.  You can't really ask
6        your lawyer.
7   A.   I can't ask him a question?
8   Q.   Yeah, I'm -- I'm sorry.  If you have a
9        question, you can say it out loud so that
10       we can hear it and --
11  A.   Okay.
12  Q.   -- we can assess how to deal with it, how
13       about that?
14  A.   Okay.
15                  MR. BLANCHFIELD:
16                  Her question, William, was
17              whether that would include any
18              backups of information just so you
19              know.
20                  MR. MOST:
21                  Okay, yeah, yeah.
22                  THE WITNESS:
23                  So, I mean, then yeah, I mean, if
24              we have backups of data, then you
25              can get it from there, but no -- yes
```

```
 1              and no I guess is the answer to your
 2              question.
 3    BY MR. MOST:
 4    Q.   Okay, perfect.  So I want to ask you about
 5         those backups.  Okay.  So does the DOC keep
 6         backups of its Cajun data?
 7    A.   OTS is supposed to keep backups of the data
 8         for us.
 9    Q.   Okay.  OTS, that's the Office of Technology
10         Services?
11    A.   Correct.
12    Q.   That's a State agency that provides
13         technology services to all sorts of
14         agencies within the Louisiana State
15         government?
16    A.   Yes.
17    Q.   Okay.  When you said OTS is supposed to
18         back up Cajun data, does OTS back up Cajun
19         data?
20    A.   Yes, now.
21    Q.   Okay.  Okay.  When did OTS begin backing up
22         Cajun data?
23    A.   I don't really know.  I mean, they've been
24         backing it up, but we discovered that there
25         was an issue over this last year of
```

```
 1          backups, but that has now been corrected.
 2     Q.   Okay.  So OTS has been backing up Cajun for
 3          -- for many years?
 4     A.   I would have give -- I guess I'd have to
 5          say when OTS was created, and I don't
 6          really remember when we created an Office
 7          of Technology Service, so several years
 8          now.
 9     Q.   Okay.  So OTS has been backing up Cajun
10          data since OTS was created.  Is that
11          correct?
12     A.   Correct.
13     Q.   Was any entity backing up Cajun data prior
14          to the creation of OTS?
15     A.   The Department of Corrections.
16     Q.   Okay, and how was the Department of
17          Corrections backing up Cajun data prior to
18          the creation of OTS?
19     A.   In the same way that OTS' protocols or do
20          it now.
21     Q.   Okay, and -- and what is that method of
22          backing up Cajun data?
23     A.   Oh, shoot, I don't remember.  I don't know.
24          I think it's once a month, and then it's
25          only kept for I want to say three years.  I
```

37

```
 1          think so, yeah.
 2   Q.    When we say, "backing up" is -- is, like,
 3          all of the data on Cajun downloaded in some
 4          form?
 5   A.    Yes.  It's a complete copy of it from what
 6          I understand.
 7   Q.    Okay, and then where does that complete
 8          copy go?
 9   A.    On a server on OTS.
10   Q.    And is that the way it was done before OTC
11          was created as well?
12   A.    Yes.
13   Q.    Okay.  So before OTS was created, once a
14          month the DOC would download and save a
15          complete copy of Cajun once a month, and
16          that was preserved for three years.  Is
17          that right?
18   A.    Yes, but now that you're saying it that
19          way, it's every day for a month, and then a
20          month is stored off for three years.  I
21          think that's the way it goes.
22   Q.    Okay.  I don't totally understand.  You
23          said what happens every day?
24   A.    It's a backup every day, but that day is
25          only good for a month, and then they store
```

```
 1          off the month for up to a year up to three
 2          years.
 3     Q.   Okay.  So there's some software that takes
 4          sort of a snapshot of Cajun every day and
 5          then bundles one month of days into some
 6          sort of a file, and then that file is saved
 7          for three years.  Is that what you're
 8          saying?
 9     A.   Yes, and but I would to say to get more
10          specific, you'd have to talk to OTS,
11          because that's the extent of my knowledge
12          of it.
13     Q.   Okay.  So with the -- setting aside the
14          issue of there was a problem, OTS should
15          have somewhere a set of documents that's
16          Cajun from this month, Cajun from the next
17          month, Cajun from the next month.  Is that
18          correct?
19     A.   Correct.
20     Q.   Okay.  Do you know what file format those
21          Cajun snapshots are in?
22     A.   No.
23     Q.   Do you know how big those files are?  Like,
24          are they ten megabytes, a hundred
25          megabytes, a gigabyte?
```

```
1   A.   No.
2   Q.   Have you ever had to restore information
3        from one of these OTS backups?
4   A.   I have never restored information, but I
5        have requested OTS to restore information,
6        but not of the whole Cajun database.  On
7        specific areas of need.
8   Q.   Okay.  So tell -- tell me about one of
9        those times.  What is a specific time you
10       did that?
11  A.   Shoot, I don't know.  More in trying to
12       figure out over time, what might have
13       occurred on a record.  So I've asked for a
14       backup in order to figure out something,
15       more doing, like, investigation-type
16       things.  I'm trying to figure out why data
17       might have changed and when it changed.
18  Q.   For a particular inmate?
19  A.   A particular -- particular inmate or a
20       particular record.
21  Q.   So the -- the idea there is that if you've
22       got a particular inmate, what you see in
23       Cajun is not going to account for
24       everything in the past, because stuff may
25       have been updated or overwritten.  So if
```

```
 1        you want to see the whole history of their
 2        Cajun record, you have to ask OTS for, you
 3        know, can you give the past information.
 4        Is that right?
 5   A.   Correct.
 6   Q.   Okay, and OTS was able to do that for you?
 7   A.   Yes.
 8   Q.   When you make a request like that, how
 9        quickly are they able to -- to get the
10        answers to you?
11   A.   Normally a couple of days.
12   Q.   Okay.  In what format do you get those
13        answers in?  Do they send you Excel spread
14        sheets?  Do they send you just an email
15        with the answers?  How does it get to you?
16   A.   They put it in a section of Cajun so I can
17        go and look at it.  So it's in the -- Cajun
18        is stored in writs.  They'll carve out some
19        writs to throw those -- that data in,
20        because I normally only ask about one
21        particular writ or -- or so.
22   Q.   Okay.  So -- so we talked earlier about how
23        the further back in time you go if you were
24        to asked to create a pull document for that
25        month, the less confidence that you would
```

41

1      have that it's completely accurate because
2      information has been overwritten or
3      updated, correct?
4  A.   Yes.
5  Q.   Could you -- let's say you were asked to
6      create a pull document like the February
7      2019 pull document for a month from a year
8      ago, would you be able to ask OTS to
9      restore the data to allow you to do that?
10 A.   Yes and no, because only certain days are
11     stored off, and again, when you have that
12     data at what point in time.  So it would
13     have to be restoring data over points of
14     time in order to get it all, and then I'm
15     not sure if you'd still get it all.
16 Q.   So when you say, only certain days are --
17     are recorded, what do you mean?
18 A.   Well, like, I was saying earlier, they keep
19     each day for a month, and then after that,
20     they only serve off one day and then one
21     year for up to three years.
22 Q.   Okay.  So OTS takes a snapshot every day
23     for a month, and then they only save one of
24     those day's snapshots?
25 A.   Yes.

1    Q.    Okay.  Do they, what, take the last day of

2          the month, the first day of the month or --

3    A.    I'm not really sure if it's the last or the

4          first.  We'd have to ask OTS that question.

5    Q.    What's the point of taking snapshots every

6          day and only saving one of these days?  Is

7          there a reason for that process?

8    A.    I would say time -- I mean, space probably,

9          but I don't know.  We'd have to decide on,

10         you know, why we decided that was -- you

11         know, I don't know.

12   Q.    It just seems like a weird process to me,

13         and so I didn't know --

14   A.    Well, the --

15   Q.    -- if there was a reason for it.

16   A.    -- the backup is scheduled to take every

17         month, and so when you get to the first of

18         the next month, then it writes over the --

19         the backup then because it's decided that

20         we have one day for each month, and it's

21         only needed for that month, and then a

22         month is stored off and then a year.  So

23         basically, the way the backup schedule is

24         set, it's, like, over -- once you get back

25         to the first of the next month, then it's

1        basically copying over that first month --
2        first day of the previous month.  You know,
3        it's like a routine.
4   Q.   I see.  So what OTS has is -- setting aside
5        the -- the problem that they had, is
6        monthly snapshots of one day from each
7        month.  So one day from January, one day
8        from February, one day from March and so
9        on.  Is that correct?
10  A.   Yes, yes.
11  Q.   Okay, and those snapshots are fairly
12       accurate because they would be accurate for
13       anything except any updating or overwriting
14       that happened in the last 30 or 31 days,
15       correct?
16  A.   Correct.
17  Q.   Okay.  So if you wanted to create a pull
18       document like the February 2019 pull
19       document a month, say, a year ago, the most
20       accurate way you could do it would be to
21       ask OTS to restore that month's snapshot
22       and then use that data.  Is that correct?
23  A.   Yes.
24  Q.   Okay, and is that something that OTS would
25       be able to do if you asked them to?

```
1    A.    Yes and no.  If they have the data.

2    Q.    What is the yes part?

3    A.    Well, if they have the data, then I would

4          say yes.  They would have to stand up

5          though probably a section of Cajun in order

6          to do it, because like I said, I've never

7          asked them to do a whole thing of Cajun.  I

8          normally just ask for a particular writ or

9          two.  So we'd have to ask OTS, but I'm

10         sure, yes, they'd have to stand up a --

11         basically a separate instance of Cajun

12         probably.

13   Q.    Yeah.  So long as it's not one of the

14         months that it has been lost, your

15         expectation is that they'd be able to do

16         that, correct?

17   A.    Yes.

18   Q.    And then you'd be able create a pull

19         document for that month like the February

20         2019 pull document?

21   A.    Yes.

22   Q.    Okay.  Do you know if these OTS files are

23         such that you could put them on a thumb

24         drive and give them to someone?

25   A.    No, I don't know.
```

1    Q.    Okay.  Who's the person at OTS who knows

2          the most about this Cajun backup system?

3    A.    I would say Charles Warren.

4    Q.    Okay.  I'm sharing what we've labeled as

5          "Exhibit I," which is -- these are some of

6          the Answers to Interrogatories that you

7          reviewed before this deposition, correct?

8           I can go to the top.  Let's see.

9    A.    I think I started with No. 9.

10   Q.    Okay.

11   A.    Right, I started with No. 9?   Yes.

12   Q.    Let's see.  Coming down -- coming down to

13         Page 9, there's an answer that talks about

14         it was discovered after suit was filed in

15         this matter that during the months of April

16         2019 through July 2020 no daily or monthly

17         backups of Cajun data were retained.  Is

18         that an answer that you reviewed?

19   A.    Yes.

20   Q.    Okay.  Okay.  So these Interrogatories

21         Answers say that "it was discovered after

22         suit was filed in this matter that during

23         the months of April 2019 through July 2020

24         no daily or monthly backups of Cajun data

25         were retained in the course of normal data

```
 1        retention practices."  Is this the problem
 2        that you were talking about before?
 3   A.   Yes.
 4   Q.   Okay.  Were you -- did you discover this
 5        problem?
 6   A.   No.
 7   Q.   Do you know who did discover this problem?
 8   A.   I think Charles and the OTS backup team.
 9   Q.   Okay, and did someone tell you about this
10        problem?
11   A.   Yes.  When they discovered it, they did,
12        yes.
13   Q.   Okay.  So someone at OTS reached out to you
14        and told you we haven't been keeping
15        backups for a certain number of months?
16   A.   Yes.
17   Q.   And so a little bit more than a year of
18        Cajun backups were never preserved,
19        correct?
20   A.   Yes.
21   Q.   It says here that this occurred because of
22        an error that prevented these backups from
23        being maintained by OTS.  Do you know what
24        that error was?
25   A.   No, not specifically.  I think it was
```

```
 1            something to do with the -- the backup
 2            routine or schedule, but I'm not positive.
 3     Q.     Okay.  It says, "The backup error was
 4            discovered and immediately corrected on
 5            July 29, 2020."  Is that your
 6            understanding?
 7     A.     Yes.
 8     Q.     And now we're back to normal.  So the --
 9            the backup system is now keeping monthly
10            snapshots once again.  Is that correct?
11     A.     Yes.
12     Q.     And is it your understanding that the
13            backups were working well and according to
14            protocol up until April 2019?
15     A.     Yes.
16     Q.     So you don't know what the error was that
17            led to this problem, correct?
18     A.     Correct.
19     Q.     And so you don't know whether it will
20            happen again in the future or not, correct?
21     A.     Correct.  I guess anything can happen.
22     Q.     Sure.  Without knowing what the error is,
23            you can't have any confidence that it won't
24            happen again, correct?
25                     MR. BLANCHFIELD:
```

```
 1                    Object to form of your question.
 2               And -- and look, look, I'm letting
 3               you ask her these questions which
 4               are clearly beyond the scope of your
 5               30(b)(6) Notice and clearly would be
 6               better addressed to OTS.  So to the
 7               extent she knows stuff, I'm going to
 8               let her answer, William.
 9               MR. MOST:
10               Okay.
11   BY MR. MOST:
12   Q.   Do you want me to re-ask the question, Ms.
13        Gueho?
14   A.   Yes.
15   Q.   Without knowing the source of the error
16        that led to the loss of these backups, you
17        can't have any confidence that it won't
18        happen again, correct?
19   A.   Correct.
20   Q.   Okay.  So these backups have been lost, and
21        so if you wanted to create pull documents
22        for the months between April 2019 and July
23        2020, you'd be able to create those pull
24        documents although there might be the issue
25        that some of them -- some of the data in
```

49

1       those pull documents has been overwritten

2       or updated with other data.  Is that

3       correct?

4   A.   Yes.

5   Q.   Okay.  Another way that some Cajun data

6       could be preserved as an alternative would

7       be for you to create pull documents every

8       month or every other month or some period

9       of time for specific sets of data.  Is that

10      correct?

11  A.   Can you repeat that.

12  Q.   Sure.  So one way that information in Cajun

13      is preserved is through printing, scanning

14      it into Oracle, right?

15  A.   Yes.

16  Q.   Another way is that OTS does monthly

17      snapshots, correct?

18  A.   Yes.

19  Q.   And then another way that data could be

20      preserved would be for you to create pull

21      documents once a month and save them as

22      Excel files, correct?

23  A.   Yes.

24  Q.   And so I just want to run through quickly

25      my understanding of how you create pull

1       documents based on our prior deposition.

2       So my understanding is to create the

3       February 2019 pull document, first, you

4       searched Cajun for people released in

5       February 2019; then you added in data from

6       other areas of Cajun; then you whittled

7       that down to people whose time comp was

8       ready within a week prior to their release,

9       and then you outputted that into a txt

10      file.  Is that correct?

11  A.  Yes.

12  Q.  And then you imported data from that txt

13      into an Excel spread sheet, correct?

14  A.  Yes.

15  Q.  Is that a fairly complete summary of how

16      you created the -- the February 2019 pull

17      document?

18  A.  Yes, that's a fairly complete summary.

19  Q.  Okay.

20  A.  But it's not as quickly as -- as you said

21      it.

22  Q.  Sure, right, right.  I said that in maybe

23      15 seconds, but it took you about a day,

24      correct?

25  A.  Yes.

| | | |
|---|---|---|
| 1 | Q. | Okay, and -- and you testified before that |
| 2 | | to create a pull document like the February |
| 3 | | 2019 one but for the most recent month, it |
| 4 | | would probably take one person, |
| 5 | | specifically you, about eight hours to |
| 6 | | generate that document, correct? |
| 7 | A. | Yes. |
| 8 | Q. | And let's say you were asked to create a |
| 9 | | pull document like the February 2019 pull |
| 10 | | document for the two most recent months, |
| 11 | | would that also take you about eight hours? |
| 12 | A. | Yes. |
| 13 | Q. | Okay. Because doing it for two months |
| 14 | | rather than for one month doesn't double |
| 15 | | the length of time it takes you to create |
| 16 | | the pull document, correct? |
| 17 | A. | Well, yes and no. It would expand the |
| 18 | | amount of data being pulled, so it would |
| 19 | | expand the -- the time that I take to |
| 20 | | review the different steps and check the |
| 21 | | data, so, yes. |
| 22 | Q. | So it might take a little bit longer, but |
| 23 | | it's going to take twice as long to do two |
| 24 | | months as opposed to one month, correct? |
| 25 | A. | I prefer to do things monthly when I -- |

1        when doing things that tedious --
2   Q.   Huh-huh.
3   A.   -- just so I don't end up getting a guy
4        that released twice and mixing his data up.
5        So it would be easier for me to do it one
6        month at a time.  I don't really like doing
7        it for long periods at a time because of
8        the ins and outs of people and making sure
9        I'm matching the data right.  I have less
10       errors if I shorten the timeframe.
11  Q.   Okay.  So if you were asked to --
12  A.   Unless --
13  Q.   Okay.  Go -- you can finish your statement.
14  A.   Oh, I was going to say unless to review one
15       at a time, you know.
16  Q.   Okay.  So if you were asked to do a pull
17       document for two months, you could do it,
18       and it would take you a little bit more
19       than eight hours, but not double eight
20       hours, but you prefer to do it one month at
21       a time.  Is that a fair summary?
22  A.   Yeah, I'd probably say a day and a half
23       instead of -- yeah.
24  Q.   Okay, and would it be quicker, would it
25       save you time if the only columns we needed

```
 1        for a pull document were release date, raw
 2        GPTS date, and admit date?
 3   A.   Name those three columns again.
 4   Q.   Sure.  Release date, raw GTPS date, and
 5        admit date.
 6   A.   So the raw GTPS date is the trickier one
 7        out of those three so -- and then admission
 8        date -- I mean, it's not going to take the
 9        full eight hours if you're just looking for
10        those three columns, but it's going to take
11        a good portion of the day.
12   Q.   Okay.  When you say, "good portion," do you
13        mean half the day?
14   A.   Yes.
15   Q.   Okay, and let's say someone wanted a pull
16        document for a full year, but just those
17        three categories, do you have a sense of
18        how long that might take you?
19   A.   No.  I mean, no, not without actually doing
20        it.
21   Q.   Yeah.
22   A.   I don't want to estimate.  I always hate
23        estimating how long it's going to take me
24        to do something in Cajun because I usually
25        underestimate myself and end up working on
```

1    it longer than it actually takes me.

2  Q.   I understand.  You like to do it month by

3       month.  So if there's 12 months, and it

4       takes about half a day for each, that might

5       take you six full days approximately.

6       Would that be a fair estimate?

7  A.   Yes.

8  Q.   Okay.  So raw GTPS -- go ahead.

9  A.   No.  Go ahead.

10 Q.   Okay.  Raw GTPS date is -- my understanding

11      is that it's an inmate's mathematically

12      correct release date not accounting for

13      CTRP credit and time lost due to

14      misbehavior.  Is that correct?

15 A.   Yes.

16 Q.   Okay.  Raw GTPS does include jail credit

17      and statutory good time credit.  Is that

18      right?

19 A.   Yes.

20 Q.   Okay.  So the raw GTPS date is the data

21      point we look at to find out the date an

22      inmate's sentence is complete, not

23      accounting for lost of good time or CPTR --

24      CTRP credit, correct?

25 A.   Yes.

```
 1   Q.   Okay.  An admit date is the date of an
 2        inmate's sentencing, correct?
 3                  MR. BLANCHFIELD:
 4                  I'm sorry.  Could you -- could
 5              you repeat that.  I missed that.
 6                  MR. MOST:
 7                  Sure.
 8   BY MR. MOST:
 9   Q.   Admit date is the date of an inmate's
10        sentencing, correct?
11   A.   Not always.
12   Q.   Okay.  But most of the time?
13   A.   Generally the admission date for DOC and
14        the sentence date match, but in some cases
15        it doesn't.
16   Q.   Under what circumstances would it not
17        match?
18   A.   I don't really know the reasons why it
19        never matches.  We'd have to check with
20        pre-class or the court system.  I think
21        sometimes the sentence comes to report on a
22        certain date, but again, that's something
23        legal and our pre-class would probably know
24        better than I do.
25   Q.   Okay, but at least you know that for most
```

1      inmates their admit date matches the date

2      of their sentencing, correct, with some

3      exceptions?

4  A.    Yeah, and or revocation date.

5  Q.    Okay.  So there in the case of a parole

6      revocation, most inmates' admit date will

7      be the date of the revocation?

8  A.    Correct.

9  Q.    And for most inmates who are newly

10      sentenced, their admit date will be the

11      date of their sentencing with some

12      exceptions, correct?

13  A.    Correct.

14  Q.    Okay.  So if you wanted to find inmates who

15      were entitled to release at the time of

16      their sentencing, you would look for

17      inmates whose GTPS date is the same as or

18      earlier than their admit date, correct?

19  A.    Say that again.

20  Q.    Sure.  So let's say you wanted to find as

21      many DOC inmates as possible whose sentence

22      was complete on the day of their

23      sentencing, right?  Let's say that was the

24      task, okay?

25  A.    Okay.

```
 1   Q.   The way you could do that is to look for
 2        inmates whose raw GTPS date is the same as
 3        or earlier than their admit date, correct?
 4   A.   Yes.
 5   Q.   And so searching for that would find you
 6        most of the inmates who meet that criteria
 7        setting aside some exceptions that we
 8        talked about before, correct?
 9   A.   Yes.
10   Q.   Okay.  So let's say you wanted to find
11        within that group inmates who were released
12        by the DOC more than 48 hours after the
13        time they were sentenced, you would then
14        also need their release date, correct?
15   A.   Yes.
16   Q.   Okay.  So with those three pieces of data,
17        raw GTPS date, release date, and admit
18        date, you could find most of the inmates
19        whose sentence was complete at the time of
20        their sentencing, but who were released
21        more than 48 hours later, correct?
22   A.   Yes.
23   Q.   Okay, and if we also wanted to know how
24        much of that time was after the DOC
25        received the inmate's paperwork, the
```

58

1        additional data point we'd need is pre-
2        class received, correct?
3    A.    Yes.
4    Q.    Okay, great.  Does Cajun note anywhere
5        whether someone has a parole hold, an ICE
6        detainer, a warrant, or any other kind of
7        hold?
8    A.    We do have detainer area in Cajun, yes, but
9        I don't know if it has all detainers, but
10       yes.  If we're aware of the detainer,
11       there's a place to update that in Cajun.
12   Q.    So it's like, it says, yes, no or
13       something?
14   A.    Yes.
15   Q.    Okay.  Do you remember what that's called,
16       what the -- the name of that field is?
17   A.    I think it's just detainer flag.
18   Q.    Okay, and so if an inmate has a detainer
19       flag yes, that means that there's some kind
20       of detainer on them whenever the --
21   A.    Yes.
22   Q.    -- DOC employee input that information?
23   A.    Yes.
24   Q.    Okay, and when you create a pull document,
25       you're not creating any new data; you're

```
 1         just pulling data from different places in
 2         Cajun and assembling it into one document.
 3         Is that correct?
 4    A.   Correct.
 5    Q.   And the reason you have to assemble it into
 6         a pull document is because there's no
 7         screen you can just call up that
 8         information on by pressing a button, right?
 9    A.   Correct.
10    Q.   It would be nice if there were, right?
11    A.   Correct.
12    Q.   Okay.  So the -- the February pull -- the
13         February 2019 pull document, you created
14         that document at the request of Secretary
15         LeBlanc.  Is that right?
16    A.   No.  That's the one that I created on my
17         own because we were trying to do the grant
18         and --
19    Q.   Okay.
20    A.   -- we were trying to put some data points
21         in the grant that would help us get the
22         grant, and so I created that document on my
23         own to figure out some of those data
24         points.
25    Q.   Okay.  So you had a team of people at DOC
```

```
 1           headquarters that was applying for a grant
 2           with the U.S. Department of Justice, right?
 3    A.    Correct.
 4    Q.    This was in early 2109?
 5    A.    Yes.
 6    Q.    Okay, and what -- what was the problem that
 7           the grant was seeking to solve?
 8    A.    We wanted a system to have a way to get the
 9           documents to us, better method than they're
10           currently being provided to us from all 64
11           parish clerks of court or however the
12           courts are broken down because there's no
13           one system that connects all those.  So
14           everybody has their own system or different
15           way of doing things.  So we were trying to
16           create or get a mechanism that would
17           streamline that and consolidate that.
18    Q.    Okay, and one of the problems was that was
19           causing inmates to have days over, right?
20    A.    Yes.
21    Q.    Okay, and so -- and you wanted to give the
22           U.S. DOJ a sense of how many inmates were
23           having days over and how many days over
24           they were having on average, right?
25    A.    Yes.
```

```
 1   Q.   And so that's why you created the February
 2        2019 pull document?
 3   A.   Yes.
 4   Q.   Okay, and then the DOC did not get that
 5        grant, correct?
 6   A.   As far -- no, we did not.
 7   Q.   Okay.  Do you know why the DOC didn't get
 8        the grant?
 9   A.   No.
10   Q.   Do you know if the DOC applied for other
11        grants to solve the same problem?
12   A.   No.
13   Q.   You don't know or there weren't any other
14        grant applications?
15   A.   Not that I am aware of.
16   Q.   Okay.  So you don't know of any other grant
17        applications wherein money was sought for
18        the same -- to solve the same problem as
19        the US DOJ grant, correct?
20   A.   Correct.
21   Q.   Okay, and so as far as you know is the days
22        over issue continuing through the present?
23   A.   I would say yes.
24   Q.   Okay.  At approximately the same rate as
25        when you assessed that in the February 2019
```

1      pull document?

2   A.   I don't know if it's the same rate.  I'd

3        have to -- you know, I don't know what the

4        data looks like today.

5   Q.   Right.  But you don't know of any big

6        changes that would cause that rate to -- to

7        substantially change.  Is that correct?

8   A.   None that I'm aware of, but again, I don't

9        really work with the processes themselves.

10       I'm just the data.

11  Q.   Okay.  Has anyone ever asked you to

12       reassess the days over situation subsequent

13       to the February 2019 pull document?

14  A.   Yes.

15  Q.   Who was that?

16  A.   I don't even know.

17  Q.   I mean, was it a lawyer?

18  A.   Yes, did do one pull for this group.  I

19       don't know -- I don't know you-all name in

20       order to kind of give them example of what

21       we do, and then I think I also requests

22       from -- I don't -- I don't know if it was

23       -- I think Adult Services so that they

24       could put together some information to get

25       with the clerk of court's office and kind

```
 1          of go through some stuff with them.
 2                     MR. MOST:
 3                     Okay.  Drew, can I ask about that
 4              pull document for you or is that,
 5              like, something created for
 6              litigation purposes?
 7                     MR. BLANCHFIELD:
 8                     It's certainly privileged, and
 9              I'm not really sure what she's
10              referring to.  We've had a number of
11              these and a number of documents
12              reviewed.  Why don't maybe during a
13              break, I'll get with her and see.
14              If I can identify it --
15                     MR. MOST:
16                     Yeah.
17                     MR. BLANCHFIELD:
18                     -- I may be able to just give it
19              to you.
20                     MR. MOST:
21                     Okay, yeah, let's figure out what
22              it is, and then we can figure out
23              what to do about it.
24      BY MR. MOST:
25      Q.   Okay.  So the -- the Adult Services thing,
```

```
 1        was that about days over the way February
 2        2019 pull document was?
 3   A.   It was about the time -- the timing mainly
 4        of sentence date to pre-class received.
 5   Q.   So it was a pull document to try and assess
 6        how long it was taking for documents to get
 7        to the DOC after someone was sentenced.  Is
 8        that correct?
 9   A.   Yes.
10   Q.   Okay, and do you know roughly when you --
11        what month and year you created that pull
12        document?
13   A.   No.  I think it was early 20 -- well, what
14        -- what are we in right now, 2020?
15   Q.   We are, yes.
16   A.   COVID has kind of just taken my sense of
17        reference out of the picture so --
18   Q.   I understand.
19   A.   -- no not without going back and trying to
20        find my different emails and stuff, I'm not
21        sure of the exact month, no.
22   Q.   Okay, but -- but you've got it in an email?
23   A.   Yes.
24   Q.   And it was an Excel spread sheet?
25   A.   Yes.
```

1    Q.    Okay.

2    A.    Or a printout because sometimes if I don't

3          put it in an Excel spread sheet, I might

4          have just printed it out from my computer,

5          so either one.

6    Q.    And then you may have scanned that and put

7          it in an email?

8    A.    Email or handed it directly to Adult

9          Services.

10   Q.    Do you still have a copy of that pull

11         document somewhere?

12   A.    I don't, but I think Adult Services would,

13         yes.

14   Q.    So you must have generated -- did you

15         generate a txt document for that pull?

16   A.    Yes, in this instance I think it was a text

17         file, yes.

18   Q.    Okay.  Would you still have that text file?

19   A.    No.  I would have handed it over to Adult

20         Services.  I don't normally keep copies of

21         all the pulls I do.

22   Q.    Okay.  So you created a txt file; you

23         either printed it or emailed it, and then

24         you deleted the copy you had?

25   A.    I wouldn't say I deleted the copy I have.

```
 1        If I printed it out straight from Cajun,
 2        then it was a printout, and then it -- it
 3        goes -- it's not nothing saved.  You just
 4        --
 5   Q.   I see.
 6   A.   It's just a pull document.  You print, and
 7        then you go onto the next job, and you're
 8        not -- you know, being which this is not my
 9        full-time job, so I have other things that
10        I do, but, yeah, if I -- if I did put it in
11        an Excel file, then it's probably somewhere
12        on my computer, but again, I don't think
13        this one was.  I think this was just a text
14        file that I printed out.
15   Q.   I see.  Okay.  So sometimes doing this pull
16        document creates some sort of readout in
17        Cajun, and you can either just print it to
18        a physical printer or you can print it to a
19        txt file, and you don't recall which of
20        these you did.  Is that correct?
21   A.   Correct.
22   Q.   Okay.  Do you remember who at Adult
23        Services you gave it to?
24   A.   It would have probably been Derrick or
25        Angela, but I'm not positive.
```

```
 1   Q.   That's Derrick Ellis?

 2   A.   Yes.

 3   Q.   And Angela Griffin?

 4   A.   Yes.

 5   Q.   And if we -- if you wanted to, like, ask

 6        them for it, how would you describe it?

 7        Would you say the --

 8   A.   The document that we pulled for the clerk

 9        -- the clerk of court's information you-all

10        wanted.  I don't know.

11   Q.   Okay.  Okay, that's fine.  We'll ask them

12        for it.  I just wanted to know how to

13        describe it.  Okay.  I'm going to hand it

14        over to Eddie Keith, who's going to ask a

15        couple of more questions about any other

16        pull documents, and then we'll sort of

17        review, see if there's any final questions.

18        Mr. Blanchard may have some questions, and

19        then we'll be done.  That's the plan.

20        Sound good?

21                  MR. BLANCHFIELD:

22                  Sounds good to me.

23                  MR. MOST:

24                  Okay.  Eddie, would you like to

25                take over?
```

```
 1                    EDDIE KEITH:
 2                    Sure.
 3                    EXAMINATION
 4    BY EDDIE KEITH:
 5    Q.   Hi, Ms. Gueho.
 6    A.   Hi.
 7    Q.   So have you made any pull documents for any
 8         other grant applications besides the DOJ
 9         grant you mentioned earlier?
10    A.   No, not that I'm aware of, no.
11    Q.   And was the pull document that you also
12         mentioned earlier, the one for Adult
13         Services specifically, was it similar in
14         substance to the February 2019 pull
15         document?
16    A.   I think it was more of the timeframe from
17         sentencing to pre-class received.  I don't
18         know if it went all the way through release
19         and things like that.
20    Q.   But you were determining if people had been
21         held past their release date?
22    A.   No.  I was more determining how long it
23         took to get the paperwork to us from
24         sentence date.
25    Q.   Have you ever pulled data for immediate
```

```
 1        release dates for any project besides the
 2        February 2019 pull document?
 3   A.   The Six Sigma project.
 4   Q.   Do you still have any of those documents?
 5   A.   No, I don't have those documents, and
 6        somebody else in our group might have, but
 7        I don't have any of those documents, no.
 8   Q.   Have you ever pulled any data to determine
 9        if people remaining in custody past their
10        release date for any project other than the
11        February 2019 pull document?
12   A.   No, I don't think so.  Not -- the Six Sigma
13        project, the 2019 thing, and then no, I
14        don't think so.
15   Q.   Do you know of anyone who might have the
16        Six Sigma documents?
17   A.   I don't know.
18                  MR. BLANCHFIELD:
19                  Was this --
20                  THE WITNESS:
21                  Is that something you already
22             looked at?
23                  MR. BLANCHFIELD:
24                  Yeah.  For the record, yeah, you
25             have them.
```

```
 1                THE WITNESS:
 2                Okay.
 3                MR. BLANCHFIELD:
 4                We have them.  Everybody has
 5           them.
 6                MR. MOST:
 7                Well, for -- this is William
 8           Most.  For clarification we got the
 9           -- the PowerPoint that was the
10           result of the Six Sigma documents.
11           Eddie may be asking about sort of
12           the documents that were used to get
13           to that point I think if that's at
14           all --
15                MR. BLANCHFIELD:
16                Yeah.
17                MR. MOST:
18                -- a clarification.
19                MR. BLANCHFIELD:
20                Yeah, and so the -- as we know,
21           that project was in 2012 about eight
22           years ago.  So we are -- and we have
23           some emails coming that go back that
24           far, which may provide some
25           information on that project.  I
```

```
 1              didn't mean to interrupt.  Go ahead.
 2    BY EDDIE KEITH:
 3    Q.   What are some other kinds of pull documents
 4         that you're -- that you and your unit
 5         creates work on?
 6    A.   Well, it's mainly just me because I'm the
 7         only one that has the Cajun knowledge, the
 8         manual pulls in my section, but, I mean,
 9         any number of things.  I mean, we pull our
10         rate of admissions, our -- you know, the
11         number of sex offenders, any statutes that
12         are -- not statutes, but any time
13         legislation has come to play, we'll pull
14         stuff regarding whatever that legislation
15         is about.  It's a number of things.  It
16         just depends.  I mean, whatever is needed
17         based on data that we have available in
18         Cajun and -- and the timeframe that we can
19         do it.  I mean, it's a number of different
20         things, but mainly I'm not doing pull
21         documents all day long.  I'm doing my other
22         job.
23    Q.   So who -- who gives you instructions to
24         search for specific data or to create pull
25         documents when you are creating pull
```

```
 1          documents?
 2     A.    It depends.  It depends on who needs it.  I
 3          mean, I pull stuff for re-entry.  I pull
 4          stuff for Adult Services.  I pull something
 5          -- stuff for whoever in the department
 6          might be asking is this data available and
 7          can we get the answer to that question, and
 8          if it's a new legislation that's coming up,
 9          you know, I might pull stuff there so that
10          we can see how it would affect us one way
11          or the other and what the ramifications of
12          that legislation might be.
13     Q.   So are you ever deciding as the head of the
14          unit to take on certain projects or to do
15          certain research?
16     A.    Yes and no.  Usually I try not to take on
17          any research because I just don't have the
18          time for it.  So mainly, I'm doing whatever
19          we have to do based on what is currently
20          the situation.  Like right now, it's COVID,
21          so I'm pulling a lot of data related to
22          COVID and things like that and trying to
23          keep up with that so --
24     Q.    I think that's all for me.
25                    MR. MOST:
```

```
 1                    Okay.  Thank you, Eddie.
 2                    Drew, do you have questions?
 3                    MR. BLANCHFIELD:
 4                    No, no, I do not.  Thank you.
 5                    MR. MOST:
 6                    Okay.  Ms. Gueho, thank you very
 7            much for your time.  I appreciate
 8            it.  I always learn a lot when we
 9            talk to you, and it's really
10            helpful.  I think it's helpful to
11            all of us since you've got so much
12            information in your head, so I
13            appreciate you being willing to do
14            this once again.
15                    THE WITNESS:
16                    Thank you.
17                    MR. BLANCHFIELD:
18                    All right.  Thank you-all.  We're
19            done here.
20                    (Whereupon, the taking of the
21            witness' testimony was concluded.)
22
23
24
25
```

```
 1              C E R T I F I C A T E
 2              THIS CERTIFICATION IS VALID ONLY FOR
    A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
 3  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
    PAGE.
 4
                I, RAYNEL E. SCHULE, Certified Court
 5  Reporter, #77005, in good standing, in and for
    the State of Louisiana, as the officer before
 6  whom this testimony was taken, do hereby certify
    that MELANIE GUEHO, after having been duly sworn
 7  by me upon authority of R.S. 37:2554, did
    testify as hereinbefore set forth in the
 8  foregoing 73 pages; that this testimony was
    reported by me in stenotype reporting method,
 9  was prepared and transcribed by me or under my
    personal direction and supervision, and is a
10  true and correct transcript to the best of my
    ability and understanding; that the transcript
11  has been prepared in compliance with transcript
    format guidelines required by statute or by
12  rules of the Board, that I have acted in
    compliance with the prohibition on contractual
13  relationships, as defined by Louisiana Code of
    Civil Procedure Article 1434 and in rules and
14  advisory opinions of the Board; that I am not of
    counsel, not related to counsel or to the
15  parties herein, nor am I otherwise interested in
    the outcome of this matter.
16
17
18  _____  _____
    Date                  Raynel E. Schule, CSR
19                        Certified Shorthand Reporter
                          State of Louisiana
20
21
22
23
24
25
```