IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **Brian Humphrey**, on behalf of himself and all similarly situated individuals,<br><br>    Plaintiff,<br><br>v.<br><br>**James LeBlanc**,<br><br>    Defendant. | No. 3:20-cv-JWD-SDJ<br><br>Hon. John W. deGravelles, District Judge<br><br>Hon. Scott D. Johnson, Magistrate Judge<br><br>**Plaintiff's Motion to Compel the Production of CAJUN Data** |

# Exhibit D

**Transcript of the Rule 30(b)(6) Deposition of Melanie Gueho in *Grant v. Gusman*, No. 17 C 2797**

**February 3, 2020**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RODNEY GRANT,                         CASE NO.

          Plaintiff,           17-cv-2797-NJB-DMD

VERSUS

MARLIN GUSMAN, et al.,

          Defendants.

_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHNNY TRAWEEK,                       CASE NO. 19-1384

          Plaintiff,           SECTION "F"

VERSUS

MARLIN GUSMAN, et al.

          Defendants.


          30(b)(6) DEPOSITION OF THE DEPARTMENT OF
PUBLIC SAFETY & CORRECTIONS, through its designated
representative, MELANIE M. GUEHO, given in the
above-entitled cause, pursuant to the following
stipulation, before Sandra P. DiFebbo, Certified
Shorthand Reporter, in and for the State of
Louisiana, at the Department of Corrections, 504
Mayflower Street, Baton Rouge, Louisiana, on the
3rd day of February, 2020.

```
 1    APPEARANCES:

 2

 3            LAW OFFICE OF WILLIAM MOST, L.L.C.
                BY:  WILLIAM MOST,
 4            ATTORNEY AT LAW
                201 St. Charles Avenue
 5            Suite 114-101
                New Orleans, Louisiana  70170
 6            Representing the Plaintiff

 7

 8            LOUISIANA DEPARTMENT OF JUSTICE
                OFFICE OF THE ATTORNEY GENERAL
                LITIGATION DIVISION, CIVIL RIGHTS SECTION
 9            BY:  JEFFERY A. "BEAU" WHEELER, II,
                ATTORNEY AT LAW
10            1450 Poydras Street, Suite 900
                New Orleans, Louisiana  70112
11            Representing the State of Louisiana,
                Department of Corrections

12

13

14    Also Present:

15            REBECCA RAMASWAMY, ESQ.

16

17    Reported By:

18

19            Sandra P. DiFebbo
                Certified Shorthand Reporter
20            State of Louisiana

21

22

23

24

25
```

```
 1     E X A M I N A T I O N        I N D E X

 2

 3                                   Page

 4   BY MR. MOST:                     5, 71

 5   BY MR. WHEELER:                  70

 6

 7

 8

 9     E X H I B I T               I N D E X

10                        Page

11

12   Exhibit 1                       12

13   Exhibit 2                       19

14   Exhibit 3                       20

15   Exhibit 4                       21

16   Exhibit 5                       29

17   Exhibit 6                       29

18

19

20

21

22

23

24

25
```

1                    S T I P U L A T I O N

2

3                    It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of THE DEPARTMENT OF PUBLIC SAFETY &

6    CORRECTIONS, through its designated representative,

7    MELANIE GUEHO, is hereby being taken pursuant to

8    the Federal Rules of Civil Procedure for all

9    purposes in accordance with law;

10                    That the formalities of reading and

11   signing are specifically waived;

12                    That the formalities of sealing,

13   certification, and filing are hereby specifically

14   waived.

15                    That all objections, save those as to

16   the form of the question and responsiveness of the

17   answer are hereby reserved until such time as this

18   deposition or any part thereof is used or sought to

19   be used in evidence.

20                         * * * * *

21                    Sandra P. DiFebbo, Certified Shorthand

22   Reporter, in and for the State of Louisiana,

23   officiated in administering the oath to the

24   witness.

25

```
 1            MELANIE GUEHO, 504 Mayflower Street,
 2      Baton Rouge, Louisiana, 70802, having been
 3      first duly sworn, was examined and testified on
 4      her oath as follows:
 5            MR. MOST:
 6                  This is William Most, counsel to
 7            plaintiffs.  The first question I have
 8            is for counsel.  Can we stipulate that
 9            today's deposition was properly
10            noticed, and the court reporter is duly
11            qualified?
12            MR. WHEELER:
13                  Yes.
14            MR. MOST:
15                  Would you like to make the statement
16            that you suggested?
17            MR. WHEELER:
18                  As a preliminary matter, any
19            questions -- we'd like to make it very
20            clear on the record that any questions
21            asked that elicit testimony that is
22            outside the scope of the topics listed
23            in notice for this deposition will be
24            lay witness testimony.  As such, any
25            such questions will elicit an object to
```

1           the scope objection from myself.

2           Whenever I object to scope, I'm clearly

3           demarcating that any testimony given

4           for that particular question that is

5           asked is lay witness testimony and not

6           testimony of the agency or the

7           Department of Corrections.

8      MR. MOST:

9           Okay.  Without agreeing or

10          disagreeing, I will understand that if

11          you say scope, that's what you mean.

12    EXAMINATION BY MR. MOST:

13         Q.   All right.  Good morning.

14         A.   Good morning.

15         Q.   Your name is Melanie Gueho? Am I

16    pronouncing that right?

17         A.   Melanie Gueho.

18         Q.   What would you like me to call you?

19         A.   Melanie is fine.

20         Q.   Thanks, Melanie. Melanie, what is your

21    name and title?  What is your title?

22         A.   Business analytics is the title on the

23    book.  Director of Data & Research is pretty much

24    what everybody refers to me as.

25         Q.   Melanie, have you ever given a deposition

```
1   before?
2         A.   No.
3         Q.   I'm an attorney.  I represent the
4   plaintiff in two cases that we're here for today,
5   Rodney Grant v. Marlin Gusman and Johnny Traweek v.
6   Marlin Gusman.  Today I'll be asking you questions.
7   Do you understand that you are under oath today?
8         A.   Yes.
9         Q.   Do you understand that your answers here
10  today have the same force as if we were in a
11  courtroom with a judge and jury?
12        A.   Yes.
13        Q.   Is there anything today that would
14  prevent you from giving me your full attention and
15  truthful and complete answers?
16        A.   No.
17        Q.   Are you taking any medications or
18  suffering from any illness that would prevent you
19  from understanding my questions or answering them
20  fully and truthfully?
21        A.   No.
22        Q.   We'll be asking questions today, but
23  there is no reason it has to be continuous.  If you
24  need to take a break at any time, just let me know
25  or Mr. Wheeler know, and we'll take a break.
```

1    However, I will, if you take a break, I'll ask you

2    who you spoke to during the break and what you

3    talked about, even if it's your attorney and what

4    you reviewed during the break.  Do you understand

5    that?

6          A.    Yes.

7          Q.    A deposition often feels like a

8    conversation, but it's a little bit different than

9    a normal conversation in that we're keeping a

10   transcript of it.  So one thing that helps keep a

11   clean transcript is if you will please wait for me

12   to finish my question before you begin responding,

13   I will then wait for you to finish your answer

14   before I ask the next question.  That will help

15   create a clean transcript.  Will you do that with

16   me?

17         A.    Okay.

18         Q.    Another thing that makes this a little

19   bit different is often people will nod their heads

20   or shake their heads to respond to a question, but

21   that won't be picked up on the transcript, so I'll

22   ask you to give verbal yeses or nos or other verbal

23   answers.  Is that all right with you?

24         A.    Yes.

25         Q.    And if you don't understand my question,

1  rather than answering it, will you let me know that
2  you don't understand it, and I'll try and rephrase
3  it?  Will you do that?
4       A.   Okay.
5       Q.   Broadly, do you know what cases you are
6  here for today?
7       A.   Yes.
8       Q.   How would you describe them?
9       A.   Oh, well, I mean, I don't know.  I think
10 everybody has been referring to it as
11 overdetention.
12      Q.   Sure.  So you are here for two
13 overdetention cases today as a witness?
14      A.   Yes.
15      Q.   Do you understand that today you are not
16 just here as Melanie?  You are the witness
17 designated to represent the Department of Public
18 Safety & Corrections and speak for it.  Do you
19 understand that?
20      A.   Yes.
21      Q.   I also may say DOC as shorthand for the
22 Department of Public Safety & Corrections.  Will
23 you understand that?
24      A.   Yes.
25      Q.   So you understand that you've been made

1    available today to represent the knowledge of the

2    DOC, correct?

3         A.    Yes.  As it pertains to me, yes.

4         Q.    And that you've been designated as a

5    representative of the DOC to speak for the DOC

6    today, correct?

7         A.    Correct.

8         Q.    So you understand that when I'm asking a

9    question to you, I'm really asking a question to

10   the DOC, correct?

11        A.    Correct.

12        Q.    When you give an answer, subject to the

13   scope issues that Mr. Wheeler brought up earlier,

14   you are giving the answer of the DOC itself,

15   correct?

16        A.    Correct.

17        Q.    One way this is unlike a normal

18   deposition is that, generally, I don't know is not

19   a sufficient answer, because a witness or an

20   organization has an obligation to have done

21   research and investigate things prior to the

22   deposition.  Do you understand that?

23        A.    Yes.

24        Q.    When did you begin preparing for this

25   deposition?

1    A.    Yesterday and a little on Friday, I

2    guess.

3    Q.    How much time did you spend on Friday

4    preparing for the deposition?

5    A.    Maybe an hour.

6    Q.    Approximately how much time did you spend

7    yesterday preparing for this deposition?

8    A.    About an hour, hour and a half.

9    Q.    What did you do during those periods of

10   time on Friday and yesterday?

11   A.    Review the questions that you provided or

12   that they provided, whichever.  I don't know who

13   puts those questions together, but reviewed those

14   questions provided.

15            MR. WHEELER:

16                  Just to be clear, I, Jeffery

17             Wheeler, also communicated with Miss

18             Gueho as part of those preparations.

19   BY MR. MOST:

20   Q.    So I'm not going to ask you anything

21   about the content of what you discussed with the

22   lawyer.  Did you look at any documents other than

23   the list of questions to prepare?

24   A.    Yes.  The spreadsheet that people are

25   referring to in the case.

1      Q.   Is that the spreadsheet that is entitled,

2  "Feb 2019_Immediate_Release_Breakdown?

3      A.   Yes.

4      Q.   Today, if I say "the spreadsheet," I'll

5  be referring to that document unless I specify

6  otherwise.  Will you understand that?

7      A.   Yes.

8      Q.   If at any point you are referring to a

9  spreadsheet other than that spreadsheet, will you

10  let me know?

11      A.   Yes.

12      Q.   Other than the spreadsheet, were there

13  any other documents you looked at to prepare for

14  this deposition?

15      A.   No.

16      Q.   Did you look at the TXT file version of

17  that spreadsheet?

18      A.   No, just the Excel spreadsheet.

19      Q.   Besides Mr. Wheeler, did you talk to

20  anyone to prepare for this deposition?

21      A.   No.

22      Q.   Did you take any notes to prepare for

23  this deposition?

24      A.   No.

25      Q.   I'm marking as Exhibit 1 the Notice of

1  30(b)(6) Deposition & Request to Bring Documents,

2  Information, or Objects.  Is this the list of

3  questions that you are talking about?

4       A.   Yes.

5       Q.   This is both a request for information,

6  and, also, for documents.  Did you bring any

7  documents here today?

8       A.   No.

9       Q.   I'm going to go through each of the

10  topics on Question 2.  I'm sorry.  I'm going to go

11  through each of the topics on Page 2.

12            MR. WHEELER:

13                 I would like to note very, very

14            quickly in regards to Point Number 1 on

15            Page 2 of the notice that so far all

16            documents responsive to all pending or

17            past due plaintiffs' discovery requests

18            have been produced at this time,

19            subject to continuing requests for

20            which the due date has not yet come.

21            MR. MOST:

22                 Thank you.

23  BY MR. MOST:

24       Q.   Topic Number 1 is, "The DOC's process of

25  overwriting the database used to generate the

1    February 2019 'pull' document and what would be

2    necessary to preserve that data."  Melanie, are you

3    prepared to testify today about this topic?

4        A.   Yes. Do you want me to now answer?

5        Q.   No.  I'm going to get into questions

6    about each topic.  I'm going to run through them

7    and see if you are prepared first.

8            Topic Number 2, "The DOC's data

9    underlying the February 2019 'pull' document."  Are

10   you prepared to testify today about this topic?

11       A.   Yes.

12       Q.   Three is, "The steps necessary to take

13   the DOC's raw data and turn it into the February

14   2019 'pull' document."  Are you prepared to testify

15   today about this topic?

16       A.   Yes.

17       Q.   Four is, "The steps necessary to take the

18   DOC's raw data and turn it into a document like the

19   February 2019 'pull' document, but for a different

20   month."  Are you prepared to testify today about

21   this topic?

22       A.   Yes.

23           MR. WHEELER:

24               Mr. Most, if you'd like, we are

25             willing to stipulate that the witness

```
 1              is prepared for all of the topics in
 2              the notice.
 3    BY MR. MOST:
 4         Q.   Melanie, are you prepared to talk
 5    knowledgeably about all 11 topics in this list?
 6         A.   Yes.
 7         Q.   Melanie, you said your informal title --
 8    people refer to you as Director of Data Research?
 9         A.   Uh-huh.
10         Q.   What is your formal title?
11         A.   Business Analyst.
12         Q.   Are you an employee of the Department of
13    Corrections?
14         A.   Yes.
15         Q.   What department within the department are
16    you part of?
17         A.   The undersecretary.
18         Q.   Which undersecretary is that?
19         A.   Oh, well, I guess he is -- I used to be
20    under Mr. Bickham, but now I'm under Secretary
21    LeBlanc, so the secretary's office.
22         Q.   So you are a person assigned within the
23    secretary's office?
24         A.   Yeah.  We have the Data and Research
25    Department that I'm over.
```

1       Q.    Who do you report to?

2       A.    Angela Whittaker.

3       Q.    Who does Angela Whittaker report to?

4       A.    Secretary LeBlanc.

5       Q.    How many people -- did you just call it

6    the data research office?

7       A.    Uh-huh.

8       Q.    How many people are within the data

9    research office?

10       A.    Myself.  Five.

11       Q.    Are you the -- you are the head of that

12    unit?

13       A.    Yes.

14       Q.    Broadly, what does your unit do?

15       A.    We're responsible for understanding the

16    data for the department, working with the other

17    areas within the department to figure out what data

18    needs to be tracked or designed, help design the

19    systems, outline it, to then communicate that with

20    OTS to make whatever changes we need to the system

21    or enhancements or modifications. Also, report out

22    on any of our data in our system, our quarterly

23    briefing book, the JRI numbers, things like that,

24    surveys.

25       Q.    OTS, that's the state Office of

```
 1  Technology Services; is that right?
 2        A.   Yes.
 3        Q.   So it sounds to me like your office is
 4  not part of the day-to-day operations of any
 5  particular function of the Department of
 6  Corrections, but you are doing special projects and
 7  trying to improve things?  Is that a fair
 8  characterization?
 9        A.   I guess you could say that.
10        Q.   You're not like integrated with PreClass
11  where they are taking all the data in and
12  processing it and processing it out, correct?
13        A.   Correct.
14        Q.   What is the quarterly briefing book?
15        A.   I think it's actually biannual now.  It
16  used to be quarterly.  It's just our demographics,
17  admissions, releases, all of those numbers and data
18  you would think our department would have that we
19  put together and put out there for all to use, and
20  it's on the website.
21        Q.   Does that in any way address the
22  timeliness of people's releases?
23        A.   No.  It just shows the number of people
24  released, stuff like that.
25        Q.   Does the DOC have an electronic dashboard
```

```
 1   of any kind?
 2         A.    No.
 3         Q.    Just in a nutshell, what is your
 4   education and professional background?
 5         A.    Like a Bachelor's in Business Management?
 6         Q.    Uh-huh.
 7         A.    Bachelor's in Business Management.
 8         Q.    Have you worked at the DOC since then?
 9         A.    About four months after I graduated from
10   college, so, yes.
11         Q.    How long have you been in the data
12   research team?
13         A.    It was -- I don't know.  It's new,
14   because the Office of Technology Services was
15   created.  Those are some job functions I had when I
16   was at my previous job that Office of Technology
17   Services did not take over, so that section was
18   kind of created to fill a void that was created
19   within DOC once OTS, Technical Services, was pulled
20   out and made its own agency.
21         Q.    When was that?
22         A.    That's what I'm saying.  I don't know.
23   Within the last five years.
24         Q.    This is a question I ask of all
25   deponents.  It's not specific to you.  Have you
```

1   ever been arrested, Melanie?

2       A.   I don't know how to answer that question.

3   Yes, I guess I have.

4       Q.   What were you arrested for?

5       A.   Driving under the influence.

6       Q.   Were you arrested any other times?

7       A.   No.

8       Q.   I'm going to mark this as Exhibit 2. Do

9   you recognize what is Exhibit 2?

10      A.   Yes.

11      Q.   How do you describe this document? What

12  do you call it?

13      A.   Well, it's the spread -- it's the text

14  document that created the spreadsheet that we've

15  been referring to that is data from CAJUN.  That's

16  our main system of record.

17      Q.   Between the lawyers, we've been

18  colloquially referring to this document as the

19  February 2019 pull document.  Have you ever heard

20  that phrase used to describe this?

21      A.   Yes.

22      Q.   So this is the February 2019 Pull

23  document?

24      A.   Yes.

25      Q.   And the data in this document matches one

1   of the tabs of the Excel spreadsheet we've been

2   talking about, correct?

3        A.   Correct.

4        Q.   So this is a list of 231 inmates,

5   correct?

6        A.   I don't know.  I imagine so.  I have not

7   counted it recently, but, yeah.

8        Q.   That sounds right to you?

9        A.   Yeah.

10       Q.   At the end of this document, it says,

11  "Days over, average 44.68" et cetera.

12       A.   Correct.

13       Q.   I'm going to mark as Exhibit 3 a document

14  entitled, "Defendant's Revised Responses to

15  Plaintiff's Second Requests for Admissions to DOC."

16  Do you see that?

17       A.   Where?

18       Q.   That's at the -- sort of under the stars.

19  It says the title of this document.

20       A.   Oh, okay.

21       Q.   You see that?

22       A.   Yes.

23       Q.   If you turn to the last page, do you see

24  these are answers submitted on behalf of defendants

25  in this case?

1        A.    Yes.

2        Q.    Do you see the very last response that

3    says, "It is admitted that in February of 2019, 231

4    people were found to be held past the release

5    dates, with an average of 44 days waiting for

6    release."  Do you see that?

7        A.    Yes.

8        Q.    So it seems like that is referring to the

9    February 2019 pull document; is that right?

10        A.    I would assume.

11        Q.    And does that sound like an accurate way

12    of describing the February 2019 pull document?

13        A.    Yes and no.  I'm not sure if I remember

14    if each and every one of these people would have

15    passed their release date.  I would have to look at

16    each person, but I would assume.

17        Q.    So perhaps with a few exceptions among

18    the 231, this is an accurate way of describing the

19    February 2019 pull document?

20        A.    Yes.

21        Q.    I'm going to mark this as Exhibit 4.  Do

22    you see Exhibit 4 is a newspaper article from the

23    Times-Picayune entitled, "Edwards, prison officials

24    pledge fix to stop people being detained past their

25    release date?"

```
 1          A.    Yes.

 2          Q.    Did you ever read this article before?

 3          A.    Nope.

 4          Q.    Turn to the second to last page.

 5          A.    Okay.

 6          Q.    The last paragraph going onto the page

 7    after that says, "Last month, the Department of

 8    Corrections said, 231 people across the state were

 9    affected.  Those people waited an average of 44

10    days to be released after a judge ordered them

11    free, with most of the delay coming while DOC

12    waited on paperwork from local officials, according

13    to Vining."  Do you see that?

14          A.    Yes.

15          Q.    Vining.  Presumably, that is Jonathan

16    Vining, counsel to the DOC?

17          A.    Yes.  I would assume.

18          Q.    It sounds like this is referring to the

19    February 2019 pull document data as well, correct?

20          A.    Yes.

21          Q.    And perhaps with a few exceptions of the

22    inmates from the pull document, is that generally

23    an accurate way of describing the February 2019

24    pull document?

25          A.    Yes.
```

1        Q.    So you said that this TXT pull document,

2    this data came from CAJUN and then the TXT document

3    was imported into Excel; is that right?

4        A.    Correct.

5        Q.    Did you make this pull document?

6        A.    Yes.

7        Q.    Do you remember when you made it?

8        A.    Somewhere -- probably March.  Right

9    around March sometime of last year.

10       Q.    So that would be shortly after the end of

11   February 2019?

12       A.    Correct.

13       Q.    Why did you make this document?

14       A.    We were working on a grant proposal to

15   try and get some funds to -- instead of having the

16   PreClass department receiving paperwork being

17   manual processed, have a system in place to receive

18   those documents and be able to get information one

19   way instead of by mail and fax and all of that.

20            So in the room of people that were

21   working on this grant proposal, we decided we

22   needed a few things to add data wise to our

23   proposal.  Some of the information is why I created

24   this, in order to get some of those numbers that we

25   thought would be helpful to add to the proposal.

```
 1          Q.    So the DOC was asking for money from the
 2    Department of Justice to fix a problem, right?
 3          A.    Correct.
 4          Q.    So this document was created to help show
 5    the scope of the problem; is that right?
 6          A.    To help give us some data points to
 7    include in the grant proposal, yes.
 8          Q.    To help show how big the problem was in
 9    Louisiana; is that right?
10          A.    The problem as far as what we noted to in
11    the grant proposal, yes.
12          Q.    That was a grant application to the
13    Bureau of Justice Assistance within the U.S.
14    Department of Justice?
15          A.    Yes.
16          Q.    Is that what is also called as a DSN
17    grant?
18          A.    I'm not sure what kind of grant it was.
19    I know it was just a grant that we applied for.
20          Q.    I'm just going to pull up on my computer
21    screen a document entitled, "Criminal Justice Data
22    Sharing & Notification Project, DSN 2019 Program
23    Narrative."  Is this the grant application you are
24    talking about?
25          A.    Yes.
```

1      Q.   It did say that at the top of it,
2  correct?
3      A.   Yes.  I think so.
4      Q.   You want to take a look?
5      A.   Yeah.  I mean, that's the beginning of
6  the statement of problem and stuff, yes.
7      Q.   And it says, "Criminal Justice Data
8  Sharing & Notification Project."
9      A.   DSN 2019, yes.
10      Q.   You said there was a team that was
11  working on putting this application together?
12      A.   Yes.
13      Q.   Was Secretary LeBlanc on that team?
14      A.   No.
15      Q.   Who else was on that team?
16      A.   My supervisor, Angela Whittaker, Angela
17  Griffin, Derek.  Oh, shoot.  What is Derek's last
18  name?  Angela's boss.
19      Q.   Derek Ellis?
20      A.   Yeah.  I'm trying to think if anybody
21  else was in there.
22      Q.   Was Jonathan Vining on the team?
23      A.   No.  I don't think so.  I think it was
24  just two other staff members from Angela's team on
25  there.  Libby Tigner and Tessie was involved.

1    Tessie Cooley, I think, is her last name.  It might
2    have been --
3              MR. WHEELER:
4                   It's Theresa Cooley, for the record.
5              THE WITNESS:
6                   There might have been somebody from
7               reentry involved, too.  I'm not sure.
8    BY MR. MOST:
9         Q.   Was Secretary LeBlanc aware of what the
10   team was doing?
11        A.   He was aware.  I'm pretty sure he was
12   aware that we were applying for a grant, yes.
13        Q.   So the grant application identified the
14   problem, and you put together this pull document to
15   provide some data to show the scope of the problem,
16   correct?
17        A.   Correct.
18        Q.   So you pulled 231 inmates into this list,
19   correct?
20        A.   I pulled those who released in February,
21   and based on the information we were looking for,
22   this was the results of my result.
23        Q.   What was that information you were
24   looking for?
25        A.   To show how many people come through our

1    system during a month's time, the difference

2    between all of these things that I calculated.  The

3    difference between paperwork received, sentence to

4    received, and time comp to received, time comp to

5    release.  Those different things.

6        Q.   So this list of 231 people, is this

7    everyone who was released from DOC custody in the

8    month of February 2019?

9        A.   No.  I think this ended up being those

10   released within seven days of time comp ready to

11   release.  The short-term rental people.

12       Q.   You were essentially looking for

13   immediate releases?

14       A.   Correct.

15       Q.   Immediate releases are persons who, when

16   they're time is computed, it seemed that they are

17   eligible to be released right then, correct?

18       A.   Correct.

19       Q.   So you went into the -- so CAJUN is the

20   electronic records management system of the DOC,

21   right?

22       A.   Correct.

23       Q.   So you went into CAJUN and got it to give

24   you a list of all the inmates released in February

25   of 2019 who were eligible for immediate release

immediately upon their time being computed,
correct?

A.   Yeah.  Using manual functions and code in
CAJUN, yes.

Q.   We talked earlier.  You said there might
be a few exceptions among these 231 who didn't meet
the description we were talking about earlier.  By
a few exceptions, do you mean one or two, two or
three, four or five?  Just ball park.  I don't need
a specific number.

A.   Yeah.  Well, it's anybody on here that if
they are time comp ready -- no.  Release date
equals their raw GTPS date, then they would not
fall into that category you mentioned, but I don't
know.  I'd have to look at them all, because, like
I said, this was anybody within seven days of
release from time comp ready to actual release. So
if all of those things equal true, and one of these
numbers over here equals a zero, then they would
not have been over.

Q.   So just to make sure I've got that clear,
the exceptions you were talking about earlier,
those would be people whose raw GTPS date equals
their release date, correct?

A.   Correct.

1      Q.    Thank you. I'm going to have you look at
2   what I've marked as Exhibit 5.  Exhibit 5 is a
3   document that says, "Converting Text file from
4   CAJUN to EXCEL," correct?
5      A.    Correct.
6      Q.    I'm also going to pass out what I'm
7   marking as Exhibit 6.  So Exhibit 5 -- Exhibit 6 is
8   something that says at the top, "Search Master and
9   then matching to cohort file in order to merge
10  data," correct?
11     A.    Correct.
12     Q.    So are these documents, 5 and 6, have you
13  seen these before?
14     A.    Yes.  I think I created them.
15     Q.    I thought you might have.  Are these,
16  essentially, the instructions for how to create a
17  pull document like the February 2019 pull document?
18     A.    Yeah.  This was a more simplistic one
19  that I had available, but, yes.
20     Q.    Do you have a more detailed set of
21  instructions than these two documents together?
22     A.    No.  Usually, if it is more detailed, I
23  just do it myself instead of creating instructions
24  and having my staff do it.
25     Q.    So these instructions would allow one of

1    your staff to create a pull document like the
2    February 2019 pull document?
3         A.    Correct.
4         Q.    Was the February 2019 pull document the
5    first time you created a pull document like that?
6         A.    Yes.
7         Q.    Had you ever taken CAJUN data and put it
8    into a text file before?
9         A.    Yes.
10        Q.    Had you ever taken CAJUN data and put it
11   into a text file and then put it into an Excel
12   spreadsheet before?
13        A.    Yes.
14        Q.    So what was different about the February
15   2019 one you had never done before?
16        A.    Like I said, it was the first time I went
17   looking for this type of information.  So based on
18   our grant proposal, just a group of people sitting
19   in a room trying to figure out, you know, how we --
20   what we needed to present in this grant proposal
21   and throwing out some ideas.  Okay.  Can we get at
22   this data?  Can we get at this data?  So based on
23   all of that, I came up with that.  There was other,
24   which I don't remember which ones, that, you know,
25   they were like we have this information and --

1   well, I do remember one of them.  Would we have the

2   information of how long it takes for PreClass --

3   not PreClass.  What is that group called?  Clerk of

4   Court.  The Clerk of Court to get the paperwork to

5   the sheriff's jail, and I don't have that

6   information.  So, yeah, like I said, coming up with

7   this to try to answer some of those questions for

8   that presentation.

9       Q.   Was the February 2019 pull document the

10  first time you created a pull document about

11  immediate releases?  Is that correct?

12      A.   I think so, yes.

13      Q.   Can you recall any others before that?

14      A.   No.

15      Q.   Have you created any pull documents about

16  immediate releases subsequent to that?

17      A.   No.

18      Q.   Were you part -- do you know what I mean

19  if I say the Six Sigma Team in 2012?

20      A.   Yes.

21      Q.   Were you a part of that team?

22      A.   Yes.

23      Q.   The Six Sigma investigation looked at the

24  various average times between various steps in the

25  process of someone being convicted to being time

```
 1   computed and being released, correct?
 2        A.    Correct.
 3              MR. WHEELER:
 4                   Object to scope.
 5   BY MR. MOST:
 6        Q.    Were there any pull documents generated
 7   as part of the Six Sigma process?
 8              MR. WHEELER:
 9                   Object to scope.
10              THE WITNESS:
11                   Yes, but I don't remember which ones
12                but more along the lines of how many
13                people admitted and things like that.
14                So we would know, you know, time frames
15                of what amounts of people PreClass
16                deals with.
17   BY MR. MOST:
18        Q.    Do you know if the data underlying the
19   Six Sigma investigation still exists anywhere?
20              MR. WHEELER:
21                   Object to scope.
22              THE WITNESS:
23                   No, I don't.
24   BY MR. MOST:
25        Q.    So these instructions that are Exhibits 5
```

1    and 6, these are instructions for creating a pull

2    document, correct?

3          A.    Getting information out of CAJUN, yes.

4          Q.    Are these instructions specific to doing

5    a pull document related to immediate release or

6    just a pull document generally?

7          A.    A pull document in general.

8          Q.    So a member of your team, if you told

9    them here is some instructions, I want a pull

10   document like the February 2019 one for immediate

11   releases, one of your staff members would be able

12   to do that?

13         A.    No.

14         Q.    Why not?

15         A.    Using these instructions? No.  These

16   instructions are totally different and would not

17   produce this document.

18         Q.    Are there instructions -- by this

19   document, you mean the February 2019 pull document?

20         A.    Yes.

21         Q.    Are there instructions for creating a

22   document like the February 2019 pull document?

23         A.    No.

24         Q.    But you know how to do it?

25         A.    Yes.  I've done -- taking some time to

1    sit down and do it again, yes, I could create it

2    again, but it would take probably a day or so to

3    get all of this information pulled in from

4    different sources in CAJUN.

5         Q.   So you could create a document like the

6    February 2019 one but for a different month,

7    correct?

8         A.   Yes, but depending on what month it is,

9    it might not be accurate.  That's why when I did it

10   back in March, I did it for the previous month,

11   because the closer we are to the time frame, the

12   more accurate the document will be.

13        Q.   So, for example, it's February 3rd today.

14   You could probably create a pretty accurate one

15   about January of 2020, correct?

16        A.   Correct. It would take me some time to

17   get it done, but, yes, I could do it.

18        Q.   You estimate about a day?

19        A.   Probably, yes, given nothing else is

20   going on in the office.

21        Q.   So about eight hours you think?

22        A.   Yes.

23        Q.   So to create a pull document like the

24   February 2019 one but for the most recent month, it

25   would probably take one person, specifically you,

1   about eight hours to generate that document,

2   correct?

3        A.    Correct.

4        Q.    What about if you didn't need all the

5   columns in the pull document?  Say you only needed

6   PreClass received, days over, and then names and

7   DOC numbers.  Would that take you less time?

8        A.    Which ones, PreClass received -- no,

9   because all of these other dates are in other areas

10  in CAJUN.  The master record, the transfer record,

11  the docket record.  I have to pull all of those

12  records together, match them, and pull in, and, as

13  you know, people have multiple sentence dates and

14  things like that.  So it's pulling all of that data

15  in from those various records within CAJUN,

16  comparing, making sure I have the right information

17  to ultimately get that information you mentioned.

18       Q.    Looking at the spreadsheet on the

19  computer, because it's easier to see all the

20  columns, are there any columns that could be cut to

21  make it take less time?  For example, Column T is

22  jail credit.  Would you be able to cut jail credit

23  to make generating a document like this quicker?

24       A.    I just would not match that piece of

25  information in.  That is still in the time comp

1   record, which is another piece of data I'm assuming

2   you would need, which is raw GTPS date, which is on

3   the time comp record as well.  So, I mean, I would

4   still have to go after the time comp record.  I

5   just would not match in that one column.

6          Q.   Are there any columns here that could be

7   cut to make the whole task simpler and quicker?

8          A.   I would probably say no, because I think

9   each of them feed off of each other thing, and

10  they're all in different records.

11         Q.   What about court code?

12         A.   A court code is on the PreClass record,

13  which, again, it's just a field I would not match

14  in, but all the steps that needed to get to those

15  other things on the PreClass record would still

16  need to be done.

17         Q.   It's February 3rd today.  You said that

18  if asked, within a day, you could probably generate

19  a quite accurate equivalent of the February 2019

20  pull document but for January 2020, correct?

21              MR. WHEELER:

22                   Object to form.  You may answer.

23              THE WITNESS:

24                   Oh, what?

25              MR. WHEELER:

1          You can answer.

2     THE WITNESS:

3          Yes, I could, after spending some

4          time and searching all of the data in

5          CAJUN, yes.

6 BY MR. MOST:

7     Q.   But it would be much harder to do one or

8 -- let me ask it this way.  It would be less

9 accurate to do one for, say, June of 2019?

10     A.   Yes.

11     Q.   Why is that?

12     A.   Because some time has passed, and some of

13 those records are per incarceration period.  There

14 is probably a good bit of some of those people that

15 have returned in the last six, seven months.  So

16 their records now would be for the current

17 incarceration period and not the previous

18 incarceration period.

19     Q.   So some of the information in CAJUN about

20 what happened to them six months or a year ago may

21 have been overwritten by new data about a

22 subsequent arrest or conviction; is that correct?

23     A.   It would have been updated with their new

24 incarceration period, yes.

25     Q.   The old information, what happens to it?

1      A.   The PreClass Department should have that
2  kind of information in Oracle, but I wouldn't know
3  how they keep their records or anything like that.
4      Q.   By Oracle, you mean that's the system
5  that contains scanned versions of paper documents;
6  is that right?
7      A.   Correct.
8      Q.   So the old information you presume is
9  backed up by printing it out and then scanning it
10  into Oracle?
11      A.   Correct.
12      Q.   Let's say you wanted to create a pull
13  document equivalent to the February 2019 one but
14  for six months ago.  It would either be inaccurate,
15  or you'd have to go back and get all of the paper
16  records in order to fill in the correct data,
17  correct?
18      A.   Correct.
19      Q.   Getting all the paper records, that
20  sounds enormously laborious, correct?
21      A.   Correct.
22      Q.   How long, ball park, do you think it
23  would take if you had to go back to the paper
24  records to create a pull document for a month?
25          MR. WHEELER:

```
 1                    Objection.
 2    BY MR. MOST:
 3         Q.   Six months ago.
 4              MR. WHEELER:
 5                   Speculation.  Go ahead. You can
 6                answer.
 7              THE WITNESS:
 8                   I wouldn't work with the paper
 9                documents.  I would have to provide a
10                list of those people that have now come
11                back into custody to PreClass, and they
12                would have to do that work.
13    BY MR. MOST:
14         Q.   So it would take a whole team of people?
15         A.   Yes.
16         Q.   Maybe dozens or hundreds of hours of
17    work?
18         A.   I wouldn't know.  I can't guesstimate how
19    many times, but, yes, it would take awhile.
20         Q.   But much, much more work than if you are
21    just looking at the most recent one, correct?
22         A.   Correct.
23         Q.   I want to talk a little bit about how you
24    created the February 2019 pull document.  You said
25    that Exhibit 6 is directions on how to create a
```

1  pull document but not specifically one about

2  immediate releases; is that right?

3      A.   Correct.

4      Q.   It talks here in the second line about

5  346h336 is the cohort of information requested.

6  What is 346h?

7      A.   It's a RID within CAJUN that a group of

8  data is stored.  I'd probably, in that respect --

9  cohort is like a group of data that I am then

10  asking them to go get the rest of the information I

11  need and match it into this original list of

12  people.

13      Q.   By them do you mean CAJUN?

14      A.   No.  Them meaning my staff or whoever I

15  wrote these instructions for.

16      Q.   How did you use CAJUN to identify

17  immediate releases to create your February --

18      A.   By searching the master record, the

19  transfer record.  I mean, do you want me to tell

20  you step by step?  Searching for those people who

21  released in February 2019.  When I say searching,

22  that's going into our transfer record, which is

23  every movement in CAJUN and pulling out just the

24  release codes for that month and year and getting

25  my initial cohort of people, people released in

1  February of 2019, and then searching the different

2  records that all of this information is.  The

3  master record, the docket record, the PreClass

4  record, and matching those to each one of -- each

5  other and then steady matching in each new item of

6  data that I needed from all of those records to

7  then get the information I needed.

8          Now, some of those records can create

9  multiple records, like dockets.  People have

10  multiple dockets, so it's determining what group of

11  dockets are for that incarceration period to get

12  the sentence date.  I think I used the earliest

13  sentence date from each one of those, because some

14  people, during their current incarceration period,

15  could have multiple sentence dates.  So taking that

16  earlier sentence date from there then going getting

17  that admission date for that release period, which,

18  again, people are going to have multiple admissions

19  or could have multiple admissions.

20          So it's going and getting the admission

21  date that is with that release period and searching

22  and matching and pulling in the fields that I

23  needed to then calculate these calculations that I

24  have comparing these different dates to each other.

25     Q.   Let me see if I can step back a second

1    and see if I understand it.  It was your goal to

2    get a list of all the inmates who were subject to

3    immediate release in February of 2019, right? That

4    was the big picture goal?

5         A.    Correct.

6         Q.    So the first thing you did was you got a

7    list of all of the inmates who had been released in

8    February of 2019, right?

9         A.    Correct.

10        Q.    Then you winnow that down to those people

11   had been released in February 2019, and their time

12   comp was ready within a week prior to that,

13   correct?

14        A.    Correct.

15        Q.    You've done that one time?

16        A.    Yes.

17        Q.    If you were to do it a second time, you

18   estimate it would take you about a day?

19        A.    Correct.

20        Q.    If you had to -- let's say the secretary

21   asked you to do that at the end of every month for

22   that month.  Would you be able to find ways to make

23   it more efficient using scripts or macros or other

24   tricks of the trade?

25             MR. WHEELER:

```
 1              Object to speculation.  You may
 2          answer.
 3          THE WITNESS:
 4              Well, CAJUN is a MAPR, which doesn't
 5          have scripts and whatever.  Eventually,
 6          if I document it and write, we could --
 7          if I take it step by step, I could
 8          eventually maybe write code to get at
 9          it, but then it would take several
10          months to write code in order to get
11          this information.
12  BY MR. MOST:
13      Q.    Even without code, do you think you would
14  get faster if you were doing it each month and more
15  efficient?
16      A.    Manually?
17      Q.    Uh-huh.
18      A.    Manually, it would take me about a day,
19  but I would throw a fit, because I have other
20  things to do than do this every month.
21      Q.    Could you train one of your staff members
22  to create a document like this?
23      A.    It would take some time.  Most of them
24  are very new and are not skilled.  My background is
25  applications programmer for MAPR, so I have the
```

1    skills of this.  Most of the people that work for
2    me now, they do not have technical skills in their
3    background.  So me trying to get them to do
4    something like this is very -- the simpler one of
5    the tasks is very tricky, and then I have to double
6    check it and check it, and sometimes give it back
7    to them to redo or then me just clean it up myself.
8    I wouldn't feel comfortable giving it to one of my
9    staff.  Let's just say that.
10        Q.    With some guidance and training, they
11   could learn how to do it?
12        A.    Possibly.
13        Q.    We talked earlier about how doing a pull
14   document for a month further in the past would be
15   less accurate, correct?
16        A.    Correct.
17        Q.    And it will be less and less accurate the
18   further back in the past you go; is that true?
19        A.    Correct.
20        Q.    Because the data in CAJUN itself is
21   overwritten by new data, but may be backed up on
22   paper and then put into Oracle, correct?
23        A.    Right.  Certain records in CAJUN are
24   updated for the most recent -- for the current
25   incarceration period.

45

1      Q.   Let's say you didn't want to create a

2  pull document for immediate releases, but you just

3  wanted to create a pull document for releases for

4  the most recent month.  Would you be able to do

5  that?

6      A.   Search who released the previous month?

7      Q.   Yeah.

8      A.   Yes.  That would still take about, I

9  don't know, 30 minutes to an hour, but, yes.

10     Q.   That would be a substantially easier task

11 than the February 2019 pull document, correct?

12     A.   Correct.

13     Q.   That document would have the same columns

14 as the February 2019 pull document except perhaps

15 days over?

16     A.   No.  The only thing that would have, if

17 I'm just searching releases, is the release date.

18     Q.   Just release date.  Okay.

19     A.   Because that would only be in the

20 transfer record.  All of this other stuff is from

21 different records.

22     Q.   What if you just wanted to create a pull

23 document that just had raw GTPS date and release

24 date?  How long do you think it would take to

25 create that pull document?

1        A.   Well, that's working with the time comp
2    record and the transfer record, so, I mean, I don't
3    know.  Two to three hours.
4        Q.   What if you just wanted raw GTPS release
5    date and days over? Would that similarly be about
6    two or three hours?
7        A.   Yeah.  Without actually doing it, I
8    really couldn't tell you, but, yeah, because then
9    you are just calculating those two dates together.
10   In CAJUN, that is a couple of manual functions to
11   actually do that.
12             MR. WHEELER:
13                  William, if you don't mind.  Miss
14               Gueho, would you explain what a manual
15               function is?
16             MR. MOST:
17                  Sure.
18             THE WITNESS:
19                  It is -- I don't know how to explain
20               it.  It's -- when I say search, you
21               know, you're not -- I'm not just
22               pulling up a window, and I'm typing in
23               something, like you would in Google.
24               I'm actually doing some code -- writing
25               code searching to get the result, and

```
 1                  then a match is another type of code.
 2                  So it's -- some of these screen shots
 3                  that I have here but with more detail,
 4                  because some stuff is missing in
 5                  between there, but it's manual
 6                  functions that I do one step at a time
 7                  to get to my end result.
 8                      So there is a match.  There is a
 9                  search.  There is a count.  There is
10                  tons of them that I have to
11                  individually do one step at a time, get
12                  my results and then do the next one and
13                  get my results and then do the next
14                  function.
15     BY MR. MOST:
16          Q.   Because you are working with technology
17     that's a couple of decades old, correct?
18          A.   Correct.
19                  MR. WHEELER:
20                      That is outside the scope.
21                  Objection.
22     BY MR. MOST:
23          Q.   So once you have -- when we have been
24     talking about creating these pull documents, the
25     number of hours, we are talking about to get it
```

1    from CAJUN to the TXT file, right?

2        A.    Yes.

3        Q.    Then you import it into Excel?

4        A.    Yes, which I usually say 30 minutes to an

5    hour to get it from text document to the Excel

6    document.

7        Q.    What other kind of pull documents has

8    your unit created, other than ones about immediate

9    release? Just some examples.

10            MR. WHEELER:

11                Object to form.  You may answer.

12            THE WITNESS:

13                I don't know.  It depends.  I really

14              don't, because, usually, I'm just

15              looking for a result.  I'm not really

16              paying attention to what all I'm

17              pulling in.  I'm trying to go after one

18              specific thing, so I don't really know

19              to tell you what I've done.

20    BY MR. MOST:

21        Q.    What are those specific things that

22    you've been looking for in pull documents in the

23    past?

24        A.    Like if we get a survey from BJS, and

25    it's a survey we have not done in previous -- it's

1    a piece of data that they are wanting, I mean, it

2    could be how many people are released to court

3    order.  Then I have to manually go and search that

4    out, because I don't really have that number

5    written anywhere to go and get.  So I have to do a

6    search on releases of cohort court orders to figure

7    out during that time period how many people were

8    released to court order.

9         Q.   Is that the reason code?

10        A.   Yes.

11        Q.   That is described?

12        A.   Yes.

13        Q.   A reason code.  That's a piece of data

14   about each inmate who is released?

15        A.   The reason code is any movement, and so

16   each one of them means why he did that movement,

17   and, so, yes, some of them are release reasons.

18        Q.   Some of the entries look like W and B?

19   The reason code?

20        A.   No.  The reason code is going to be an

21   alpha and then a three-digit number.  I don't know

22   if the reason code is actually on this document.

23   Yeah.  I don't think the reason codes are actually

24   on these documents.

25        Q.   Is there a reason code for immediate

1   release?

2        A.   No.

3        Q.   That would make it simpler, huh? Oh,

4   yeah.  I see.  Reason code like G8201 or G301?

5        A.   Yes.  G301 is a release reason.

6        Q.   What is RCC?  Do you know what that is?

7   Look at the third line of Exhibit 6.

8        A.   I think that's one of our -- list of all

9   offenders who released from RCC.  That is probably

10  a location.

11       Q.   Like maybe Rayburn or something?

12       A.   Yeah.  Probably Rayburn Correction

13  Center.

14       Q.   Could you direct CAJUN to just put all

15  its data into a TXT file?

16       A.   All of the CAJUN data into a TXT file?

17  CAJUN is set up into many, many, many, Excel

18  spreadsheets.  A RID basically looks like an Excel

19  spreadsheet, so the masters has 600 RIDs.  So that

20  would be 600 spreadsheets.  I think they are so

21  long that it would not all -- one RID probably

22  would not import into Excel, and then you're

23  talking about your masters, your transfers.  It's a

24  lot of data, so, no.  I would say.  It would take a

25  long, long, long time to do that.

1    Q.   This is really helpful, big picture

2    stuff.  I'd like to next go through the February

3    2019 pull document, through the different columns

4    of data, so that I understand what they mean.

5    A.   Okay.

6    Q.   Some of them are reflected here on

7    Exhibit 2.  It doesn't have all of the columns, so

8    we may need to look at the spreadsheet as well.  So

9    in the spreadsheet, the second tab titled February

10   2019_Original Format, that is the same as the TXT

11   February 2019 pull document, correct?

12   A.   Correct.

13   Q.   So starting at the left most column,

14   Column A, entitled, "DOC Number," I assume that is

15   an inmate's DOC number?

16   A.   Yes.

17   Q.   Column B is Last Name.  That is the

18   inmate's last name?

19   A.   Correct.

20   Q.   C is First Name.  That is the inmate's

21   first name?

22   A.   Yes.

23   Q.   D is Sentence Date.  Is that the date the

24   inmate was sentenced?

25   A.   The earliest sentence date for that

1    incarceration period of that release, yes.

2        Q.    So that is going to be the inmate was

3    released on a particular conviction.  That is the

4    date of the sentencing for that conviction,

5    correct?

6        A.    For that time period, yes.  Well, let me

7    back up.  If he was in on a revocation, then in our

8    system it's under the sentence date, but it's not

9    truly his sentence date.  It's his revocation date.

10   So it is going to be sentence date or revocation

11   date, but it means the same thing to us, but it's

12   not his true sentence date on his court documents.

13       Q.    I really appreciate you being precise.

14   I'm trying to understand this document.  That kind

15   of precision is really helpful, so thank you.  The

16   next, Column E, that is Court Code, correct?

17       A.    Correct.

18       Q.    That is the -- those are numeric numbers

19   that are associated -- each one is associated with

20   a specific court in Louisiana, correct?

21       A.    Correct.

22       Q.    Is there a court code for parole or

23   probation revocation; do you know?

24       A.    No.  That is actually like the district.

25   I think 111 is Orleans, but I'm not positive

```
 1   without having my table, but, no.  And then there
 2   is one code that we have for out of state cases, so
 3   they're not all Louisiana.
 4        Q.   The next column is Admit Date.  That's
 5   the admission date of this inmate into DOC custody
 6   for this particular incarceration period?
 7        A.   Correct.
 8        Q.   It looks like usually the admit date is
 9   the same as the sentencing date, because someone is
10   sentenced to the custody of the DOC, and so that's
11   their admit date, correct?
12        A.   Correct.
13        Q.   Admit date doesn't necessarily mean when
14   the person was physically brought to the DOC,
15   correct?
16        A.   It is when he is -- physically brought,
17   meaning one of our state facilities, no, but when
18   he is admitted to DOC custody, yes.
19        Q.   So the person is considered to be
20   admitted to DOC custody on the day they are
21   sentenced to the custody of the Department of
22   Corrections, correct?
23        A.   Yes and no.  I think sometimes I don't
24   know how the court system works, so I'm going to
25   say yes and no.
```

```
1            MR. WHEELER:
2                 I object to scope on that question.
3     BY MR. MOST:
4         Q.   It looks like for almost all of these the
5     admit date is the same as the sentence date,
6     correct?
7         A.   Yes.
8         Q.   Time Comp Ready is Column G.
9         A.   Correct.
10        Q.   What does that mean?
11        A.   That is the date the initial time comp
12    for that incarceration period was completed,
13    calculated.
14        Q.   So sometimes an inmate,in the period of
15    the time that they're in the DOC, the time comp --
16    their time will be computed multiple times because
17    it may change for good time or CTRP credit,
18    correct?
19        A.   Correct.
20        Q.   Time comp ready is the first time that
21    the inmate's time was computed on that conviction,
22    correct?
23        A.   For that incarceration period, yes.
24        Q.   CTRP Last Date, Column H.  What is that?
25        A.   That is if he had some certified
```

1    treatment rehabilitation programming credit.  That

2    would be the last date that he received those

3    additional dates toward his release.

4         Q.    CTRP is like classes and programs an

5    inmate can do in prison to get time taken off their

6    period of incarceration, correct?

7         A.    Correct.

8         Q.    Column I.  Is that Time Comp Last Date?

9         A.    Yes.

10        Q.    What does that mean?

11        A.    That is the date that the time comp was

12   last calculated for any reason.

13        Q.    Column J.  That's Raw GTPS Date?

14        A.    Correct.

15        Q.    What does GTPS stand for?

16        A.    Good time parole supervision.

17        Q.    So the raw GTPS date, this is the

18   mathematically correct GTPS date after all factors

19   are computed, sentence or jail credit, good time

20   credit, CTRP credit, et cetera?

21        A.    No.  It's prior to CTRP, and I don't know

22   what all you mentioned there, but it is prior to

23   anything that might adjust from the original

24   sentence, so it doesn't include loss of good time

25   or CTRP.

1      Q.   But it would --

2      A.   Or any other reason why they would adjust

3  the days, the court ordered days, or something like

4  that.

5      Q.   But this would include jail credit,

6  right?

7      A.   Correct.

8      Q.   And would it include at least an initial

9  computation of good time under whatever good time

10 act applies?

11     A.   Yes.

12     Q.   I know you're not trying to speak over

13 me, but if you'd wait until I'm completely done, it

14 will make it easier for the court reporter.

15     A.   Okay.

16     Q.   Release Date.  Is that the date an inmate

17 was actually released?

18     A.   Yes.

19     Q.   That is Column K. Next column is L, Days

20 Over.  What does days over mean?

21     A.   I think in one of my other columns I

22 might have mentioned this, but that column title is

23 kind of misleading.  It is actually the date

24 between raw GTPS date and release date, so like --

25 well, no.  It's the days from admission date to

```
 1  release date.  Yes.  Thirteen days.  Yes.  It is
 2  admission date to release date, so it's actually a
 3  time served with us.  So for some of these
 4  offenders, it's not really days over, because that
 5  guy, his raw -- the first guy on the list, his raw
 6  GTPS date and his release date matches, so it's
 7  kind of -- once I cull down to the people that
 8  really are truly days over, then that would be days
 9  over for those people, but it's kind of a
10  misleading title that I put on it.  It's actually
11  time served with DOC.
12       Q.   For many people on this list, that will
13  describe the number of days past their legal
14  release date, correct?
15            MR. WHEELER:
16                 Object to scope.
17            THE WITNESS:
18                 Yeah.  I mean, it depends on the
19              reasons for each one of those people,
20              because you kind of have to look at
21              them one by one, but, yeah.
22            MR. WHEELER:
23                 Object, also, insofar as it calls
24              for a legal conclusion.
25  BY MR. MOST:
```

 1        Q.   So let's take and see if we can
 2   understand one.   Row 6 is -- I'm going to call him
 3   HH.   You see that?
 4        A.   Yeah.   Henry Heffner, yeah.
 5        Q.   So for Mr. Heffner, his raw GTPS date was
 6   January 14, 2019, correct?
 7        A.   Correct.
 8        Q.   He was released on February 15th, 2019,
 9   correct?
10        A.   Correct.
11        Q.   And so he was held past -- 37 days past
12   his calculated release date, correct?
13        A.   Is that 37 days? Is that 77 days between
14   those two days or 37 days between the February -- I
15   mean the January 9th date?   I need a calculator.
16        Q.   Yeah.   I think you're right.
17        A.   So I think that is the admission date to
18   that, so then actually he is from 1/14 to 2/15.
19   That would only be, what, 31 days?   Yeah.
20        Q.   Okay.   So he was held 31 days past his
21   calculated?
22        A.   Yeah.   The raw to release, which is what
23   you are talking about, is over there in Column S,
24   so he is 32.
25        Q.   Raw to release is going to be the column

1    that's more likely to show people who are held past

2    their release date, correct?

3         A.   For that guy, yes.

4         Q.   We are going to go through each column.

5    We have plenty of time to talk about this.  Is

6    there something you wanted to say?

7         A.   No.  Go ahead.

8         Q.   So days over is, for the people on this

9    list, it's the release date minus admit date?

10        A.   Correct.

11        Q.   Column M is PreClass Received?

12        A.   Yes.

13        Q.   Is that the date the DOC received that

14   inmate's PreClass packet?

15        A.   Correct.

16        Q.   So if it was brought to the DOC via a

17   vehicle from a sheriff's office, for example, that

18   would be -- and the date it's received, that means

19   that would be the PreClass received date?

20             MR. WHEELER:

21                  I object to form, compound, and I

22               object to scope, unless you want to

23               clean it up.

24             THE WITNESS:

25                  You would have to ask Angela that.

1          I know that's the date, and I don't

2          know what date that is based on. You

3          just said driving and all of that

4          stuff.  Angela would know better what

5          that date actually means.  I just know

6          in our data it's the PreClass received

7          date.

8    BY MR. MOST:

9        Q.   The day that DOC got that inmate's

10   PreClass packet?

11       A.   Correct.

12       Q.   Sent To Receive, Column N.  Is that

13   sentenced?  What does "Sent" stand for?

14       A.   That is from sentence date to received

15   date.

16       Q.   Received date is PreClass received date?

17       A.   Correct.

18       Q.   So everything in here that talks about

19   received, that's PreClass received?

20       A.   Correct.

21       Q.   So then O is Received to Comp.  Is that

22   number of days from PreClass received to time comp

23   ready?

24       A.   Yes.

25       Q.   So some of these columns, like this one,

1    are just the mathematical result of comparing two

2    other columns, correct?

3         A.    Correct.

4         Q.    TM Ready to Release.  Is TM time comp?

5         A.    Yes.

6         Q.    So that's the number of days between the

7    initial calculation of the offender's time

8    computation and their release, correct?

9         A.    Correct.

10        Q.    So this column shows -- so this whole

11   spreadsheet is people who are subject to immediate

12   release upon time computation, right?

13        A.    Correct.

14        Q.    So this column shows that for people

15   eligible for immediate release upon time

16   computation, a lot of them it's one day before they

17   are actually released.  For some it's three.  For

18   some it's four, some it's five, some it's six.  I'm

19   looking down the column here.  Is that right?

20        A.    Correct.

21        Q.    Column Q.  This is TM to Last.  Is that

22   the number of days from time comp ready date to

23   time comp last date?

24        A.    I'm trying to find my time comp last

25   date.  I think so, but I'm trying to find my time

1    comp last date.  Yes.

2        Q.   That's going to be -- there is a lot of

3    zeros in that column, because for most of the

4    people on this list, the time comp was probably

5    only done once, right?

6        A.   I would assume so, yes.

7        Q.   Column R is CTRP to Rel.  That's CTRP to

8    release date?

9        A.   Yes.

10       Q.   So that is the number of days from the

11   last date the offender's time computation was done

12   because of CTRP credits to their release date,

13   correct?

14       A.   Correct.

15       Q.   Column S is Raw to Release.  Is that the

16   number of days from raw GTPS date to the release

17   date?

18       A.   Correct.

19       Q.   Jail Credit.  Is that the number of jail

20   credit days that inmate received?

21       A.   For this incarceration period, yes.

22       Q.   CTRP Earned Date is the number of CTRP

23   credits an inmate received in that period of

24   incarceration?

25       A.   Yes, but I don't know if that's the total

1    or just equal to this last CTRP update.  So, yeah.

2    It's either for -- the 120 days are for that date,

3    that February 6th date, or it's the total.  I don't

4    know.  I'd have to go back and look at data in

5    order to figure that out.

6         Q.   So with this spreadsheet, it looks like

7    we can track certain things.  We can see when an

8    inmate was sentenced, correct?

9         A.   Correct.

10        Q.   We can see when the DOC received their

11   PreClass packet, correct?

12        A.   Correct.

13        Q.   And then we can see how long it took

14   between receiving the PreClass packet and doing the

15   first time computation for that inmate, correct?

16        A.   Correct.

17        Q.   We can see, once their time comp is done,

18   and they're found to be eligible for immediate

19   release, how long before they're actually released,

20   correct?

21        A.   Correct.

22        Q.   Column J, Raw GTPS Date, that is the date

23   someone's sentence is complete, barring loss of

24   good time or CTRP time, correct?

25        A.   Correct.

 1          Q.   And for people eligible for immediate
 2     release, they're unlikely to have CTRP credit or
 3     lots of good time, correct, because they have only
 4     been in a short period of time?
 5          A.   I don't know.  You'd have to ask PreClass
 6     that, because if they've been in parish jail, I
 7     think sometimes while they're awaiting sentence or
 8     something like that, sometimes they are in programs
 9     that might be acceptable, but I'm not sure.  You
10     would have to ask PreClass that question.
11          Q.   So I wanted to also click through the
12     various tabs of this spreadsheet to see if I
13     understand what they are about.  So the first tab
14     is Directory of Workbook. It looks like a key you
15     made to explain --
16          A.   The different columns.
17          Q.   It looks to me like a key of the various
18     tabs in the spreadsheet.  Is that right?
19          A.   Correct.
20          Q.   Are any of these tabs most likely to show
21     us the people who were held past their release date
22     in February of 2019?
23          A.   If you look at the -- I mean, you'd have
24     to look down the different -- the list and look at
25     the different dates and the calculations to

1    determine that, but, yeah.

2         Q.   Like if I were saying -- where in this

3    spreadsheet should I look to see the best big

4    picture about who was held past their release date?

5    Am I looking at Tab 2, Feb 2019 Original Format, or

6    is there another tab that would be more likely to

7    give me that information?

8         A.   No, because the tab after that is the

9    same information.  I just re -- I just added it to

10   the columns to make the headers more -- what do you

11   call it.  The headers make more sense to other

12   people than just me, but it's all the same data

13   that is contained in it.  It's all the same

14   information.

15        Q.   Oh, yeah.  I see that.  That tab has a

16   little extra row that explains what each column

17   means.  So then Tab 5 is those people whose raw

18   release date was prior to their sentence date?

19        A.   Yes.

20        Q.   So that might be someone, for example,

21   who had so much jail credit that it was more than

22   their sentence?

23        A.   I would assume, yes.

24        Q.   Tab 6 breaks it down by court, so you can

25   see where more of the problem is coming from, which

1   parts of the state?  Is that right?

2       A.   I wouldn't necessarily say problem, but

3   it's just a count of those records, yes, by court.

4       Q.   Raw Prior to Paperwork Received.  So

5   that's the people who, once their time was

6   computed, you see that their calculated release

7   date is before the paperwork even got to the DOC,

8   correct?

9       A.   Correct.

10      Q.   The next one breaks that down by court?

11      A.   Correct.

12      Q.   Then the next, Raw Prior to Time Comp

13  Ready.  That is where people's calculated release

14  date is prior to the date in which they did the

15  time computation, right?

16      A.   Correct.

17      Q.   The next one, Raw Equal to Actual

18  Release.  These are the people whose release date

19  actually matched the calculated what their release

20  date should be, correct?

21      A.   Correct.

22      Q.   It looks to be about 14 people out of

23  231; is that right?

24      A.   Correct.

25      Q.   Then the next, Raw Greater than Actual

1    Release, the next tab.  This is all the people
2    whose calculated release date is later than their
3    actual release date?
4              MR. WHEELER:
5                   Hold on, please.
6              THE WITNESS:
7                   Okay.
8              MR. WHEELER:
9                   Would you please repeat your
10               question?
11             MR. MOST:
12                  Sure.
13   BY MR. MOST:
14        Q.   So I'm looking at a tab that's Raw
15   Greater than Annual.
16        A.   Correct.
17        Q.   These are the people whose calculated
18   release date was later than their actual release
19   date, correct?
20        A.   Their raw GTPS date is greater than their
21   actual release date, correct.
22        Q.   Any idea why there would be people like
23   that?
24        A.   It looks like all of those have CTRP
25   credits, so I am assuming because their CTRP moved

1    them.

2         Q.    The next one is Raw Prior to Release.

3    All Other Reason Why.  These are also people who

4    their raw calculated release date is prior to their

5    release date, and they didn't fit into one of the

6    other categories, right?

7         A.    Correct.

8         Q.    This is really great data.  It is really

9    helpful for us to understand what is going on.  You

10   say that -- you wouldn't say that -- you objected

11   to my use of the word "problem?"

12        A.    Yeah.  I mean, I can't say whether it's a

13   problem or not.  I mean, it's just a count of the

14   data on the previous spreadsheet.

15             MR. WHEELER:

16                  Object to scope.

17   BY MR. MOST:

18        Q.    Do you think there is a problem here?

19             MR. WHEELER:

20                  Object to scope.

21             THE WITNESS:

22                  Again, that's not for me to say.

23   BY MR. MOST:

24        Q.    Well, what do you think?

25             MR. WHEELER:

```
 1                    Object to scope.
 2            THE WITNESS:
 3                    I think I have a lot going on, and I
 4                just play with the data.
 5    BY MR. MOST:
 6        Q.   Do you know if the DOC got the grant from
 7    the Department of Justice?
 8            MR. WHEELER:
 9                    Object to scope.
10            THE WITNESS:
11                    As far as I'm aware, no.
12    BY MR. MOST:
13        Q.   Do you recall the Six Sigma report had
14    overdue days in it?  Does that ring a bell?
15            MR. WHEELER:
16                    Object to scope.
17            THE WITNESS:
18                    That's been so many years ago I
19                 don't really remember what all of the
20                 -- I just know the outcome of that was
21                 to consolidate PreClass.
22            MR. MOST:
23                    Beau, do you have any questions?
24            MR. WHEELER:
25                    Can I have five or ten minutes,
```

```
 1              please?
 2         MR. MOST:
 3              Sure.
 4              {BRIEF RECESS}
 5  EXAMINATION BY MR. WHEELER:
 6         Q.   Miss Gueho, I  only have two questions
 7  for you.  Earlier, Mr. Most used the word
 8  "overwritten" when referring to updated data in the
 9  spreadsheet.  To be clear, and please correct me if
10  this is a misstatement of your earlier testimony.
11  The data contained in the spreadsheet is not lost
12  or destroyed.  It is simply made more difficult to
13  compile due to the necessity of having to retrieve
14  that data from the physical file of the individual
15  offenders?
16         A.   Correct.
17         Q.   Does this spreadsheet take into account
18  the process of determining whether or not an inmate
19  may be subject to parole holds, ICE detainers,
20  warrants, or other similar holds that would prevent
21  an inmate's release?
22         A.   No.
23              MR. WHEELER:
24                   No other questions.
25  BY MR. MOST:
```

71

1     Q.   Just to clarify regarding overwritten, so
2  if I'm understanding you correctly, Melanie, data
3  is overwritten within CAJUN, correct?
4     A.   Well, I consider it being updated with
5  the new information that is coming in about the
6  offender for that record.
7     Q.   So the old data is no longer in CAJUN and
8  has been replaced by new data in some circumstances
9  within CAJUN, correct?
10     A.   Correct.
11     Q.   You believe that in some cases the old
12  data may be backed up in scanned images of paper
13  printouts, but you're not sure, correct?
14     A.   Correct.
15     MR. MOST:
16          And I'll note on the record that the
17       sheriff's -- representatives of the
18       sheriff's office were noticed for this
19       deposition, but they're not present and
20       gave no indication to wait or postpone.
21       Anything else?
22     MR. WHEELER:
23          No.
24          [End of deposition, 11:40.]
25

1          C E R T I F I C A T E

2

3                This certification is valid only for
a transcript accompanied by my original signature
4 and original required seal on this page.

5                I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6 as the officer before whom this testimony was
taken, do hereby certify that MELANIE GUEHO, after
7 having been duly sworn by me upon authority of R.S.
37:2554, did testify as hereinbefore set forth in
8 the foregoing 71 pages;

9                That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10 or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11 ability and understanding;

12                That the transcript has been
prepared in compliance with transcript format
13 guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14 prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15 and in rules and advisory opinions of the board;

16                That I am not related to Counsel or
to the parties herein, nor am I otherwise
17 interested in the outcome of this matter.

18

19

20

21 _____
Sandra P. DiFebbo,
22 Certified Shorthand Reporter

23 Date:  _____

24

25