## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| BRIAN HUMPHREY, JOEL GIROIR, and BRYANT WHITE, on behalf of themselves and all similarly situated individuals, | CIVIL ACTION NO. 3:20-cv-00233-JWD-SDJ |
| Plaintiff, | CLASS ACTION |
| v. | **JURY TRIAL DEMANDED** |
| JAMES LEBLANC, | |
| Defendant. | |

## SECOND AMENDED CLASS ACTION COMPLAINT[1]

## INTRODUCTION

1.      For years now, the Louisiana Department of Public Safety & Corrections ("the DOC") has been unlawfully and knowingly overdetaining thousands of Louisiana residents in its custody every year. Defendant James LeBlanc, Secretary of the DOC, has known about this misconduct since at least 2012.[2] Secretary LeBlanc has admitted that the DOC is "legally bound" to release people on time, and he has admitted that the DOC's chronic, unlawful overdetention is a "big problem."[3] Yet Secretary LeBlanc has done little to fix the big problem.

2.      By overdetaining Louisianans as a matter of policy, the DOC is usurping the sentencing authority that belongs to Louisiana's judiciary. Many of these people are sentenced by a court or a parole board to "time served" or an equivalent sentence or parole or probation revocation determination that legally entitles them to immediate release from the moment they are sentenced or have their parole or probation revoked. But they are not immediately released. Instead, as a standard practice, the DOC drags its feet computing their release dates and, in the meantime, simply

---

[1] Plaintiffs file this amendment pursuant to Federal Rule of Civil Procedure 15(a)(2), with leave granted by the Court. *See* ECF 35.
[2] Ex. 1, Dep. of Secretary LeBlanc at 45, 48-49.

continues to detain people who should be free and whom the DOC has no legal authority to imprison. Many are forced to sit for weeks or even months with no idea of when the DOC will get around to processing their paperwork and releasing them. The DOC, in other words, falsely imprisons thousands of people every year, degrading lives and creating uncertainty and misery for families across the state.

3.      Still, Secretary LeBlanc has not implemented any policy to ensure that the DOC stops overdetaining—and falsely imprisoning—Louisianans. Overdetention costs the state at least $2.8M per year,[4] but Secretary LeBlanc has not attempted to reallocate that spending toward new measures to prevent the DOC from holding people past their legal release dates. Meanwhile, the DOC simply pretends that overdetention is an acceptable part of a person's punishment, when by law it is not.

4.      Named Plaintiffs Brian Humphrey, Joel Giroir, and Bryant White were victims of the DOC's misconduct. They seek to represent a Class of all persons who have been remanded to the custody of the DOC since April 16, 2019 (pursuant to a criminal sentence or a parole or probation revocation), and who were entitled to release at the time they were remanded to the DOC's custody, but who were released by the DOC more than 48 hours past the time that they were remanded. On behalf of the numerous people subject to this unlawful practice, the Named Plaintiffs seek to have each putative class member recover the damages they suffered from their false and unlawful overdetention.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a). It has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C.

---

[3] *Id.* at 41.
[4] Ex. 2, DOC Grant Application at 4.

§ 1367 because those claims arise from the same events and are part of the same case and controversy as the federal claims.

6.      Venue is proper in this district under 28 U.S.C. § 1391 because Defendant resides in this judicial district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

7.      Plaintiff Brian Humphrey was eligible for immediate release upon his sentencing on April 16, 2019,[5] but the DOC did not release him from custody until May 13, 2019,[6] the day that the DOC finally computed his release date and found him eligible for immediate release.[7] The DOC did not compute Mr. Humphrey's release date or set him free until 17 days after the DOC received his paperwork from the Bossier Parish Sheriff's Office on April 26, 2019, and 27 days after he was sentenced on April 16.[8]

8.      Plaintiff Joel Giroir was eligible for immediate release upon his probation revocation and resentencing hearing on January 26, 2021. Instead he was detained for weeks beyond his legal release date and was not released until February 22, 2021.

9.      Plaintiff Bryant White was eligible for immediate release from the Orleans Parish jail after pleading guilty on charges with credit for time served, on March 1, 2021, but instead was placed on a "parole hold" for weeks and was not released until April 23, 2021.

10.     Defendant James LeBlanc is the Secretary of the DOC and its final policymaker. He is sued in his individual capacity. He has served in that role since 2008. He is appointed by the Louisiana governor and is the chief executive officer for the DOC, which includes both prisons and the Board of Pardons and Parole. He formulates rules and regulations for the DOC, and he

---

[5] Ex. 3, Humphrey Sentencing Minutes at 2.
[6] Ex. 4, Humphrey Certificate of Release.
[7] Ex. 5, Humphrey Release Date Computation Information.

determines policy regarding management, personnel, and total operations for the agency. He oversees the DOC's central office and its field unit staff, who are charged with carrying out the work of the agency and protecting the rights of all persons held in DOC custody. Secretary LeBlanc was aware of and consciously disregarded a substantial risk of overdetention to the putative Class. He was aware of the overdetention problem but failed to exert the supervision necessary to end it. At all relevant times, Secretary LeBlanc has acted under color of law.

## FACTUAL ALLEGATIONS

### I.    Named Plaintiffs Were Overdetained for More than 48 Hours by the DOC after They Were Entitled to Immediate Release

#### A.    Brian Humphrey

11.    On April 16, 2019, the 26th Judicial District Court in Bossier Parish sentenced Mr. Humphrey to "3 years hard labor in the Louisiana Department of Corrections." In issuing that sentence, however, the Court simultaneously gave Mr. Humphrey credit for the time he had already served in jail, and ordered further that the sentence should "suspend all but time served."[9] In other words, Mr. Humphrey's sentencing judge gave him credit for the time he had served in jail, and otherwise suspended his sentence. Thus, as of the date of his sentencing, Mr. Humphrey had served his entire sentence. He should have been released immediately.

12.    That did not happen. Instead, the Bossier Parish Sheriff took Mr. Humphrey back into the jail. Then, on April 18, 2019, Mr. Humphrey was transported to Webster – Bayou Dorcheat Correctional Center Transitional Work Program, a DOC facility. There Mr. Humphrey, who by law should have been a free man, waited in prison for weeks, until the DOC got around to reviewing his papers and finally released him.

---

[8] Ex. 6, Facsimile Transmittal Sheet.
[9] Ex. 3, Humphrey Sentencing Minutes at 2.

4

13.     From the date of his sentencing on April 16, 2019, Mr. Humphrey was in the custody of the DOC. On information and belief, during the first ten days of Mr. Humphrey's custody, the DOC made no attempt to determine whether it had any legal right to imprison him.

14.     Then, on April 26, 2019, the Bossier Sheriff's Office sent to the DOC paperwork that the Sheriff had received from the Clerk of Court of the 26th Judicial District. This paperwork contained a note that read "3 years HC DOC all but time served suspended."[10] Mr. Humphrey's Uniform Sentencing Commitment Order notes "0" years, "0" months, and "0" days under "Amount of Time in DPS&C custody."[11] Also on April 26, 2019, the Bossier Sheriff's Office faxed 14 pages of "pre-class" information on Mr. Humphrey to the Bayou Dorcheat Correctional Center,[12] where Mr. Humphrey was being held in DOC custody.

15.     This paperwork made plain that Mr. Humphrey should have been a free man already, and that the DOC had no right to detain him. But the DOC did not release him. Instead, with the paperwork in hand, the DOC waited more than two weeks to determine whether it had any authority to imprison Mr. Humphrey at all.

16.     On May 13, 2019, the DOC completed Mr. Humphrey's time computation, resulting in a calculation of 0 days.[13] Mr. Humphrey's "must serve" time was calculated to be -114 days.[14] Any person whose "must serve" comes to a negative number is eligible for immediate release.[15]

17.     That same day, May 13, 2019, the DOC issued a "Certificate of Release" for Mr. Humphrey certifying his "Completion of Sentence."[16]

---

[10] Ex. 7, Humphrey DOC Basic Information Interview for Local Jail Facilities.
[11] Ex. 8, Humphrey Uniform Sentencing Commitment Order.
[12] Ex. 6, Facsimile Transmittal Sheet.
[13] Ex. 5, Humphrey Release Date Computation Information.
[14] Ex. 9, Humphrey Time Computation and Jail Credits.
[15] Ex. 10, Dep. of DOC 30(b)(6) Representative Angela Griffin (Jan. 10, 2020) at 87.
[16] Ex. 4, Humphrey Certificate of Release.

5

18.     Mr. Humphrey was released from DOC custody on May 13, 2019, at 5:30 PM, 27 days after he was entitled for immediate release upon his sentencing and 17 days after the DOC received his paperwork from the Bossier Sheriff's Office.

**B.     Joel Giroir**[17]

19.     Joel Giroir is a 36-year-old man who was overdetained by the DOC in the St. Tammany Parish Jail.

20.     Mr. Giroir was held on an attachment with no bond in case number 589-169 and held on a $5,000 bond in case number 589-855 in St. Tammany Parish Jail from January 30, 2018, to March 13, 2018. He was held with no bond on case numbers 589-855 and 589-169 from June 12, 2018 until July 19, 2018. On July 19, 2018, he was sentenced to 90 days in DOC custody in lieu of revocation. He served 110 days in Concordia Parish Jail. He turned himself into St. Tammany Parish Jail on January 22, 2021, and was incarcerated there until his revocation hearing date on January 26, 2021.

21.     On January 26, 2021, Mr. Giroir had a probation revocation and resentencing hearing. He was sentenced to one year in DOC custody.

22.     Under Louisiana's "good time" law, Mr. Giroir is entitled to a diminution of sentence. La. Rev. Stat. § 15:571.3(B)(1)(a). Because of his good behavior and because he was not convicted of a crime of violence, he is only required to serve 35 percent of his one-year sentence, or 128 days.

23.     As of the date of his revocation and sentencing on January 26, 2021, Mr. Giroir had served at least 192 days in jail on his one-year sentence. Thus, on the date of his sentencing, he was eligible for immediate release.

---

[17] Ex. 18, Declaration of Joel Giroir.

24.     Mr. Giroir was not immediately released on January 26, 2021, even though he had already served at least 64 days beyond his sentence. Instead, he was held in the jail until February 22, 2021.

**C.     Bryant White**[18]

25.     Bryant White was overdetained by the DOC in the Orleans Parish jail for more than seven weeks.

26.     In 2013 Mr. White was sentenced on a criminal conviction, served time in prison, and was later released on parole.

27.     On March 12, 2019, while he was on parole for the 2013 sentence, Mr. White was arrested in Orleans Parish and confined to the Orleans Parish jail. A parole hold was then placed on Mr. White, on April 4, 2019.

28.     On March 1, 2021, while still in the custody of the Orleans Parish jail, Mr. White pleaded guilty to two felony charges stemming from the March 12, 2019 arrest, and was sentenced to 6 months and 23 months to run concurrently, with credit for the time he had served in the Orleans Parish jail since March 12, 2019.

29.     By the time of his plea, Mr. White had served 697 days in jail since March 12, 2019. Under Louisiana's "good time" law, he was entitled to a diminution of the remainder of his 2013 sentence for which the DOC had issued the parole hold. As such, under Louisiana's sentencing laws, the DOC should have "revoked" his parole at the time of his March 1, 2021 plea, and, with credit for the 697 days he had served, he should have been released immediately.

30.     Mr. White was not released on March 1, 2021, however. Instead, the DOC took more than seven weeks to revoke his parole, finally doing so on April 23, 2021. During that time Mr. White was imprisoned in the Orleans Parish jail by the DOC on the parole hold, even though the

---

[18] Ex. 19, Declaration of Bryant White.

DOC lacked legal authority to imprison him on the parole hold after his March 1 plea and sentencing.

## II.    The DOC Has a Pattern and Practice of Overdetaining People in Its Custody

31.    The Named Plaintiffs' cases were not aberrations—to the contrary, their false imprisonment through overdetention is the standard practice of the DOC, a standard practice that Defendant LeBlanc has known about for at least eight years, yet has failed to change.

32.    The DOC has no process in place for ensuring that persons entitled to immediate release upon sentencing or parole or probation revocation are actually released on time, or any time quickly thereafter. Instead, the DOC detains such people for weeks and even months with no idea whether it has a legal right to imprison them at all. For the DOC, such determinations are made in an unhurried process in which the DOC's central office responsible for computing time and issuing release instructions (1) waits days or weeks for others to provide it with the person's sentencing or parole or probation revocation paperwork, and then (2) waits days or weeks to actually examine the paperwork and determine whether the DOC has the legal authority to detain the person. During all that time, the person who should be free—whom a judge or parole board has already deemed eligible for immediate release—languishes behind bars. Thousands of people in Louisiana suffer this fate every year.

33.    To make matters worse, the leadership of the DOC, including Defendant LeBlanc, have been acutely aware of this problem since at least 2012. And after making half-hearted efforts to mitigate the problem, they have shifted instead to justify and normalize the false imprisonment of thousands of Louisianans every year.

### A.    The DOC Detains Thousands of People Past Their Legal Release Dates Every Year

34.    The DOC recognizes that a person who (1) has spent time in custody pretrial, (2) is given a sentence with credit for time served, and (3) has a sentence that is less than or equal to their

period of pretrial custody is entitled to release on the day of their sentencing.[19] For example, a person who spent two months in jail awaiting sentencing, and is then sentenced to thirty days with credit for time served, is entitled to release on the day of his sentencing.

35.    The DOC is responsible for a person's overdetention from the day of sentencing or parole or probation revocation, even if the person is not yet in a DOC facility. The DOC has conceded that a person's "admit date" to DOC custody is the date of that person's sentencing,[20] and the equivalent is true when a person's parole or probation is revoked. Indeed, Secretary LeBlanc has explained that he is responsible for the inmates remanded "to the custody of the DOC," whether they are in "a state-run facility, a parish-run facility, or private-facility."[21]

36.    Any person who is detained past their legal release date is overdetained. The DOC admits that it is "legally bound to release inmates on their release date."[22] Secretary LeBlanc has stated that he first learned "that thousands of people in the custody of the Department of Corrections for whatever reason were being held past their release date" in 2012.[23] But every investigation into the matter since that time has confirmed that the problem continues; indeed it has even come to the attention of judges and legislators.

37.    In 2012, a team of DOC staff performed a review of its time calculation processes, which revealed a widespread pattern of people being held past their legal release dates. Specifically, the investigation found that when the DOC calculated the release dates of inmates, 83% were eligible for "immediate release . . . due to an earlier release date."[24] The DOC learned through this investigation that it was overdetaining over 2,000 people each year, with an average of 71.69

---

[19] *See* Ex. 11, Dep. of DOC 30(b)(6) Representative Angela Griffin (May 31, 2019) at 30-31.
[20] Ex. 12, Dep. of DOC 30(b)(6) Representative Melanie Gueho at 53.
[21] Ex. 1, Dep. of Secretary LeBlanc at 13.
[22] *Id.* at 15.
[23] *Id.* at 48.
[24] Ex. 13, DOC Lean Six Sigma 2012 PreClassification at 4.

"overdue days" per person who was overdetained.[25] The DOC has admitted that this is "a lot of overdetention."[26]

38.    The 2012 review found that some of the delay was caused by the time it took for the DOC to receive documents from the clerks' and sheriffs' offices, and the remainder was caused by the DOC itself taking an average of approximately 79 days to calculate release dates after it had the sentencing documents in hand.[27]

39.    These 2012 findings should have set off alarm bells. Under Louisiana law, confining any person without legal authority amounts to false imprisonment. Under settled decisions by the United States Supreme Court, meanwhile, correctional facilities are allowed some time to ensure that an imprisoned person's release is administratively proper, but in all events, it is presumptively unreasonable to imprison a person for more than 48 hours after they are entitled to release.[28] The DOC's imprisonment of people for *months* after they are entitled to release flagrantly violates the laws of Louisiana and the United States.

40.    No such alarm was raised, however. After making their 2012 findings, the DOC did not eliminate or even meaningfully mitigate the problem of overdetention. Secretary LeBlanc recently testified that he understood that "people [are still] being held [in DOC custody] an average of about two months past their release date."[29]

41.    Indeed, five years after the 2012 investigation, in 2017, another internal investigation reported that the DOC had "an average of 200 inmates per month held an average of 49 days past

---

[25] Ex. 14, Dep. of DOC 30(b)(6) Representative Derek Ellis at 20.

[26] Ex. 15, Dep. of DOC 30(b)(6) Representative Angela Whittaker at 33.

[27] *Id.* ("Q. So this approximately 79-day number represents the DOC's, to the best of its knowledge in 2012, about how long it was taking for documents to wait at the DOC to be calculated? A. Correct.").

[28] *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

[29] Ex. 1, Dep. of Secretary LeBlanc at 45.

the end of their sentence."[30]   So many people were being overdetained under this practice that it cost the state "$2.8M per year in housing costs alone."[31] According to the DOC, this is "taxpayer money" that the "DOC should not have to spend" on people whose sentences are complete.[32]

42.     But the 2017 investigation did not fix things either. As recently as 2019, the DOC compiled a set of data and found that it had held at least 231 individuals past their legal release dates in a single month (February of 2019) for an average of 44 extra days.[33] This suggests that over 2,000 people per year are still being overdetained, seven years after the DOC first identified the problem.

43.     The causes of this problem have been obvious since at least the 2012 investigation. That inquiry found that some of the delay was caused by the time it took for the DOC to receive documents from the clerks' and sheriffs' offices, and then, even after receiving the sentencing papers, the DOC was taking an average of approximately 79 additional days to complete the process of calculating sentences.[34] For example, the DOC waits nearly 11 days on average to even *begin* calculating a person's time once the paperwork is received from the sheriff or court clerk.[35]

44.     As the DOC's overdetention practices have continued, judges and state legislators have periodically reminded Secretary LeBlanc of the problem.

45.     On January 20, 2015, Judge Mary Doggett of the 9th Judicial District Court sent an email that was forwarded to Secretary LeBlanc complaining that an individual had been held past his

---

[30] Ex. 14, Dep. of DOC 30(b)(6) Representative Derek Ellis at 38 ("Q. So it's a true statement that the DOC found that in 2017 it had an average of 200 inmates per month held an average of 49 days past the end of their sentence, correct? A. Yes.").

[31] Ex. 2, DOC Grant Application at 4.

[32] Ex. 14, Dep. of DOC 30(b)(6) Representative Derek Ellis at 35.

[33] *See* Ex. 16, Feb. Pull Doc.; *see also* Ex. X, *Grant v. Gusman* RFA Responses, RFA No. 76 ("It is admitted that in February of 2019, 231 people were found to be held past the release date, with an average of 44 days waiting for release.").

[34] Ex. 15, Dep. of DOC 30(b)(6) Representative Angela Whittaker at 33.

[35] This number was obtained by calculating the average of the column "RECEIV TO COMP" in Ex. 16, Feb. Pull Doc. The "RECEIV TO COMP" column provides, for each individual listed, the number of days that passed between the DOC receiving the person's paperwork and the DOC beginning the process of calculating the person's time.

release date by nearly two months "in spite of several phone calls from Judge Randow for his release."[36]

46.    On January 28, 2016, a state legislator's office emailed Secretary LeBlanc regarding an individual who had obtained "an order of immediate release" more than two weeks prior, and was "still being detained and has been given no explanation of the delay."[37]

47.    On February 21, 2019, Secretary LeBlanc received an email from Judge Jules D. Edwards of the 15th Judicial District Court to which Judge Edwards had attached three articles about overdetention in Louisiana and information about a specific overdetained person. Judge Edwards added that "defense attorneys in Lafayette are also complaining about the failure to timely release inmates from LPCC." Secretary LeBlanc's response indicated that he had read at least one of the articles.[38]

### B.    Secretary LeBlanc Has Been Deliberately Indifferent to the DOC's Overdetention of Thousands of Louisianans

48.    Multiple investigations since 2012, and repeated attempts to intervene by other branches of Louisiana government, have done little to change the DOC's pattern of overdetention. The DOC has been content to tinker around the edges of the problem, while doing little to actually reduce or eliminate the mass false incarceration it is committing.

49.    Upon learning of the scale of its overdetention problem in 2012, the DOC did not set a goal of eliminating the problem. Rather, it set a goal to "[r]educe the percentage of Immediate

---

[36] Ex. 17, Secretary LeBlanc Emails 3-4 (Email from Mary Lauve Doggett, District Judge, 9th JDC, to Cole Gralapp, District Administrator, Probation and Parole (Jan. 20, 2015, 4:48 PM) (forwarded to James LeBlanc Jan. 23, 2015, 1:54 PM)).

[37] *Id.* at 10 (Email from the office of Chris Hazel, State Representative, House District No. 27, to James LeBlanc, Secretary, DOC (Jan. 28, 2016, 9:44 AM)).

[38] *Id.* at 1-2 (Email from Jules D. Edwards III, District Judge, 15th JDC, to Rhett Covington, Assistant Secretary, DOC (forwarded to James LeBlanc Feb. 24, 2019, 6:14 PM)).

Releases by 80% (from 2252 to 450/yr)" and to "[r]educe the average number of days per case for immediate releases from 71.69 days (non CTRP) to 31 days."[39]

50.    After learning that the DOC was still detaining people an average of about two months past their legal release dates even with the intervention resulting from the 2012 review in place, Secretary LeBlanc did not fire anyone. He did not demote anyone. He did not dock anyone's pay. He did not even reprimand anyone.[40] He did not take any supervisory action to prevent his agency from continuing to detain people past their legal release dates.

51.    Since that time, Secretary LeBlanc has not consulted with the heads of other states' departments of corrections about how they ensure that people are not detained past their legal release dates, aside from looking at some of the software that other states use.[41]

52.    Secretary LeBlanc has suggested that overdetention might be somewhat lessened in Louisiana if the DOC were to go and pick up the paperwork necessary to process release dates rather than waiting for sheriffs and clerks to deliver it,[42] but the DOC has never implemented that strategy under Secretary LeBlanc's leadership. Likewise the DOC's central office waits days to receive parole or probation revocation paperwork from its own parole board in order to begin calculating parole or probation revocation release times.

53.    Secretary LeBlanc has failed to adopt a policy proposed by a legislative auditor that would impose a deadline on sheriffs to submit pre-classification packets to the DOC, despite his

---

[39] Ex. 13, DOC Lean Six Sigma 2012 PreClassification at 5. The DOC estimated that if it could achieve these goals of reducing the percentage of overdetained people by 80% and reducing the average number of days of overdetention per person to 31 days, it could save the state $3.7 million per year. *Id.* at 19.

[40] Ex. 1, Dep. of Secretary LeBlanc at 48-49.

[41] *Id.* at 103-04.

[42] *Id.* at 80, 100-01.

own admission that "there's no reason why [the DOC] couldn't" adopt such a policy and that he is "not sure why we don't, to be honest," and "we could certainly, at least, make an attempt."[43]

54.     Secretary LeBlanc has not adopted any policy for the DOC requiring the immediate calculation of sentences or parole revocation release dates; instead, he has allowed these dates to be calculated in an *ad hoc* manner after the DOC central office receives the relevant paperwork.

55.     Further, the DOC has declined help when offered. For example, in 2019, the executive director of the Louisiana Clerks of Court Association, Debbie Hudnall, had a series of meetings with the DOC and Secretary LeBlanc. Ms. Hudnall suggested that, to speed things up, the Clerks of Court could begin emailing sentencing documents to the DOC. The DOC declined, claiming that they "don't have the capability of receiving that."[44]

56.     Aside from the specific investigations in 2012, 2017, and 2019, the DOC does not even keep a record or count of individuals who have been overdetained.[45]

57.     Shockingly, the DOC has tried to frame overdetention as a component of a person's sentence, stating that a person's "sentence continues" *past* the legal release date ordered by a judge "until [the DOC does the person's] time comp[utation] and release[s] him."[46]

58.     Indeed, the DOC has endorsed overdetention as a matter of policy.

---

[43] *See Crittindon v. Gusman*, No. 3:17-cv-00512-SDD-EWD at 26 (M.D. La., Apr. 13, 2020) (order denying motions for summary judgment) ("[B]oth Secretary LeBlanc and Defendant Stagg testified in their depositions that they were familiar with a proposal by the legislative auditor that such a deadline be implemented, and both men expressed approval for the idea. In fact, when Secretary LeBlanc was asked at his deposition if it has 'ever been considered to include a timeframe for the submission of these materials to DOC,' he responded: 'Not that I'm aware of, but **there's no reason why we couldn't. I mean, I'm not sure why we don't, to be honest with you.**' Secretary LeBlanc added: 'I'm not sure that we could enforce it to begin with, but we could certainly, at least, make an attempt.'") (emphasis in original).

[44] Testimony of Debbie Hudnall, Louisiana House of Representatives, Judiciary Committee, Jan. 15, 2020, at 1:03:35, Available at

http://house.louisiana.gov/H_Video/VideoArchivePlayer.aspx?v=house/2019/dec/1212_19_J U.

[45] *See* Ex. 11, Dep. of DOC 30(b)(6) Representative Angela Griffin (May 31, 2019) at 29.

[46] Ex. 10, Dep. of DOC 30(b)(6) Representative Angela Griffin (Jan. 10, 2020) at 36-39.

59.     For example, at least as late as May 2019, the DOC website's "Frequently Asked Questions" page stated, "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date." The DOC has since removed the reference to taking "up to 12 weeks to calculate a date," a timeframe even Secretary LeBlanc conceded was "ridiculous" and "absurd."[47]

60.     The DOC also included an audio statement in its voicemail recording saying that it "takes at least 90 days after sentencing" for the department to calculate a person's time. This statement was finally removed from the voicemail recording in or around February or March of 2019.[48]

61.     These voicemail and website statements reveal the scope of the DOC's misconduct; their purpose was to discourage family members from "inundat[ing]" the DOC with questions about when their loved ones—who had been told by a judge that they were free to rejoin their families— would actually be released.[49]

62.     Named Plaintiffs are among the thousands of people who have been wrongfully imprisoned as a result of Secretary LeBlanc's demonstrated indifference to the DOC's unlawful conduct.

## CLASS ACTION ALLEGATIONS

63.     Named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, to assert the claims alleged in this Complaint on a common basis.

64.     This action is brought and may properly be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, because the questions of law or fact common

---

[47] Ex. 1, Dep. of Secretary LeBlanc at 88-90.
[48] *See* Ex. 14, Dep. of DOC 30(b)(6) Representative Derek Ellis at 12-13.

to proposed class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## I.    The Plaintiff Class

65.    Named Plaintiffs propose a class defined as: all persons who have been remanded to the custody of the DOC since April 16, 2019, and who were entitled to release at the time of their remand (either pursuant to sentencing or parole or probation revocation), but who were released by the DOC more than 48 hours past the time that they were remanded to the DOC's custody. The Class seeks to recover damages for the injuries caused to each class member by this overdetention and false imprisonment.

## II.    Rule 23(a)

66.    The proposed class satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

### A.    Numerosity — Fed. R. Civ. P. 23(a)(1)

67.    The Class is so numerous that joinder of all members is impracticable. The most recent overdetention data from the DOC (from February of 2019) shows that over 200 individuals were overdetained in a single month, suggesting that the DOC overdetains over 2,000 individuals over the course of a year. This 2019 count was consistent with data from 2017, which showed that the DOC had "an average of 200 inmates per month held . . . past the end of their sentence."[50] Upon information and belief, the DOC has not implemented any major changes that might have

---

[49] *See* Ex. 1, Dep. of Secretary LeBlanc at 89; *see also* Ex. 14, Dep. of DOC 30(b)(6) Representative Derek Ellis at 18.

[50] Ex. 14, Dep. of DOC 30(b)(6) Representative Derek Ellis at 38 ("Q. So it's a true statement that the DOC found that in 2017 it had an average of 200 inmates per month held an average of 49 days past the end of their sentence, correct? A. Yes.").

significantly mitigated the rate of overdetention that was captured in the February 2019 snapshot. Plaintiffs therefore estimate a class size of over 2,000 members.

**B.    Commonality — Fed. R. Civ. P. 23(a)(2)**

68.    All members of the proposed Class are subject to the same systemic unconstitutional policies, acts, and omissions on the part of Defendant described in this Complaint, and all have suffered or will suffer violations of their constitutional rights and their rights under state law as a result of the DOC's pattern and practice of overdetaining people in its custody.

69.    There are questions of law and fact common to the members of the class.

70.    Questions of law that are common to all members of the class include, but are not limited to:

- Whether the DOC had, or has, the legal authority to hold class members past their sentencing or parole or probation revocation dates under the United States Constitution;
- Whether Class Members had, or have, a liberty interest in their immediate release upon sentencing or parole or probation revocation under the United States Constitution;
- Whether Defendant's failure to adopt a policy or policies to mitigate overdetention constitutes deliberate indifference;
- Whether the DOC had, or has, the legal authority to hold class members past their sentencing or parole or probation revocation dates under the Louisiana Constitution;
- Whether Class Members had, or have, a liberty interest in their immediate release upon sentencing or parole or probation revocation under the Louisiana Constitution; and
- Whether the DOC's detention of Class Members past their legal release dates constitutes false imprisonment under state law.

71.    Questions of fact that are common to all members of the class include, but are not limited to:

- Whether the DOC has a pattern of overdetaining people in its custody;
- Whether Defendant is aware of the DOC's pattern of overdetaining people;
- Whether the DOC is responsible for people sentenced to DOC custody from the day they are sentenced; and
- Whether Defendant failed to adopt a policy or policies to mitigate overdetention.

17

72.    Defendant is expected to raise common defenses to these claims, including denying that his actions violate the law.

### C.    Typicality — Fed. R. Civ. P. 23(a)(3)

73.    Named Plaintiffs' claims are typical of those of the Class, as their claims arise from the same policies, practices, or courses of conduct as those of the Class, and their claims are based on the same theories of law as the Class's claims. Named Plaintiffs were eligible for immediate release upon their sentencing or parole or probation revocation, and the DOC held them in custody past that date. Named Representatives are therefore typical of the putative Class, and they suffered the same injury of overdetention described in this Complaint.

### D.    Adequacy — Fed. R. Civ. P. 23(a)(4)

74.    Named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class Members, who each have the same basic constitutional claims. Named Plaintiffs are members of the Class, and their interests coincide with, and are not antagonistic to, those of the other Class Members.

75.    There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating their constitutional rights.

76.    Plaintiffs are represented by attorneys from the Promise of Justice Initiative, Loevy and Loevy, and Most & Associates, who have experience in litigating complex civil rights matters related to prisoners' rights in federal court and extensive knowledge of both the details of the DOC and the relevant constitutional and statutory law. Most & Associates has litigated a number of individual overdetention cases in Louisiana.

77.    Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements.

18

III.     **Rule 23(b)(3)**

78.     Class action status is appropriate because the questions of law or fact common to Class Members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

79.     The question of Defendant's longstanding indifference to policies that result in mass overdetention, and the mass overdetention that results from this indifference, predominates over any individualized issues related to the claims of individual Class Members. The issue of Defendant's liability is common across the Class and will predominate over any unique or personal issues.

80.     A class action is the superior form of adjudication of the claims alleged in this Complaint because most of the proposed Class Members' claims are negative value suits; for many Members of the putative Class, the damages at stake are too slight to repay the cost of an individual suit. Class Members' interests in individually controlling separate actions against Defendant for their overdetention is therefore low. Moreover, no unusual difficulties are likely to be encountered in the management of this class action.

81.     Even if Class Members could afford to litigate their claims individually, individualized litigation creates a potential for inconsistent or contradictory judgments and increases delay and expense to all parties and to the courts. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT I
**42 U.S.C. § 1983**

82.     Named Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

83.     Named Plaintiffs bring this claim on their own behalf and on behalf of the putative Class against Defendant.

84.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution is violated where a person remains incarcerated after the legal authority to hold that person has expired.[51] No privilege enables a jailor to detain a person beyond the period of that person's lawful sentence.[52]

85.     The DOC's legal authority to detain Named Plaintiffs expired on the day they were sentenced or had their parole or probation revoked. Yet pursuant to an unlawful, standard practice that has existed for years, the DOC nevertheless continued detaining Named Plaintiffs for well over 48 hours before attempting to determine whether it had any legal authority to imprison them.

86.     The DOC falsely imprisoned Named Plaintiffs pursuant to a practice that has existed for years in which it waits weeks and even months to determine whether it has lawful authority to imprison persons who in fact were entitled to release on the day of their sentences or parole or probation revocations. That practice injured the thousands of members of the putative class, as described in this Complaint.

87.     Defendant LeBlanc has been aware of this practice since at least 2012, but he has not attempted to stop it; instead the agency Defendant oversees has attempted to normalize its own misconduct.

88.     Secretary LeBlanc's failure to adopt a policy or policies to prevent overdetention is "deliberately indifferent" because "it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[53]

---

[51] *See Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980).
[52] *See Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968); *see also Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N.D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).
[53] *Rhyne v. Henderson Cnty.,* 973 F.2d 386, 392 (5th Cir. 1992).

89.     In failing to adopt any policy to prevent predictable overdetention, Secretary LeBlanc acted with deliberate indifference. This is evidenced by the fact that every investigation into the matter since 2012 has shown that overdetention is a persistent and widespread problem in Louisiana, yet Secretary LeBlanc did not create any policy to attempt to remedy the problem.

90.     Through his deliberate indifference, Secretary LeBlanc deprived Named Plaintiffs, and all Members of the putative Class they seek to represent, of the fundamental right to liberty and violated their due process rights under the Fourteenth Amendment, causing the injuries described in this Complaint.

## COUNT II
### Due Process under Article I, Section 2 of the Louisiana Constitution

91.     Named Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

92.     Named Plaintiffs bring this claim on their own behalf and on behalf of the putative Class against Defendant.

93.     Article One, Section Two of the Louisiana Constitution of 1974 guarantees that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."

94.     By reason of the same conduct that violated Named Plaintiffs' federal constitutional rights, Defendant violated Named Plaintiffs' state constitutional rights to liberty and due process, as well as the state constitutional rights of the putative class he seeks to represent, causing the injuries described in this Complaint.

## COUNT III
### False Imprisonment under State Law

95.     Named Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

21

96.     Named Plaintiffs bring this claim on their own behalf and on behalf of the putative Class against Defendant.

97.     Defendant committed the tort of false imprisonment against Named Plaintiffs when the DOC "restrain[ed] [Named Plaintiffs] against [their] will without a warrant or other statutory authority"[54] for multiple days beyond Named Plaintiffs' legal release dates. By definition, the Class Members Named Plaintiffs seek to represent were also falsely imprisoned by Defendant when they were unlawfully detained beyond their legal release dates, causing the injuries described in this Complaint.

## COUNT IV
## State Law Negligence

98.     Named Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

99.     Named Plaintiffs bring this claim on their own behalf and on behalf of the putative Class against Defendant.

100.     Defendant owes duties to avoid overdetention to persons in DOC custody, including Named Plaintiffs and the members of the putative Class.[55]

101.     These duties were breached by Defendant's acts and omissions, including the failure to timely release Named Plaintiffs and the putative Class Members.

102.     The risks and harms that Defendant caused were within the scope of protection afforded by the duties he owed to Named Plaintiffs and to the putative Class Members.

103.     As a result of Defendant's acts and omissions, Named Plaintiffs and the putative Class Members suffered actual, foreseeable harm, as described in this Complaint.

---

[54] *Kyle v. City of New Orleans*, 353 So.2d 969, 971 (La. 1977); *see also Miller v. Desoto Regional Health Sys.*, 128 So.3d 649, 655-56 (La. App. 3d Cir. 2013).

[55] *Porter v. Epps*, 659 F. 3d 440, 445 (5th Cir. 2011) (a jailor has "not only the duty to protect a prisoner, but also the duty to effect his timely release.").

## COUNT V
### State Law Intentional Infliction of Emotional Distress

104.    Named Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

105.    Named Plaintiffs bring this claim on their own behalf and on behalf of the putative Class against Defendant.

106.    Defendant Leblanc has acted intentionally or recklessly regarding the false imprisonment and overdetention of Named Plaintiffs and the Members of the putative Class.

107.    Defendant's conduct has been extreme and outrageous, and it has been rooted in an abuse of power and authority over the freedom of Named Plaintiffs and the Members of the putative Class.

108.    Defendant's misconduct has caused severe emotional distress, induced by weeks and even months of caging in crowded, dangerous jails and prisons of persons who were legally entitled to be free.

### PRAYER FOR RELIEF

Wherefore, Named Plaintiffs request that this Court enter judgment in their favor, and in favor of the putative class they seek to represent, against Defendant James LeBlanc and order the following relief:

(a) An order and judgment awarding compensatory and punitive damages to Named Plaintiffs and to the members of the putative class whom Named Plaintiffs seek to represent;

(b) An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(c) Any other relief this Court deems proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this 29th day of April, 2021.

/s/ Mercedes Montagnes

Mercedes Montagnes, La. Bar No. 33287
Jamila Johnson, La. Bar No. 37953
Nishi Kumar, La. Bar No. 37415
Rebecca Ramaswamy, La. Bar No. 39524
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Sarah Grady (*pro hac vice*)
Stephen H. Weil (*pro hac vice*)
Michael Kanovitz (*pro hac vice*)
John Hazinski (*pro hac vice*)
Loevy & Loevy
311 N. Aberdeen
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
Email: sarah@loevy.com

William Most, La. Bar No. 36914
Most & Associates
201 St. Charles Avenue, Suite 114, #101
New Orleans, LA 70170
Telephone: (504) 509-5023
Email: williammost@gmail.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Stephen H. Weil, an attorney, hereby certify that on April 29, 2021, I caused a copy of the foregoing to be filed with the Court's CM/ECF system, which will serve a copy of this document on all counsel who have filed appearances in the above-captioned matter.

*/s/ Stephen H. Weil*