**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

BRIAN HUMPHREY *et al.*, on behalf of
themselves and all others similarly situated,

              Plaintiffs,

                 v.

JAMES LEBLANC,

              Defendant.

Civil Action No. 3:20-cv-0233

Judge John W. Degravelles

Magistrate Judge Scott D. Johnson

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION FOR CLASS CERTIFICATION**

# Exhibit List

| Exhibit | Description |
|---|---|
| 1 | Deposition of Debbie Hudnall 7/24/2020 |
| 2 | James LeBlanc emails |
| 3 | Deposition of Melanie Gueho 2/3/2020 |
| 4 | Declaration of William Most |
| 5 | Deposition of Angela Griffin 5/31/2019 |
| 6 | Declaration of Mercedes Montagnes |
| 7 | Amended Expert Report of Dora Schriro |
| 8 | Deposition of Derek Ellis 5/31/2019 |
| 9 | Deposition of James LeBlanc 5/23/2019 |
| 10 | Department of Corrections Lean Six Sigma 2012 PreClassification |
| 11 | Deposition of Angela Whittaker 5/31/2019 |
| 12 | Criminal Justice Data Sharing and Notification Project |
| 13 | Expert Report of Rita Rossi |
| 14 | Deposition of Melanie Gueho 11/13/2020 |
| 15 | Deposition of Angela Griffin 1/10/2020 |
| 16 | Declaration of Stephen Weil |
| 17 | Deposition of James LeBlanc 1/7/2022 |
| 18 | Deposition of Derek Ellis 1/4/2022 |
| 19 | Deposition of Melanie Gueho 1/5/2022 |
| 20 | Declaration of Joel Giroir |
| 21 | Declaration of Bryant White |
| 22 | Brian Humphrey release documents |

Pursuant to Federal Rule of Civil Procedure 23(b)(3) and Local Civil Rule 7(d), Named Plaintiffs, through their undersigned counsel, respectfully submit this memorandum in support of their motion for class certification.

## I.     Introduction.

Defendant James LeBlanc is the is the Secretary of the Louisiana Department of Public Safety & Corrections ("the DOC"), a position he has held since 2008.  For at least the last ten years, Secretary LeBlanc has known that the agency he oversees overdetains thousands of Louisiana residents in its custody every year.  Specifically, many Louisianans are sentenced by a court to "time served" or other adjudications which entitle them to release. Under clearly established law, jailors like the DOC have a reasonable time to process and release a person once the legal basis for imprisoning them ceases to exist.  *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) ("There is a clearly established right to timely release from prison").  Prison systems throughout the United States can and do complete the administrative steps needed for release within hours, or sometimes a day or two.  *Cf. Powell v. Barrett*, 376 F. Supp. 2d 1340, 1354 (N.D. Ga. 2005) ("The Court has been unable to find any case, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible." (emphasis original)).  Under Secretary LeBlanc, however, the DOC routinely takes up to *three months* to perform the same tasks.  Since 2012, multiple studies, of which LeBlanc concedes he is aware, have confirmed that the DOC's rampant overdetention problem continues, and that it is caused by a failure to process release paperwork within the time allowed by the law.  Secretary LeBlanc admits that the DOC is "legally bound" to release people in a timely manner, and that the DOC's chronic, unlawful overdetention is a "big problem."  Yet since a "Lean Six Sigma" study revealed in 2012 that the DOC had an average release delay of several months, the DOC has done little to address the big

1

problem. The result is that to this day, the DOC continues to imprison hundreds of Louisianans per month without legal authority to do so.

Named Plaintiffs Brian Humphrey, Joel Giroir, and Bryant White brought this suit to seek a remedy for the harm caused by this policy failure, and have charged that Secretary LeBlanc has been deliberately indifferent to the DOC's long and widespread practice of overdetaining people who are entitled to immediate release. They are not the first plaintiffs to do so, and courts have remarked on the "'staggering volume of factual evidence of incompetence and indifference in the [DOC] headed by LeBlanc.'" *Traweek v. Gusman*, No. 19-cv-1384, 2021 WL 199387, at \*5 (E.D. La. Jan. 20, 2021) (vacated and remanded to determine qualified immunity). *See also infra at* 26-27 (collecting DOC overdetention cases). The evidence of Secretary LeBlanc's indifference compelling. But it is not important at the class certification stage not because it portends that Secretary LeBlanc will be found liable. Rather, it matters at this juncture because it is common to all members of the proposed class. The widespread scope of the DOC's overdetention problem, its severity, and the evidence that Secretary LeBlanc has been deliberately indifferent to it, therefore are central to the Court's Rule 23 analysis:

***First***, the Fifth Circuit has already endorsed the common claim that the Named Plaintiffs seek to bring on behalf of the class, stating that "LeBlanc [can] be liable for the [DOC's] alleged pattern of overdetention," *Traweek v. LeBlanc*, No. 21-30096, 2022 WL 2315444, at \*2 (5th Cir. June 28, 2022) (citing *Hicks v. LeBlanc*, 832 F. App'x 836, 842 (5th Cir. 2020)), and that LeBlanc's alleged "'failure to adopt a policy [of remedying overdetention] can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights.'" *Hicks*, 832 F. App'x at 841 (quoting *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011)). Indeed the Fifth Circuit recently affirmed that Secretary

2

LeBlanc's years of inaction in light of the 2012 "Six Sigma" overdetention study are evidence of his indifference to the "widespread overdetentions of DOC prisoners." *Crittindon v. LeBlanc*, 37 F.4th 177, 183 (5th Cir. 2022), *pet. for reh'g en banc filed*, No. 20-30304 (5th Cir. June 24, 2022). And the facts relevant to Secretary LeBlanc's liability are common to the class: when Secretary LeBlanc became aware of the widespread problem; what, if anything, he did to fix it, in light of the obvious probability that *not* fixing the problem would result in the deprivation of the liberty of thousands of Louisianans; and whether Secretary LeBlanc's actions—and his choice not to do more—were reasonable. These common, core facts will be the central evidence for the claims of every single person who Named Plaintiffs seek to represent under Rule 23. The members of the proposed class run into the thousands, and it would be impracticable and wasteful to hold trials at which each member presented the same, common evidence about the DOC's overdetention problem and Secretary LeBlanc's indifference to it. The Rule 23 class action procedural device exists precisely to avoid such results.

**Second**, any differences among the individual class members are insubstantial in this case. The paperwork used to calculate the release date of every class member will assuredly feature a unique combination of criminal charges, criminal history, and sentencing charges. Those differences, however, are immaterial to the common claims against Secretary LeBlanc. In *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) the Supreme Court identified 48 hours as the outer bounds of reasonable time to perform the administrative tasks and release a person entitled to be free, and since then "the great weight of precedent suggests that release must occur within a matter of hours after the right to it accrues," *Barnes v. District of Columbia*, 242 F.R.D. 113, 117 (D.D.C. 2007) (citing *McLaughlin*), not the weeks that it still takes for release by Secretary LeBlanc's DOC. In the face of *McLaughlin*'s 48-hour threshold, courts confronting

3

widespread practices of overdetention like the one at issue in this case have had little difficulty certifying classes of overdetained persons under Rule 23(b)(3). *See, e.g.*, *Barnes v. District of Columbia*, 242 F.R.D. 113 (D.D.C. 2007) (certifying Rule 23(b)(3) overdetention class); *Bynum v. District of Columbia*, 214 F.R.D. 27, 39-40 (D.D.C. 2003) (same); *Driver v. Marion County Sheriff*, 859 F.3d 489, 491-92 (7th Cir. 2017) (certifying Rule 23(b)(3) overdetention class and observing, "*McLaughlin* recognized that at some point the State has no legitimate interest in detaining persons for an extended period of time, and if the regular practice exceeds that time period deemed constitutionally-permissible, the State is not immune from systemic challenges such as a class action. At some point well short of the 24-plus hours alleged here, there is no reason to believe that individual issues would account for that delay.").

*     *     *

Thousands of people have suffered the same type of injury, for the same reason: after learning that the DOC had a widespread practice of overdetaining people entitled to immediate release, Secretary LeBlanc, out of indifference, chose not to fix it. Where numerous people suffer the same injury from a common cause, Rule 23(b)(3) permits the courts to economize resources by trying their claims together. This case presents that circumstance. Class certification is appropriate.

## II.     Factual background.

### A.     The DOC's overdetention policy and Secretary LeBlanc's response.

False imprisonment through overdetention is the standard practice of the DOC. It is a practice that Secretary LeBlanc has known about since at least 2012, Ex. 9 at 45, 48-49, yet has failed to change.

In Louisiana, like other states, people frequently receive a criminal adjudication (*i.e.*, a sentence or a parole revocation) that, while technically ordering incarceration, is really an

4

adjudication of zero incarceration that entitles the person to immediate release. The DOC recognizes that a person is entitled to immediate release who (1) has spent time in custody pretrial or who has accumulated good time, (2) is given an adjudication to incarceration with credit for time served or good time, and (3) the adjudication to incarceration is for a period less than or equal to their credited period. *See* Ex. 5 at 30-31.; *See also* Ex. 18 at 20:21-21:7. For example, a person who spent two months in jail awaiting sentencing, and is then sentenced to thirty days with credit for time served, is entitled to release on the day of their sentencing. Likewise a person who has not served their entire sentence is still entitled to immediate release if, on the date they are remanded, they have reached or surpassed their good time parole release date. Ex. 17 at 19:23-20:8. The DOC admits that it is "legally bound to release inmates on their release date." Ex. 17 at 15:18-16:19.

The DOC, moreover, is responsible for a person's detention—and timely release from detention—from the day of sentencing or parole revocation, even if the person is not yet in a DOC facility. Ex. 3 at 53; Ex. 17 at 14:11-15:5; 16:7-12. Secretary LeBlanc has explained that he is "responsible for the inmates sentenced to the custody of the [DOC]," whether they are in "a state-run facility, a parish-run facility, or private-facility." Ex. 9 at 13.

Secretary LeBlanc has agreed that it is a problem for even a single person to be held past their release date, *and* he has testified that learned in 2012 that thousands of people in the custody of the DOC were being held past their release date. Ex. 17 at 22:13-22. But since then, every investigation into the matter has confirmed that the problem continues.

In 2012, a team of DOC staff performed a "Lean Six Sigma" review of its time calculation processes, which revealed a widespread pattern of people being held past their legal

release dates.[1] Ex. 10. Specifically, the investigation found that when the DOC calculated release dates, 83% were eligible for "immediate release . . . due to an earlier release date." *Id.* at 4. The DOC learned through this investigation that it was overdetaining over 2,000 people each year, with an average of 71.69 "overdue days" per person who was overdetained. Ex. 8 at 20. The DOC has admitted that this is "a lot of overdetention." Ex. 11 at 33. The 2012 review found that some of the delay was caused by the time it took for the DOC to receive documents from the clerks' and sheriffs' offices, and the remainder was caused by the DOC itself taking an average of 79 days to calculate sentences after it had the sentencing documents in hand. *Id.*

No alarm was raised following the 2012 study, however. Despite the Six Sigma findings, the DOC did not eliminate or even meaningfully mitigate the problem of overdetention, and Secretary LeBlanc recently testified that he understood that "people [are still] being held [in DOC custody] an average of about two months past their release date." Ex. 9 at 45. Indeed, five years after the 2012 investigation, in 2017, another internal investigation reported that the DOC had "an average of 200 inmates per month held an average of 49 days past the end of their sentence." Ex. 8 at 38. So many people were being overdetained under this practice that the DOC itself calculated that the overdetention cost the state "$2.8 [million] per year in housing costs alone." Ex. 12 at 4. But the 2017 investigation did not fix things, either. In 2019, the DOC compiled a set of data showing that it had held 231 people past their legal release dates in a single month (February of 2019) for an average of 44 days. *Id*.

Instead of trying to find a solution, the DOC institutionalized the problem in its public-facing communications. On its website, the DOC posted a statement: "If a person has recently been sentenced to [DOC] custody, it can take up to 12 weeks to calculate a date as the

---

[1] "Lean Six Sigma is a team-focused managerial approach that seeks to improve performance by eliminating waste and defects." Will Kenton, *Lean Six Sigma*, Investopedia.com (Feb. 5, 2018).

Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date." Ex. 9 at 88-90 (admitting that "12 weeks is ridiculous" and "just absurd."). The DOC also put on its voicemail an audio statement that it "takes at least 90 days after sentencing" for the department to calculate how much time a person must serve. *See* Ex. 8 at 12-13. The DOC posted these statements online and on voicemail to reduce the number of calls from people asking why a family member was still in prison past their release date. *Id.* at 18.[2]

Yet when offered help to fix its overdetention problem, the DOC declined it. For example, Secretary LeBlanc had multiple meetings with Debbie Hudnall, Executive Director of the Louisiana Clerks of Court Association, starting in the fall of 2016. Ex. 1 at 17. At the first meeting, Secretary LeBlanc complained that "the process of getting documents to the DOC is slow, and so people are being over-detained." *Id.* at 22.  In response, Hudnall proposed a solution: the clerks of court could email the relevant documents "directly to the DOC." *Id.* at 25. The idea was that "if the DOC was saying the problem was things are getting to us too slow, the Clerks of Court can make sure that happened very quickly by emailing it." *Id.* But Secretary LeBlanc rejected that offer, saying "they would not be set up to accept [the documents] electronically" because they did not have "the capability to receive the documents via email." *Id.* at 26-27. As Ms. Hudnall explained, Secretary LeBlanc was not claiming the DOC literally could not receive emailed documents; he objected to the proposal because it would "cause more work for them [the DOC]." *Id.* at 28.

---

[2] "Q. [The purpose was to] tell people's families, to tell inmates' families, hey, it may take months for an inmate's time to get computed after their sentence, so you don't need to call us about it, right? A. Giving them parameters of how long it may take, yes."

After his first meeting with Ms. Hudnall, Secretary LeBlanc said that he would "develop an action plan with [Hudnall] and the Sheriffs' Offices in these areas to improve upon this turnaround time" and "look at the feasibility of receiving the UCO and Bill of Information documents electronically." Ex. 2. But in the intervening six years, Secretary LeBlanc has not developed that action plan. Ex. 17 at 52-54; 113-14. Nor did he conduct the feasibility study. *Id.* at 45-46. Nor did he even set goals about fixing the overdetention problem in any of the DOC's strategic plans through 2019, the most recent year for which a strategic plan is available. *Id.* at 94-100; 113-14.

Secretary LeBlanc did eventually respond to the Clerk of Courts' 2016 proposal that the DOC receive sentencing documents electronically: three years after promising in *2016* to "look at the feasibility of receiving the [sentencing] documents electronically from the Clerks," the DOC, in *2019*, submitted a grant proposal to the U.S. Department of Justice to create a web portal that would make such submissions possible. Ex. 17 at 44-48. When the DOC did not receive the grant money, however, it made no additional efforts to set up the portal on its own dime, and it has no plans to develop that system as of today—even though LeBlanc acknowledges that receiving the documents electronically would speed up the release process. Ex. 17 at 80-82. LeBlanc conceded that as of today the DOC has no written plans to put in place any electronic transmission of sentencing documents, Ex. 17 at 83. Even though in a 2019 deposition LeBlanc identified the problem as a priority and committed to having the DOC obtain documents rather than "waiting passively to receive: the paperwork from sheriff's offices, Ex. 17 at 89-90, the DOC's 2019 strategic plan, for which LeBlanc sets the goals and priorities, did not identify it as a priority. Ex. 17 at 95-97. Among other things, LeBlanc conceded that he could have put timelines for the delivery of paperwork into the "Basic Jail Guidelines"—the DOC's

contract with the sheriffs—but that he had never done so, Ex. 17 at 58, in part because speeding delivery of paperwork might create additional work for the DOC, and "we've got enough to do" without enforcing a requirement that sheriffs speed up delivery of sentencing paperwork. Ex. 17 at 59.  Indeed LeBlanc testified in 2022 that he had stopped setting additional goals for taking affirmative steps to speed up delivery of sentencing paperwork: "[A]t this point, I don't want to commit to anything, because then if I don't meet the deadlines, then I'll be responsible for that." Ex. 17 at 93-94.

In sum, the evidence shows that Secretary LeBlanc and the DOC:

1)      learned that thousands of DOC inmates are held past their release dates each year;

2)      did not set a goal of fixing the problem;

3)      did not take the steps necessary to fix the problem;

4)      refused help when offered; and

5)      never even developed the "action plan" the Secretary promised.

As Plaintiffs have noted, Judge Feldman characterized the factual record as a "staggering volume of factual evidence of incompetence and indifference in the Department headed by LeBlanc." *Traweek*, 2021 WL 199387 at *5. Another court found it "plausible that Secretary LeBlanc engaged in a policy of unconstitutionally over-detaining persons and that policy was the driving force behind" the plaintiff's alleged constitutional injury. *Grant v. Gusman*, 2018 WL 3869494, at *11 (E.D. La. Aug. 14, 2018).  And Chief Judge Dick remarked that the "state of affairs at the DOC . . . evinces a reckless disregard for the likelihood of overdetention in the DOC system." *Crittindon v. Gusman*, No. 17-cv-2797, 2020 WL 1862467, at *15 (M.D. La. Apr. 13, 2020).

The opinions of outside experts are in line with these assessments. Named Plaintiffs have submitted the expert report of Dr. Dora Schriro, who has served as the director of the Missouri

9

Department of Corrections, the Arizona Department of Corrections, and the New York City Department of Corrections, as well as the Director of the ICE office of Detention Policy and Planning at the Department of Homeland Security. Ex. 7 Based on her experience leading multiple corrections departments, Dr. Schriro offers the opinion that the DOC's failure to put in place a system to guarantee timely releases of persons in its custody, including its failure to ensure timely communication of sentencing information, indicates a failure by Secretary LeBlanc to perform the basic leadership functions that fall on directorship positions like his. Ex. 7 at 23-27. Given the powers and duties of his office, it appeared to Dr. Schriro that Secretary LeBlanc was indifferent to the problem of overdetention by the DOC. Ex. 7 at 68. Dr. Schriro opined further that the problem of overdetention by the DOC did not appear to be intractable, Ex. 7 at 49-56, 58, but rather was caused by Secretary LeBlanc's failure to prioritize fixing the problem. *Id.* Likewise Rita Rossi, an expert with decades of experience in correctional recordkeeping and sentence calculation, observed that while there are multiple methods to perform a sentencing calculation and effectuate timely releases, whatever the method, a department of corrections must orient its operations to enable the calculation of each sentence within a matter of hours. Ex. 13. Ms. Rossi further opined that the DOC's system for sentencing calculation did not appear designed to complete quick sentence calculation, resulting in predictable delay. Ex. 13 at 7. Indeed, in the year after this case was filed, the DOC overdetained more than 1,700 people who were entitled to immediate release. *See infra* at 17.

### B.    The Named Plaintiffs.

#### 1.    Brian Humphrey

On April 16, 2019, the 26th Judicial District Court in Bossier Parish sentenced Mr. Humphrey to "3 years hard labor in the Louisiana Department of Corrections." In issuing that sentence, however, the Court simultaneously gave Mr. Humphrey credit for the time he had

already served in jail, and ordered further that the sentence should "suspend all but time served." Ex. 22.  In other words, Mr. Humphrey's sentencing judge gave him credit for the time he had served in jail, and otherwise suspended his sentence. Thus, as of the date of his sentencing, Mr. Humphrey had served his entire sentence. He should have been released immediately.

That did not happen. Instead, the Bossier Parish Sheriff took Mr. Humphrey back into the jail.  Then, on April 18, 2019, Mr. Humphrey was transported to Webster – Bayou Dorcheat Correctional Center Transitional Work Program, a DOC facility. There Mr. Humphrey, who by law should have been a free man, waited in prison for weeks, until the DOC got around to reviewing his papers and finally released him.  *Id.*

From the date of his sentencing on April 16, 2019, Mr. Humphrey was in the custody of the DOC.  Then, on April 26, 2019, the Bossier Sheriff's Office sent to the DOC paperwork that the Sheriff had received from the Clerk of Court of the 26th Judicial District. Ex. 22.  This paperwork contained a note that read "3 years HC DOC all but time served suspended." *Id.* Mr. Humphrey's Uniform Sentencing Commitment Order notes "0" years, "0" months, and "0" days under "Amount of Time in DPS&C custody." *Id.* Also on April 26, 2019, the Bossier Sheriff's Office faxed 14 pages of "pre-class" information on Mr. Humphrey to the Bayou Dorcheat Correctional Center, where Mr. Humphrey was being held in DOC custody.  *Id.*

This paperwork made plain that Mr. Humphrey should have been a free man already, and that the DOC had no right to detain him. But the DOC did not release him. Instead, with the paperwork in hand, the DOC waited more than two weeks to determine whether it had any authority to imprison Mr. Humphrey at all.

On May 13, 2019, the DOC completed Mr. Humphrey's time computation, resulting in a calculation of 0 days. Mr. Humphrey's "must serve" time was calculated to be -114 days. *Id.*

Any person whose "must serve" comes to a negative number is eligible for immediate release. That same day, May 13, 2019, the DOC issued a "Certificate of Release" for Mr. Humphrey certifying his "Completion of Sentence." *Id.* Mr. Humphrey was released from DOC custody on May 13, 2019, at 5:30 PM, 27 days after he was entitled for immediate release upon his sentencing and 17 days after the DOC received his paperwork from the Bossier Sheriff's Office.

### 2.     Joel Giroir

Joel Giroir is a 36-year-old man who was overdetained by the DOC in the St. Tammany Parish Jail. On January 26, 2021, Mr. Giroir was sentenced to one year in DOC custody after his probation was revoked. Ex. 20. Under Louisiana's "good time" law, Mr. Giroir was entitled to diminution of sentence. La. Rev. Stat. § 15:571.3(B)(1)(a). Because of his good behavior and because he was not convicted of a crime of violence, he was only required to serve 35 percent of his one-year sentence, or 128 days. Ex. 20.

Before receiving the one-year sentence, Mr. Giroir was held with no bond in case number 589-169 and held on a $5,000 bond in St. Tammany Parish Jail from January 30, 2018, to March 13, 2018. He was incarcerated on those same cases from June 12, 2018 until July 19, 2018. On July 19, 2018, he was sentenced to 90 days in DOC custody in lieu of revocation. He served 110 days in Concordia Parish Jail. And he eventually turned himself into St. Tammany Parish Jail on January 22, 2021, and was incarcerated there until his revocation hearing date on January 26, 2021. Ex. 20.

As of the date of his revocation and sentencing on January 26, 2021, Mr. Giroir had served at least 192 days in jail on his one-year sentence. Thus, on the date of his sentencing, he was eligible for immediate release. Mr. Giroir was not immediately released on January 26, 2021, even though he had already served at least 64 days beyond his sentence. Instead, he was held in the jail until February 22, 2021. *Id.*

12

### 3.    Bryant White

Bryant White was overdetained by the DOC in the Orleans Justice Center, the parish jail, for more than seven weeks.  In 2013 Mr. White was convicted of a non-violent crime and sentenced to serve ten years in prison.  Ex. 22.  He served five years of that sentence in prison and was later released on parole supervision.  On March 12, 2019, while he was on parole for the 2013 sentence, Mr. White was arrested in Orleans Parish and confined to the Orleans Justice Center. The DOC issued a parole hold on Mr. White on April 4, 2019.  *Id.*

On March 1, 2021, while still in the custody of the Orleans Justice Center, Mr. White pleaded guilty to two felony charges stemming from the March 12, 2019 arrest, and was sentenced to 6 months and 23 months to run concurrently, with credit for the time he had served in the Orleans Justice Center since March 12, 2019.  *Id.* On this sentence, he was eligible for immediate release. On March 1, 2021, pursuant to Louisiana's parole laws, Mr. White's parole supervision for the 2013 sentence was revoked immediately because he was convicted of a felony. On the date of his plea, Mr. White had served 697 days in jail since April 4, 2019. *Id.* Under Louisiana's "good time" law, he was entitled to diminution of the remainder of his 2013 sentence for which the DOC had issued the parole hold. As such, the DOC should have "revoked" his parole at the time of his March 1, 2021 plea, and, with credit for the 697 days he had served, he should have been released immediately. *Id.*

Mr. White was not released on March 1, 2021, however.  Instead, the DOC took more than seven weeks to release him, finally doing so on April 23, 2021. *Id.* During that time Mr. White was imprisoned in the Orleans Justice Center by the DOC on the parole hold, even though the DOC lacked legal authority to imprison him on the parole hold after his March 1 plea and sentencing.

### III.    The proposed class.

Named Plaintiffs propose to represent a class of persons injured by Secretary LeBlanc's indifference to the DOC's widespread practice of overdetention.  They propose to represent a class of persons defined as:

> all persons who have been remanded to the custody of the DOC since April 16, 2019, and who were entitled to release at the time of their remand (either pursuant to sentencing or parole revocation), but who were released by the DOC more than 48 hours past the time that they were remanded to the DOC's custody.

ECF 43 ¶ 65.

"[T]he class action device exists primarily, if not solely, to achieve a measure of judicial economy, which benefits the parties as well as the entire judicial system. It preserves the resources of both the courts and the parties by permitting issues affecting all class members to be litigated in an efficient, expedited, and manageable fashion." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 410 (5th Cir. 1998).  When a party proposes to adjudicate multiple claims together as a class action instead of a series of individual actions, the question for the trial court is whether combining claims in a class action would be a fair and efficient means of adjudicating them. *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974). The trial court performs this task using the analytical guideposts set out in Rule 23.

A trial court deciding whether to certify a class under Rule 23 does examine the merits of the case before it, but it does so not to determine who is likely to win or lose, but rather to determine whether the claims can fairly and efficiently be tried together, or whether multiple, repeat adjudications of similar claims are instead required. *In re Deepwater Horizon*, 739 F.3d 790, 806 (5th Cir. 2014) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 464 (2013).

14

To be certified as a class action, a putative class must be ascertainable, it must satisfy each of the prerequisites of Rule 23(a), and it must fall within one of the three categories of class suits described in Rule 23(b). 7A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1759 (4th ed. 2022). Plaintiffs review these requirements below.

> ### A. The class is ascertainable.

A Rule 23 class must be "adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970); *see also John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). "A class is ascertainable if 'the general outlines of the membership of the class are determinable at the outset of the litigation.'" *Rodriguez v. Flowers Foods, Inc.*, No. 4:16-cv-245, 2016 WL 7210943, at *4 (S.D. Tex. Dec. 13, 2016) (quoting 7A Wright & Miller, *Federal Practice and Procedure* § 1760 (3d ed.)). The point of this requirement is to ensure that class membership is "sufficiently defined so as to enable the court to determine whether a particular individual is a member of the class." *Wagner v. Cent. Louisiana Elec. Co.*, 99 F.R.D. 279, 282 (E.D. La. 1983) (citing *DeBremaecker*, 433 F.2d at 734).

The ascertainability requirement is easily met in this case. Much of the information necessary to adjudicate Plaintiffs' class-action claims is contained within just one repository: the DOC's electronic records database known as "CAJUN" (the Corrections and Justice Unified Network). CAJUN records data about each person in DOC custody, including the date an individual was admitted to custody; the date the individual was released; the individual's "mathematically correct release date," and the date on which the DOC obtained the paperwork necessary to compute the individual's sentence. Ex. 14 at 56:20–57:22. CAJUN also records an individual's "must serve" information, which reflects how much time the inmate has left to spend in prison. Ex. 15 at 87:3–10. Anyone with a negative must serve number is eligible for immediate release. *Id.* at 87:23–25. These data identify individuals who served their required

15

time in custody as of the day they were sentenced or revoked on parole, but who remained in

DOC custody for more than 48 hours thereafter. Ex. 14 at 56:20–57:22.

To identify persons who have been overdetained, the fields described above are extracted

from the CAJUN database and compiled in a separate file referred to by the DOC as a "pull

document." *See* Ex. 14 at 59:12–61:3; Ex. 16 at 23:1–24:7.  As part of discovery in this case, the

DOC extracted a pull document identifying more than 1,700 people who had been overdetained

between April 2019 and May 2020.[3] Ex. 19 at 26, and the DOC confirmed that using the

extracted CAJUN data would permit identification of persons who were entitled to immediate

release upon sentencing or parole revocation but were released more than 48 hours later. Ex. 19

at 30. The CAJUN data, in short, contain information that permits identification of each class

member in this case via reference to their objective release criteria. The proposed class satisfies

the ascertainability requirement.

**B.    Class satisfies Rule 23(a).**

**1.    Numerosity.**

Rule 23(a)(1)'s numerosity requirement is satisfied because the proposed class is so

numerous that joinder of all members is impracticable. Classes of more than 40 members are

generally large enough to satisfy the numerosity requirement. *See Mullen v. Treasure Chest*

*Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999); *see also Lewis v. Cain*, 324 F.R.D. 159, 168

(M.D. La. 2018). The proposed class here runs into the thousands.  The CAJUN "pull document"

described *supra* indicates that 1,700 were overdetained just between April 2019 to May 2020.

The proposed class continues through the present, Ex. 19 at 25-26, and Secretary LeBlanc has

indicated that as of January 2022 no substantial changes have been made to the DOC practices

---

[3]    In creating this "pull document," the DOC used the same methodology that it used to create the
February 2019 "pull document" to support its DOJ grant application *see supra* at 7.  Ex. 19 at 41.

16

that would have led to a changes in its practice of widespread overdetention. *See supra* at 9-10.
Named Plaintiffs respectfully submit that the numerosity requirement is easily satisfied.

**2.     Commonality.**

The proposed class and its named representative share factual and legal issues more than
adequate to satisfy commonality because Plaintiffs' claims "depend upon a common contention"
that "is capable of classwide resolution" such that "determination of its truth or falsity will
resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*
*Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The central question driving this case is whether
the DOC's pattern and practice of overdetaining individuals in DOC custody violates the rights
of people imprisoned without legal authority, and whether, as of April 2019 and going forward,
the DOC's continued practice of overdetaining thousands of people per year was caused by
Secretary LeBlanc's failure to change the practices leading to overdetention, even though he
learned about the problem in 2012. Those core facts are common to the Named Plaintiffs and the
absent class members alike. That is, all members of the proposed class share the common claim
that Defendant's pattern and practice of overdetention violates their rights under the Due Process
Clause of the Fourteenth Amendment to the United States Constitution; violates their rights
under Article One, Section Two of the Louisiana Constitution; subjects them to the tort law of
false imprisonment; amounts to negligence; and intentionally inflicts emotional distress.

Named Plaintiffs satisfies the commonality requirement because class members have
numerous questions of fact and law in common, and "even a single common question" can
satisfy the commonality requirement. *See Wal-Mart,* 564 U.S. at 359.  Here, the common
questions of fact shared by all class members include:

17

- Whether the DOC is responsible for calculating the release date of people sentenced or revoked to DOC custody from the day they are sentenced or revoked

- Whether the DOC has had a pattern of overdetaining people in its custody

- Whether Secretary LeBlanc has been aware of the DOC's pattern of overdetaining people

- Whether, despite his knowledge, Secretary LeBlanc has failed to implement a policy or policies to put an end to the problem

Questions of law that are common to all members of the class include, but are not limited to:

- Whether the DOC has the legal authority to hold persons past their release dates under the United States Constitution

- Whether persons have a liberty interest in their immediate release upon sentencing and parole revocation under the United States Constitution

- Whether Secretary LeBlanc's failure to adopt a policy or policies to mitigate overdetention constitutes deliberate indifference

- Whether people have a liberty interest in their immediate release upon sentencing and parole revocation under the Louisiana Constitution

- Whether the DOC's detention of people past their legal release dates constitutes false imprisonment under state law

The answers to these common questions, and others, are central to all class members' claims and—crucially—all these common questions "are amenable to a common answer." *Jones v. Gusman*, 296 F.R.D. 416, 466 (E.D. La. 2013); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1122-24 (9th Cir. 2010) (finding commonality even though class members were detained pursuant to different statutes and under different factual circumstances because a single question, namely, whether a bond hearing was required for individuals detained longer than six months, was "posed by the detention of every member of the class and their [individual claims would] largely be determined by its answer."). In *O'Donnell v. Harris County, Texas*, No. 16-cv-1414, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017) (Rosenthal, J.), for example, the district court certified a class of people detained pre-trial on misdemeanor charges "for whom a secured financial condition of release has been set and who cannot pay the amount necessary for release

18

on the secured money bail because of indigence," *id.* at *1, finding that even though the plaintiffs were challenging "a largely unwritten and customary policy," *id.* at *5 n.3, they satisfied Rule 23(a)(2)'s commonality requirement because the "plaintiffs [were] challeng[ing] a municipal policy that, because it is a policy, applies to, and affects, indigent misdemeanor arrestees subjected to secured money bail the same way." *Id.* at *5. The policy choice that Named Plaintiffs challenge here—Secretary LeBlanc's choice not to fix the DOC's widespread overdetention problem despite knowing that it resulted in thousands of overdetentions every year—injured Named Plaintiffs and the absent class members in the same way. Accordingly, the proposed class satisfies the commonality requirement of Rule 23(a)(2).

### 3.    Typicality.

Named Plaintiffs satisfy the typicality requirement because they are members of the proposed class, and they share the same claims. *Lewis*, 324 F.R.D. at 169 ("Typicality requires showing that, in fact, the proposed representatives have that claim [that is shared by all members of the proposed class].") (citations omitted). Named Plaintiffs' claims "arise from a similar course of conduct and share the same legal theor[ies]" as class members' claims, and are therefore typical of class members' claims. *Id.* (quoting *James v. City of Dall.*, 254 F.3d 551, 571 (5th Cir. 2001)).  Named Plaintiffs' situation will differ from class members' in terms of their location of detention, their underlying criminal charges, and how long they were overdetained. But the basis of liability in this case is not dependent upon such individual circumstances. Rather, it turns on upon Secretary LeBlanc's longstanding failure to put an end to the DOC's practice of detaining individuals well past their legal release dates.  Typicality is satisfied.

### 4.    Adequacy.

Named Plaintiffs are adequate representatives of the class because their interests in the vindication of the legal claims raised here are entirely aligned with the interests of the other class

members, who each have the same basic claims. Named Plaintiffs are members of the class, and their interests coincide with, and are not antagonistic to, those of the other class members.

Named Plaintiffs' interests are not antagonistic to those of the class. Named Plaintiffs and class members suffered the same harms. They assert the same legal claims, seek the same litigation outcomes, and would benefit from the relief compensating persons detained without legal authority for times exceeding 48 hours, for all persons technically remanded to the custody of the DOC, but who in reality are eligible for immediate release. There is no financial conflict between Named Plaintiffs and absent class members, as all will benefit from compensation for the same essential harm.

Plaintiffs' counsel, meanwhile, have already devoted substantial time investigating the factual and legal issues in this case and have aggressively pursued the discovery required to put forward a claim for class-wide relief.  Proposed class counsel are experienced in handling class actions and other complex litigation. The Promise of Justice Initiative ("PJI") is dedicated to ensuring constitutional conditions for institutionalized individuals, and PJI's attorneys are highly knowledgeable in the applicable law. Ex. 6 at ¶ 7. Loevy & Loevy is one of the nation's largest and most successful civil rights law firms. *Id.* Ex. 16 at ¶ 5. Most & Associates have litigated numerous lawsuits in Louisiana related to overdetention on behalf of individuals. *Id.* Ex. 4 at ¶ 12. Collectively, counsel has significant experience in the areas of criminal law, constitutional law, and class action litigation.  Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements.  Named Plaintiffs respectfully submit that they, and their counsel, satisfy Rule 23(a)(4)'s adequacy requirement.

### C.    The proposed class satisfies Rule 23(b)(3).

In order to certify a class under Rule 23(b)(3), the trial court must determine that "questions of law or fact common to the members of the class predominate over any questions

affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quoting Fed. R. Civ. P. 23(b)(3)). As Named Plaintiffs explain herein, the proposed class satisfies both these prerequisites.

### 1.    Common issues predominate.

Rule 23(b)(3)'s requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). The inquiry focuses on "how a trial on the merits would be conducted if a class were certified," *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quotation omitted), which "begins . . . with the elements of the underlying cause of action." *Torres v. S.G.E. Mgmt., L.L.C.,* 838 F.3d 629, 636 (5th Cir. 2016).

Specifically, the predominance inquiry "'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials . . . .'" *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)). *Cf. Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012) ("If, to make a *prima facie* showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." (quotation omitted)). In this way, the predominance requirement is designed to help district courts avoid trials in which "adding or subtracting members to a putative class has

21

'a substantial effect on the substance or quantity of evidence offered . . . .'" *Earl*, 339 F.R.D. at 424 (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978)). "[T]he 'clear thrust' of Rule 23(b)(3) is "'to minimize the requirement of active intervention by numerous members of an affected class.'" *Earl v. Boeing Co.*, 339 F.R.D. 391, 424 (E.D. Tex. 2021) (quoting *Robinson v. Union Carbide Corp.*, 544 F.2d 1258, 1261 (5th Cir. 1977). "'[N]o mathematical or mechanical test'" exists to evaluate predominance" under Rule 23(b)(3). *Id.* (quoting *Messner*, 669 F.3d at 814). Rather, with its focus on how a class case will be tried, "[p]ragmatism is the lodestar of predominance." *Id.*

Named Plaintiffs begin with the elements of the claims they have asserted in this case. Named Plaintiffs allege that they, and the absent class members, were detained for more than 48 hours after an adjudication (sentence / parole revocation) to zero incarceration time, which entitled them to immediate release. This is a well-established violation of both the Fourteenth Amendment's due process guarantee and Louisiana's prohibition against false imprisonment. The Fourteenth Amendment forbids states from "depriv[ing] any person of life, liberty, or property, without due process of law," U.S. Const., Amend. XIV. "[T]here is a clearly established right to timely release from prison," *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011), and "over detention, or detention absent (or beyond the expiration of) legal process, violates an incarcerated person's right to due process." *Traweek v. Gusman*, 19-cv-01384-MLCF-JVM, 2019 WL 5430590, *6 (E.D. La., Oct. 23, 2019). "There is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence." *Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968). And "when . . . a court's decision to end an inmate's detention 'has become a matter of public record,' [a jailer] is at fault for keeping him in custody," because "'[t]he responsibility for a failure of communication between the courts and the jailhouse' falls on the

22

jailer." *Harris v. Clay Cnty., Mississippi*, No. 21-60456, 2022 WL 2662099, at *6 (5th Cir. July

11, 2022) (quoting *Whirl*, 407 F.2d at 791, 792). *Cf. Shorts v. Bartholomew*, 255 F. App'x 46, 52

(6th Cir. 2007) (person's due process rights violated when he was imprisoned past the term of his

credit-for-time-served sentence; collecting cases).

The law recognizes that jailers cannot respond to court orders instantaneously, and thus

allows a brief period in order to complete administrative tasks prior to release. That period,

however, is measured in hours, not days or weeks. *See Lewis v. O'Grady*, 853 F.2d 1366, 1370

(7th Cir. 1988) ("We recognize that the administrative tasks incident to a release of a prisoner

from custody may require some time to accomplish — in this case perhaps a number of hours.").

As Named Plaintiffs noted at the outset of this memorandum, the Supreme Court in *County of*

*Riverside v. McLaughlin* identified 48 hours as the outer limit of detention that will "as a general

matter" comply with due process.  500 U.S. at 57.  When the period of detention without

authority exceeds 48 hours, on the other hand, "the calculus changes.  In such a case, the arrested

individual does not bear the burden of proving an unreasonable delay.  Rather, the burden shifts

to the government to demonstrate the existence of a bona fide emergency or other extraordinary

circumstance." *Id.* at 57.

*McLaughlin* concerned the application of the due process clause to the time that a person

may be detained before receiving a probable cause hearing before a court. *Id.* at 56. Because

*McLaughlin* ruled generally on the period of permissible detention without court authority,

however, the courts have applied the decision to situations where "legal authority for detention

has ceased, whether by acquittal after trial, release on recognizance bond, completion of jail time

in the sentence, or otherwise." *Driver v. Marion Cnty. Sheriff*, 859 F.3d 489, 491 (7th Cir. 2017)

(citing *McLaughlin*).  And in those situations, where "all that is left are the ministerial actions to

accomplish that release which are within the control of the jail officials," which are "significantly less onerous and less time-consuming than the [myriad steps . . . between an arrest and a judicial determination] involved in *McLaughlin*, the 48-hour rule makes no sense," and a jailer should be held to a significantly shorter period. *Id.* [4]  *Accord Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 276 (D.D.C. 2011) ("[C]ourts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48–hour horizon set out in *McLaughlin*." (collecting cases)). As one court observed after a wide-ranging survey:

> The Court has been unable to find any case, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible. . . . Accordingly, based on the arguments and record currently before the Court, dismissal of Plaintiffs' over-detention claims on qualified immunity grounds would be improper.

*Powell v. Barrett*, 376 F. Supp. 2d 1340, 1354 (N.D. Ga. 2005) (citing *McLaughlin*; emphasis original).

The Fifth Circuit has been equally emphatic that it is a custodian's *affirmative* responsibility to know whether they have authority to imprison a person, and that "when . . . a

---

[4]  *McLaughlin* said as much itself, emphasizing that "[t]his [the 48-hour window] is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours . . . . if the arrested individual can prove that his or her probable cause determination was delayed unreasonably." 500 U.S. at 56. Since then numerous courts have held that overdetentions substantially shorter than 48 hours are unlawful. *See, e.g.*, *Arline v. City of Jacksonville*, 359 F. Supp. 2d 1300 (M.D. Fla. 2005) (2 ½ hour detention following acquittal presented jury question); *Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) (jury verdict for plaintiff for half-hour overdetention at court holding cell and 2 ½ hours at jail after release order ); *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) (whether 11 hours was reasonable was a question of fact for jury); *Green v. Baca*, 306 F.Supp.2d 903 (C.D. Cal. 2004) (12 ½ hour delay not reasonable as a matter of law; summary judgment denied); *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. Aug. 8, 1994) (3 hours); *Parilla v. Eslinger*, 2005 WL 3288760  (M.D. Fla. Dec. 5, 2005) (approximately 5 hours after court ordered released and 14 hours after family paid bond); *Muick v. Jasso*, No. 3:02-cv-1089, 2003 WL 22054226, at *1 (N.D. Tex. Apr. 3, 2003) (labeling plaintiff's claim for fifty-minute overdetention as nonfrivolous).

court's decision to end an inmate's detention 'has become a matter of public record, . . . [t]he responsibility for a failure of communication between the courts and the jailhouse' falls on the jailer." *Harris*, 2022 WL 2662099, at *6 (quoting *Whirl*, 407 F.2d at 792). As *Whirl* explained, "[T]he jailer has the means, the freedom, and the duty to make necessary inquiries . . . [including] the duty to effect [a prisoner's] timely release. 407 F.2d at 792. As such, a jailer cannot be heard to invoke the excuse of missing paperwork: "a game of who has the paper and who saw the paper is not constitutionally playable." *Id.* at 798.

Louisiana's false imprisonment tort prohibits essentially the same conduct. The tort of false imprisonment occurs when one "restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority." *Kyle v. City of New Orleans*, 353 So.2d 969, 971 (La. 1977). The elements of false imprisonment under Louisiana law are: (1) proof of imprisonment, and (2) lack of legal authority. There "is no requirement of proving that the confinement be intentional." *Prisk v. Palazzo*, 668 So.2d 415, 417 (La. Ct. App. 1996). Nor is there any requirement that the jailer know the prisoner is being held unlawfully:

> The fact that the jailer is without personal knowledge that the prisoner is held unlawfully does not constitute a defense to an action for false imprisonment. . . . .
> In such circumstance, as in the one before us, ignorance of the law is no excuse.

*Whirl v. Kern*, 407 F. 2d 781, 791 (5th Cir. 1968). The lack of an intent requirement arises from the fact that the jailer's "obligation is to see that the sentence imposed is the sentence served." *State ex rel. Pierre v. Maggio*, 445 So.2d 425, 426 (La. 1984). Thus "[n]o privilege enables a jailer to detain a prisoner beyond the period of his lawful sentence," *Whirl*, 407 F.2d at 791, and if is undisputed that a person was held past their legal release date, a district court should issue a "directed verdict as to liability, and [leave] for the jury only the issue of damages." *Id.* at 793.

25

Under both the federal and state bodies of overdetention law, issues common to the class predominate. The evidence of Secretary LeBlanc's longstanding indifference to the DOC's widespread practice of overdetention is a common issue at the forefront of this case, since he is the DOC's ultimate decisionmaker. Multiple courts have considered LeBlanc's liability for the same DOC overdetention policies that Named Plaintiffs challenge here and have ruled that he can be held liable as the supervisor. *See Hicks v. LeBlanc*, 832 F. App'x 836, 842 (5th Cir. 2020) ("[Plaintiff] alleged that LeBlanc knew of the DOC's long history of over-detaining inmates [and other defects] . . . . Based on these allegations, LeBlanc could be held liable for incompetent over-detention, such as the failure to process a prisoner's release or immediately compute an inmate's sentence after being sentenced to time served."); *Taylor v. LeBlanc*, 21-cv-00072-BAJ-RLB, Doc. 10 at *13 (M.D. La., Sept. 13, 2021) ("Plaintiff alleges that LeBlanc's failure to adopt policies to correct DOC's unlawful detention problem constitutes deliberate indifference to Plaintiff's constitutional right to timely release. This allegation, and the evidence Plaintiff has identified to support it, is sufficient to overcome the qualified immunity defense at the 12(b)(6) stage of these proceedings."); *McNeal v. DPS&C*, 18-cv-00736-JWD-EWD, Doc. 110 (M.D. La., April 18, 2022) ("A reasonable juror could also find from the facts alleged in the Amended Complaint that LeBlanc was deliberately indifferent based on the longstanding pattern of sufficiently similar incidents described in the Amended Complaint.").

As the Court of Appeals recently wrote at length in *Crittindon v. LeBlanc*, 37 F.4th 177 (5th Cir. 2022), LeBlanc, like other supervisory officials, "may be liable under § 1983 for their failure to adopt policies if that failure causally results in a constitutional injury." 37 F.4th at 186. *Crittindon* noted that "[l]iability only arises when the officials act, or fail to act, with deliberate indifference, a disregard for a known or obvious consequence of their actions," *id.* (quotations

and brackets omitted), but reviewing evidence of LeBlanc's notice and inaction essentially identical to the evidence Named Plaintiffs propose here, *compare id at* 183-84, 186-87 *with supra* at 8-9, *Crittindon* held that "[a] reasonable factfinder could conclude that [LeBlanc's] awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference." 37 F.4th at 187-88.

     In short, multiple authorities have held that policy claims are proper based on the evidence Plaintiffs have assembled here and that Secretary LeBlanc can be held liable. Secretary LeBlanc's misconduct was not directed to the plight of any particular person, but amounted to a stance of indifference to the fates of people entitled to immediate release from DOC custody generally. Indeed *Hicks*, *Taylor*, *McNeal*, and *Crittindon* serve as a test-proof of the common nature of the deliberate indifference claims against Secretary LeBlanc: each case involved a different plaintiff, with a different sentence, different jail credits, and a different criminal history, yet in each case the court held that Secretary LeBlanc could be held liable for their overdetention, based on essentially the same evidence that Named Plaintiffs propose to offer in this case—that LeBlanc, as a supervisor, was indifferent to practices of the DOC that caused hundreds of people per month to be unlawfully overdetained.

     **2.**    **The proposed class is superior to other available methods for fairly and efficiently adjudicating the controversy.**

     Rule 23(b)(3) additionally requires that "class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 623-24 (5th Cir. 1999) (quoting Fed. R. Civ. P. 23(b)(3)). This requirement, and its "non-exhaustive[]" factors,[5] are designed "[t]o reinforce the point that

---

[5] The "superiority" factors are:

the court with the aid of the parties ought to assess the relative advantages of alternative procedures for handling the total controversy . . . ." Fed. R. Civ. P. 23(b)(3) 1966 committee note.  In particular, "when many individuals have small damage claims, a class action is especially appropriate because absent a class suit, it is unlikely that any of the claimants will be accorded relief." 2 Newberg and Rubenstein on Class Actions § 4:64 (6th ed. 2022).

The class Named Plaintiffs have proposed is superior.  Perhaps most importantly, the claims of its members are small enough that it is unlikely many of the members' rights will be vindicated in individual suits.  The history of the DOC's overdetention practice is proof enough of that.  There is every reason to believe that since at least 2012, thousands of Louisianans have been overdetained every year for significant periods because of the misconduct that Named Plaintiffs have recounted in this memorandum.  Yet only a handful of lawsuits have been filed over the last decade to seek remedies for those violations.  Unless a class is certified, there is every reason that the rights of the vast majority of the proposed class members will never be vindicated, and little call for each class member to control their own cases.

The proposed class also has none of the features that sometimes cut against superiority. The acts and omissions at issue in this case are largely concentrated in the DOC's headquarters where he is officed, the claims of all class members involve the same bodies of law (federal and Louisiana), and the claims in this case are against a single supervisor, operating a single agency,

---

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

causing the same basic injury, in the same manner.  The amount of damages suffered by different class members may vary from individual to individual, but "it uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate." 7AA  Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure§ 1781 (3d ed. 2022).  The Rule 23(b)(3) class action devices is an efficient and fair—and superior—means of adjudicating the claims at issue in this case.

## IV.    Conclusion

For the reasons set out herein, Named Plaintiffs respectfully submit that certification of the class they propose is appropriate under Rule 23(b)(3).

Dated:  July 21, 2022                                      Respectfully submitted,


*/s/ Nishi Kumar*                                          */s/ Stephen H. Weil*


Mercedes Montagnes, La. Bar No. 33287                     Stephen Weil
Rebecca Ramaswamy, La. Bar No. 39524                      Loevy & Loevy
Nishi Kumar, La. Bar No. 37415                            311 N. Aberdeen, 3rd FL
The Promise of Justice Initiative                         Chicago, IL 60607
1024 Elysian Fields Avenue                                Tel:  (312) 243-5900
New Orleans, LA 70117                                      Fax:  (312) 243-5902
Telephone: (504) 529-5955                                 Email:  weil@loevy.com
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org


*/s/  William Most*


William Most, La. Bar No. 37764
Caroline Gabriel, La. Bar No. 38224
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
Email: williammost@gmail.com


                                                          *Counsel for Plaintiffs*