**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

BRIAN HUMPHREY, on behalf of himself
and all others similarly situated,

              Plaintiff,

              v.

JAMES LEBLANC, in his official capacity
as Secretary of the Louisiana Department of
Public Safety & Corrections,

              Defendant.

CIVIL ACTION NO. 3:20-cv-00233

JUDGE JOHN W. DeGRAVELLES

MAGISTRATE JUDGE SCOTT D.
JOHNSON

# EXHIBIT 13

**Expert Report of Rita Rossi**

**EDUCATION**

Eastern Illinois University | Charleston Illinois
*Bachelor of Science in Family Services and Sociology*

**PROFESSIONAL EXPERIENCE**

Illinois Department of Corrections:

Correctional Counselor I | December 1989 – June 1991
- Supervised all inmate releases, discharge and parole (MSR-Mandatory Supervised Release)
- Secured Parole Plans and release orders
- Acted as liaison between the offenders and the Parole Agents as well as the Prison Review Board

Correctional; Counselor II | June 1991 – November 1998
- Correctional Counselor I duties
- Became a founding member of statewide committee whose objective was to reduce recidivism
- Supervised the develop of the Parole School Program for Illinois, called PreStart
- Wrote curriculum for and taught Prestart classes
- Supervised interns and Offender Workers

Executive II (Record Office Supervisor) | November 1998 – December 2013
- Supervised all Record Office Staff
- Co-authored a Training Manuel for Record Office staff. Including all calculation and disciplinary duties.
- Litigation Coordinator
- Coordinator of all offender movement including, releases, transfers, court writs, furloughs, and discharges
- Sex Offender Registration Coordinator

Public Service Administrator (Assistant Chief Legal Records Officer for the State of Illinois) | December 2013 – July 2015
- Addressed all phone calls, emails, mandates and calculation issues for all DOC facilities
- Responsible for answering all facility Record Office questions for staff and community.
- Liaison between IDOC Executive Staff and the facilities.

**MATERIALS REVIEWED**

*Humphrey v. LeBlanc* – Plaintiff second amended complaint, defense answer, & exhibits.

*Humphrey v. LeBlanc* – LDPS&C Rule 30(b)(6) subpoena, deposition transcripts & exhibits, James LeBlanc deposition transcript & exhibits.

*Giroir v. LeBlanc* – Plaintiff motion for class certification, defense response in opposition, plaintiff reply, & exhibits.

## SUMMARY OF EXPERIENCE

My name is Rita Rossi. For more than 25 years I was employed by the Illinois Department of Corrections ("IDOC") in various roles relating to the computation of sentences and the release of prisoners. From 1989 through 1998 I worked in several roles of increasing responsibility relating to correctional counseling, with a focus on the release of prisoners from incarceration. This included supervising all releases of persons from the IDOC's custody, as well as the discharge of all former prisoners from parole (called mandatory supervised release, or "MSR"), and the securing of parole plans and release orders. I additionally supervised the development of the IDOC's Parole School Program to train parole officers in numerous aspects of parole, including calculation and discharge.

From 1998 through 2013 I held an Executive II position within the IDOC, as Record Office Supervisor. In that role I supervised staff of the IDOC's Records Office, which is responsible for calculating sentences and release dates for persons in IDOC custody. In this role I also developed the training manual for Record Office staff, which instructed staff regarding the manner to perform all time calculation and calculation of the effects of in-sentence discipline on sentences. I was also coordinator of all movement of persons imprisoned in the IDOC, including all releases, transfers, court writs, and discharges.

From 2013 until my retirement in 2015, I held an administrative position as Assistant Chief Legal Records Officer for the State of Illinois. In this role I oversaw all sentence calculation issues for all IDOC facilities. I was responsible for answering all Record Office questions, and I served as the liaison between IDOC executive staff and the IDOC's sentence calculation function.

Through my decades of experience operating and overseeing the IDOC's sentencing calculation and release functions, I have developed substantial knowledge and expertise regarding the manner in which departments of corrections must calculate sentences, particularly the obligations and capabilities of departments of corrections to calculate sentences in a manner that does not result in either over- or under-detention. This includes preventing the overdetention of persons who, when sentenced, are entitled to immediate release and therefore should not spend any time in prison past their sentence.

## OPERATION OF CORRECTIONS SENTENCING FUNCTION

I have been asked to review the operation of the sentencing function calculation function of the Louisiana Department of Public Safety & Corrections (LDPS&C) and offer an opinion regarding whether the manner of its operation comports with comports with the accepted practices of a department of corrections sentencing calculation function, as well as whether the LDPS&C's system of sentencing calculation would predictably cause the LDPS&C to detain

people for more time than it is LDPS&C authorized to incarcerate under the sentence issued by a sentencing court.

A department of corrections sentencing calculation function operates to effectuate the incarceration authority of the department itself. The authority of a department of corrections to imprison a person derives from a person's sentence to incarceration by a court of law. Therefore, the sentencing calculation function of a department of corrections must inform the department whether a court has sentenced a person to the department's custody—i.e., whether the department of corrections has legal authority take custody of a person—and if so, for how long.

Persons who are convicted of a crime (or adjudicated to have violated probation) are often sentenced to less than the time that they have already served in jail or on probation, and thus while the resolution of their criminal conviction is a sentence, they have no period of incarceration remaining to serve (referred to below as a "time-served" sentence). A department of corrections sentencing calculation function operates on the understanding that, because a department of corrections has no actual inherent authority to incarcerate such persons, the department cannot assume there is authority to incarcerate the person until proven otherwise. As such, the sentencing calculation function must be performed immediately. In corrections, the amount of time permitted to perform that function is understood to be a matter of a few hours. In a sentencing environment where time-served sentences are commonly issued by courts, a sentencing calculation function that takes more than the short, hours-long window permitted for sentence calculation is guaranteed to result in widespread overdetention.

Additionally, it is commonly understood that the authority of a department of corrections to imprison persons is derived only from the sentence issued from a sentencing court, and not from other sources that might permit some *other* entity to incarcerate the person. In other words, it is understood that a department of corrections does not have authority to imprison a person on the basis of arrest warrants, detainers, and sentences to incarceration in other jurisdictions, such as another state. A department of corrections sentencing calculation function may certainly attempt to identify arrest warrants and the like and alert authorities that do have authority to detain the person. But it is commonly understood that a sentencing calculation function cannot be used as a means for a department of corrections to imprison a person on behalf of another jurisdiction. Thus, a delay in completing the calculation of a sentence for the purpose of imprisoning a person in order to determine whether some *other* jurisdiction has authority to incarcerate the person is never permitted.

**PERFORMING SENTENCING CALCULATION**

There are multiple ways to accomplish the prompt sentencing calculations that are expected of a department of corrections sentencing calculation function. During my career with the IDOC, the department used multiple means of performing prompt calculations. One method, referred to as dress-in-dress-out, consisted of busing all convicted persons from the court to a department of corrections intake facility, where their sentences would be calculated upon arrival, and those entitled to immediate release would be sent back to court on the same bus at the end of the day. Another method was to station IDOC employees in the courthouses themselves in order

3

to perform sentencing calculations and effectuate releases on the spot. Yet another method is to accept electronic transmission of sentencing documents from the courthouse to the department of corrections sentencing function. Whatever the method, the department of corrections must orient its operations to enable the calculation of each sentence within a matter of hours.

The IDOC's sentencing calculation function operates first to determine whether the IDOC had legal authority to detain a person based on the sentence imposed by the sentencing court. If the IDOC lacks legal authority to imprison a person, they are released that day.

All of IDOC's intake facilities, officially know as Reception and Classification Centers (R&Cs), are familiar with how to process dress-in-dress-outs (or turn-arounds as Illinois refers to them). Most intakes include some people who will be released immediately. The only documents that are required by IDOC to perform the sentencing calculation function is the Mittimus, also known in IDOC as the Judge's order or Sentence order. The IDOC can use this document to calculate a prisoner's sentence and can release prisoners with this document alone.

Quick calculations and turn-arounds are done as soon as the prisoner is brought to the R&C facility. Several staff from the facilities are trained how to do these calculations, so the absence of one or two employees will not be a reason for someone not being released properly. When the Record Office staff determine that any intake might be released that same day, their Sentence orders are separated out and when the entire intake is complete, the staff member begins the release process. The calculation is double checked, and a release checklist is completed. At that time, other prison functions connected with the release process are notified and simultaneously begin the release process. The IDOC's Bureau of Identification confirms the person's identity; Healthcare, Clinical Services, Security Transport, and Parole complete the necessary release paperwork; and the person is released from the prison that same day. (The release is either to Parole or Mandatory Supervised Release, unless they are only incarcerated on a technical parole violation and that violation has calculated out. Those people will be completely discharged from IDOC. In all events the person leaves the facility, i.e., the person walks—or more commonly is bussed—out of the prison gates.)

In addition to these release procedures, the IDOC also checks to determine whether there are other authorities who might have the right to detain the person. The IDOC's sentencing calculation function performs this check using LEADS (Law Enforcement Automated Data System), a nationwide law enforcement information system that records arrest warrants, detainers, and similar information. This is done simultaneously with the release process. If a "hit" comes up, the IDOC will do everything it can to notify the relevant law enforcement authority that the person in question is in IDOC custody. The IDOC, however, does not incarcerate the person either for the purpose of conducting this search, nor does it incarcerate the person past their release date to wait for the relevant law enforcement authority to pick that person up and detain them. That is  because it is well understood that the IDOC's authority to imprison or detain a person comes exclusively from the sentencing court's order and not from another source.

4

In the IDOC these procedures have been put in place to accomplish what is understood to be legally required: detention of persons for the exact period of time as the sentence issued by the sentencing court—no shorter, and no longer. It is understood that this is the mission of any department of corrections operating under the U.S. Constitution, whatever state it may be in. The system functions by staff simultaneously gathering the necessary information to determine whether the IDOC has authority to imprison the person, and if so, for how long. The system is designed to perform this function quickly because it is understood that in many cases the IDOC does not have authority to imprison the person. Gathering other information, including whether other authorities may have the right to detain or imprison the person, is desirable, but a sentencing calculation function must not be designed in a way that a person is imprisoned without any authority while such parallel investigations are performed.

**SENTENCING CALCULATION PERFORMED UNDER DEFENDANT'S OVERSIGHT**

The documents and deposition testimony that I reviewed in this case indicate that the sentence calculation function of the LDPS&C operates substantially differently than the sentence calculation function of the IDOC, and does so in ways that conflict with the understood obligation of a department of corrections to imprison persons for, and only for, sentences to imprisonment that are issued by the sentencing courts.

First, the LDPS&C's sentencing calculation function appears to be operating with full knowledge that the LDPS&C is incarcerating numerous persons for weeks or months while their sentencing papers are gathered, even though these persons have not been sentenced to any prison time by the sentencing court. For example, LDPS&C witness Spears testified that the LDPS&C allows waiting period of two to three weeks to receive a packet of information from the parishes where persons are sentenced. If a person is being imprisoned by the LDPS&C during that time, which I understand they are (though they are housed in jails), such a waiting period is inconsistent with the understood mission, and authority, of departments of corrections to incarcerate persons only for the time set forth in sentencing orders.

The testimony of LDPS&C staff indicated steps that would cause needless delay to pile up further. LDPS&C witness Whittaker's testimony indicates that the LDPS&C has simply elected not to set up a portal or similar electronic means of receiving sentencing paperwork, even though the LDPS&C appears to believe that this would eliminate virtually all the time spent waiting for sentencing papers.

The LDPS&C witness Spears's testimony indicates that the LDPS&C has little interest in receiving sentencing papers electronically, on grounds that electronic receipt would be cumbersome for calculating the sentences of persons who are *not* entitled to immediate release— even though this means consigning persons who *are* entitled to immediate release to unlawful detention. That approach is inconsistent with the understood mission of a department of correction's sentencing calculation function, which is to ensure that a department of correction does not incarcerate persons without authority to do so.

The testimony by LDPS&C witness Spears also indicates that the LDPS&C considers electronic receipt cumbersome because all documents electronically received would have to be

printed out and distributed by hand. Such printing and distributing is unnecessary for calculating a sentence, however, and simply adds more time to the process. The claim that such procedures are necessary also reflects an unwillingness to alter procedures in a manner that could cut down sentencing calculation time. This also is inconsistent with the understood mission of a DOC's sentencing calculation function, since a refusal to receive information electronically reflects an indifference to the risk that paper processing will result in the LDPS&C unlawfully imprisoning people entitled to immediate release.

The testimony from LDPS&C witnesses Spears and Whittaker indicates an unwillingness to meaningfully expedite the sentencing calculation process for persons entitled to immediate release. Specifically, their testimony indicates that the LDPS&C insists on obtaining all parts of a "Pre-Class" packet for each person being sentenced before engaging in the sentence calculation. A pre-class packet is very helpful when deciding the proper facility to place a prisoner, but when the judge's intent is to release someone based on time already served, that information is unnecessary.

The testimony of LDPS&C witnesses Spears and Whittaker also indicates that even when the LDPS&C receives sufficient papers to determine that the sentencing court sentenced the person to time served, the LDPS&C will continue to imprison the person while the sentencing calculation function conducts what amounts to an investigation of the person's background. The LDPS&C will continue to imprison a person whose sentence has already been completed for as long as it takes for the sentencing calculation function to determine whether some other legal entity has arrest warrants or detainers for that person, and it will continue to imprison a person for as long as it takes to determine whether there is some other Louisiana sentence on which the person might be incarcerated. It appears that the LDPS&C will also continue to incarcerate the person until those other authorities muster themselves to assert custody over the person.

These practices are all inconsistent with the commonly understood role of a department of corrections sentencing calculation function. It is certainly desirable to determine whether there might be some other authority for incarcerating a person. The IDOC's sentencing calculation function, for example, searches for this information simultaneously with the calculation of the person's sentence, and, if and when such information is identified, the authority that is authorized to detain the person is contacted promptly. But it is well understood that a department of corrections does not have authority to imprison a person for the purposes of conducting such an investigation, just as it does not have authority to imprison a person who might have an arrest warrant or a detainer by another jurisdiction.

Forcing persons to stay imprisoned beyond the time it is necessary to calculate the sentence issued by the sentencing court for to allow LDPS&C to conduct such an investigation inevitably results in detention without authority. This is because numerous people are sentenced to an equivalent of "time served," meaning that a department of corrections does not have any authority to imprison them, whether in order to conduct an investigation or for any other reason. A department of corrections sentence calculation function that, as a practice, does not undertake sentence calculation until such investigations have been completed inevitably results in unauthorized imprisonment of numerous persons who are entitled to immediate release. A

system designed around imprisoning persons for the purpose of conducting investigations will necessarily lead to numerous cases of overdetention.

## CONCLUSION

The primary purpose of sentencing calculation function for any department of corrections is to ensure that the department of corrections imprisons persons lawfully pursuant to orders of a sentencing court. It is commonly understood in the corrections community that the sentencing calculation function should not lead to persons being incarcerated for any less time than ordered, or any more time than ordered. And because numerous persons are sentenced to zero remaining time of incarceration, it is vital for a sentencing calculation function to prevent against such persons from being imprisoned unlawfully.

As I have described in this report, a sentencing calculation function accomplishes this purpose with systems designed to ensure that a sentence is calculated quickly. One component of these systems must be designed to gather sentencing information promptly. A second component of the systems must be designed to perform the calculation of the sentence once the information to determine the court's sentence has been received. Because a department of corrections does not have authority to actually imprison numerous persons who are sentenced to time served, it is vital that both these components of the sentencing calculation function be set up to calculate a person's sentence within a short period of time, measured in hours rather than multiple days or weeks. By way of illustration, I have described the sentencing calculation function of the IDOC, in which the system is designed to accomplish sentence calculation quickly.

My examination of the information that was provided to me indicated that the sentence calculation function of the LDPS&C is set up differently, and is not designed to determine quickly whether the LDPS&C actually has authority to imprison a person. First, the LDPS&C appears to have little interest in gathering sentencing information quickly. Second, once the information is gathered, the system of sentencing calculation developed by the LDPS&C is not designed to complete quick sentencing calculation, but instead continues to imprison people in order to leave time to gather additional information that is not necessary to determine a person's sentence, but rather is gathered for other purposes – such as determining whether some other entity has the authority to arrest or detain the person. Incorporating such delays into the system of sentencing calculation inevitably and predictably causes persons entitled to immediate release to instead by imprisoned without authority for lengthy periods while the information-gathering process is completed.

*       *       *

Under penalty of perjury I swear that the foregoing is true and correct to the best of my knowledge and belief.

March 11, 2022    /s/ Rita Rossi
Date                    Rita Rossi

7

8