# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BRIAN HUMPHREY,** | * | **CIVIL ACTION** |
| **on behalf of himself** | * | |
| **and all similarly situated individuals,** | * | **NUMBER: 3:20-cv-00233-JWD-SDJ** |
| | * | |
| | * | |
| **VERSUS** | * | |
| | * | **JUDGE JOHN W. DeGRAVELLES** |
| | * | |
| **JAMES LEBLANC** | * | **MAGISTRATE JUDGE** |
| | * | **SCOTT JOHNSON** |

**************************************************************************

## MEMORANDUM IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Defendant James LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections (hereinafter, "DPS&C") respectfully submits this opposition to Plaintiffs' Motion to for Class Certification (R.Doc. 104).

### I.   Summary of the Argument

Plaintiffs bear the burden of proving that all requirements under Federal Rule of Civil Procedure 23 are met in order to certify this purported class action.  Plaintiffs' unsupported and conclusory arguments do not survive the "rigorous analysis" that is required to prove that certification is appropriate.

Plaintiffs seek to certify a class of offenders remanded to the custody of DOC who were "entitled to release" at the time of their remand, but who were released more than 48 hours past their remand. At the outset, Plaintiffs' proposed "fail safe" class definition is flawed, and premised on an incorrect legal standard. Contrary to Plaintiffs' arguments, there is not "bright-line" 48-hour limit to release an offender for the purposes of due process. The *McLaughlin* case, cited by Plaintiffs, only applies to the time period for a probable cause determination following a warrantless arrest to comply with the Fourth Amendment. Further, even if the case did apply,

*McLaughlin* actually sets forth a <u>presumption</u> that release of an offender within 48-hours is reasonable. That presumption can be rebutted by a jailer by showing the circumstances surrounding the release was reasonable. This reasonableness standard must be applied to <u>each and every purported class member</u> and necessarily precludes class certification in this matter.

The types of offenders contemplated in Plaintiffs' proposed class definition are those offenders who likely served time as a pre-trial detainee prior to their sentencing date. DPS&C has no connection to, or knowledge of, pre-trial detainees, their sentencing date, or the outcome of their sentencing until the local facility housing such an individual notifies DPS&C that the individual was sentenced to a felony, and therefore within the custody of DPS&C. There is unavoidable delay in this process, which is completely out of the control of DPS&C. Louisiana law obligates the local facilities to provide DPS&C with all necessary paperwork for all offenders sentenced to DPS&C custody. DPS&C cannot process time computation until all paperwork required under the law is received.  Then DPS&C must follow all necessary steps and time computation processes, and the law, to ensure that the offender is in fact entitled to release. Every inmate's time computation process is unique. Given that the DPS&C must rely on 102 local jail facilities located throughout the state to provide DPS&C with notice of an offender's sentencing outcome, individualized issues necessarily arise with respect to Plaintiffs' claims and the claims of every purported class member.

Plaintiffs have not provided any evidence to support their contention that the purported class would meet the numerosity requirement. Based on the evidence provided, Plaintiffs have not set forth an objective method for identifying the members of the class or that the named Plaintiffs are similarity situated with any other persons. Further, the individualized issues surrounding each offender's sentence, credits earned, location of local facility in which the offender served as a pre-trial detainee, and release process shows that the purported class members do not share common

2

questions of law or fact. Plaintiffs' attempt to impose liability on DPS&C for any release after 48 hours of sentencing, despite the fact that DPS&C would have no knowledge or control over the release of an offender in some instances well past the 48-hour period, cannot circumvent their burden to show commonality.

As shown by the named Plaintiffs' unique facts and circumstances surrounding their releases and the various damages sought, the named Plaintiffs' claims are not even typical of each other, much less typical of the purported class members. For the same reasons, the named Plaintiffs cannot adequately represent the purported class.

Finally, Plaintiffs failed to prove that any common issues predominate over the vast individualized issues here. The "48-hours after sentencing" standard that Plaintiffs base their entire case on alone proves that an individualized inquiry would be required for each purported class member. The very case Plaintiffs rely on actually sets forth a rebuttable presumption of reasonableness to release an arrestee within 48 hours. Whether each release and alleged delay was reasonable necessarily turns on individualized questions that would turn any purported class action into numerous "mini trials" on liability and therefore fails the predominance test. Further, as Plaintiffs even concede, the damages sought by each purported class member will vary. The named Plaintiffs seek individualized damages, such as lost wages and mental anguish, which must be calculated individually for each purported class member- another reason by class certification is not appropriate here.

Plaintiffs have the burden of proving each and every requirement under Rule 23. Plaintiffs fail to meet this burden. Their motion relies on conclusory arguments and fails to demonstrate that class certification is appropriate. As such, Plaintiffs fail to meet the requirements of Rule 23 and the Motion for Class Certification must be denied.

## II.  Factual Background

While the issues before this Court in Plaintiffs' Motion for Class Certification are strictly limited to the rigorous analysis of whether Plaintiffs have proven the elements of class certification, Plaintiffs' conclusory arguments gloss over the complex and unique process for time computation and those offenders Plaintiffs claim are entitled to "immediate release." A description of this process, the individualized issues involved and the named Plaintiffs' time computation processes demonstrate the problems Plaintiffs face in proving that class certification is proper.

### A.  Time computation

The process of time computation to determine if an inmate is eligible for release is complex and involves many steps. At the outset, when an individual is arrested, and is in the custody of a local facility, that individual is a pre-trial detainee. DPS&C does not have custody of pre-trial detainees.[1] Further, DPS&C has no knowledge of the existence of pre-trial detainees, their sentencing dates, or the results of their sentencing until the local facility provides that information. If a pre-trial detainee remains in the custody of the local facility, and is later convicted of the crime(s), the pre-trial detainee may be entitled to various credits while serving in the local facility.[2] The convictions, sentences, and credits of any particular offender will differ and each offender's process is unique.

Here, Plaintiffs allege that once a pre-trial detainee is sentenced to hard labor, the application of certain time credits requires that the offender should be "immediately released," even though DPS&C would have no knowledge of the offender at that time.  However, as required

---

[1] La. R.S. 15:824.

[2] A pre-trial detainee, upon sentencing, may be entitled to jail credits for the time spent in custody prior to sentencing. *See* La. C.Crim.P. art. 880. An offender may be entitled to Certified Treatment and Rehabilitative Credits (CTRP) by participating in education, job skill training, faith-based initiatives and treatment programs. These credits can be earned by a pre-trial detainee in a local facility.

by Louisiana law, many steps must occur, and required documentation must be obtained, before DPS&C can release an offender.

The application of various credits lead to the anomaly that, when a pre-trial detainee spends months in a local facility awaiting trial or sentencing, by the time he is sentenced, he may appear on paper to be overdue for release because of the credits earned. However, in many instances, the offender is actually not "overdue" for release, and the DPS&C must ensure that he/she is not released early. For instance, if a detainee spends six months in a local facility, and then is sentenced to one year at hard labor, with good time credits and potential CTRP credits earned, on paper it may reflect that he was due for release prior to the time of sentencing and prior to the time that the DPS&C had any knowledge of his existence or custody of the detainee. Obviously, a pre-trial detainee cannot be released prior to the time he is sentenced. This hypothetical pre-trial detainee is not entitled to release prior to his sentence date, and presents the exact scenario that exemplifies why class certification is not appropriate here.

Not all inmates sentenced to hard labor are sent to the physical custody of DPS&C.[3] In fact, when an offender is sentenced to hard labor, DPS&C is not immediately notified of that fact.[4] After an inmate is sentenced to DPS&C time, local jails have a statutory obligation to send DPS&C the required paperwork on each offender. La. R.S.§ 15:566 tasks the local sheriff with providing proper paperwork to the DPS&C and notifying the DPS&C of transfers. It provides that the sheriff of the parish in which the prisoner has been convicted:

> . . . [Sh]all deliver with the prisoner all documents and statements required by Article 892 ... of the Louisiana Code of Criminal Procedure.

***

---

[3] Affidavit of Angela Griffin, attached as Exhibit 1, at para. 2.
[4] Exhibit 1, Affidavit of Angela Griffin, para. 2.

If said documents are not tendered with the prisoner, the Department of Corrections shall refuse delivery of said prisoner.[5]

Further, La. C.Cr.P. art. 892 lists documentation and information that must be transmitted by the sheriff to DPS&C.[6] This required paperwork, comprised of several pieces of documentation and information, is known as the "Pre-Class Packet." If the required paperwork listed in Article 892 is not provided, DPS&C cannot calculate the release date for a pre-trial detainee sentenced to DPS&C time. Currently, there are 102 local jails across Louisiana. Obviously, given the numerous local jails and different procedures (or lack thereof) adopted by each jail or sheriff's office, individualized issues associated with the collection of necessary paperwork arise. Further, because of how the different offices operate, different delays and issues arise during this process.

Once DPS&C receives the Pre-Class Packet, DPS&C must verify that all required paperwork is included, must confirm the sentence is for hard labor, and confirm that the National Crime Information Center (NCIC) criminal history coincides with the disposition.[7] If any of the Pre-Class Packet information or documentation is missing or incomplete, DPS&C cannot perform its time computation.[8] If any information is missing, DPS&C must track down the information, but is still at the mercy of other entities, such as a local jails, sheriff's offices or clerks of court, to

---

[5] La. R.S. 15:566. La. R.S.§ 15:706 also allows a sheriff to transfer prisoners to another parish when the jail is unsafe, unfit for detention, or otherwise presents a security risk. As an explicit condition of such transfers, the statute requires the transferring sheriff to notify either the court (for persons not under DPS&C sentence) or DPS&C (for persons under DPS&C sentence) of the transfer.

[6] The information that DOC receives from the local sheriff of the Parish of conviction is referred to as a "Pre-Class Packet," and must include: Basic Information and Interview for Local Jail Facilities Form; Credit for DPSC Commitment Form; Bill of Information; Uniform Commitment Order with Judges Signature; Suspect Rap Sheet with photo, State Identification Number (SID) and the Arrest Tracking Number (ATN) from the fingerprint for the conviction/disposition of the sentence from the Automated Fingerprinting Identification System; and DPSC Acknowledgements and Signature Statement signed by the inmate. Exhibit 1, Affidavit of Angela Griffin, para. 6.

[7] Exhibit 1, Affidavit of Angela Griffin, para. 8.

[8] Exhibit 1, Affidavit of Angela Griffin, para. 9.

timely provide the information. Oftentimes, delays by these entities impact the processing of releases.[9]

Only once all of the information is received, the process of performing an offender's time computation can begin, which is detailed in the Release Clearing Checklist.[10] This process involves review of jail credits applicable for each sentence, sentence date, sentence start date, length of sentence for each charge, good time rate and parole eligibility for each charge, and whether an offender has time to serve on other sentences. DPS&C must also confirm whether the offender has warrants or charges without dispositions in Louisiana or out of state proceedings.[11] This requires obtaining the criminal history reports from State Police, FBI, or out of state criminal history.[12] In addition, an offender's State Police Rap Sheet must be cleared of all charges.  If the charges on the Rap Sheet do not show that they have been cleared or resolved and they remain open, then Pre-Class must call the Courts and District Attorneys to check every single arrest that does not have a disposition.[13]  While it is a burdensome process, it is imperative that all arrests and charges be cleared before the offender can be released.  Further, Pre-Class must also gather from the local Sheriff fingerprints from AFIS (Automated Fingerprint Identification System) to provide positive identification of the offender.

Only after all paperwork is received and verified can DPS&C release an inmate.[14] During this process, DPS&C relies on receiving paperwork and information from multiple entities, over which it has no authority or control, before an offender's time computation can even begin.

---

[9] Exhibit 1, Affidavit of Angela Griffin, para. 9.
[10] Exhibit 1-A, Release Clearing Checklist.
[11] Exhibit 1, Affidavit of Angela Griffin, para. 11-12; Exhibit 1-A, Release Clearing Checklist.
[12] Exhibit 1, Affidavit of Angela Griffin, para. 13.
[13] Exhibit 1, Affidavit of Angela Griffin para. 14.
[14] Exhibit 1, Affidavit of Angela Griffin, para. 14-15.

**B. The DPS&C has continuously worked to address identified issues**

Contrary to Plaintiffs' conclusory arguments, DPS&C has worked diligently to address the issues outlined above. While DPS&C is not able to force third-parties to provide paperwork timely, its work to identify and address these issues is the antithesis of deliberate indifference. Some of these steps include:

- While Plaintiffs incorrectly assert that DPS&C "did nothing" following its internal review of time computation in 2012, known as the Six Sigma Project, the priority recommendation of the project was to centralize the Pre-Class Department. In 2013, DPS&C followed that recommendation and centralized its entire Pre-Class department. Instead of each state facility performing time computations, the entire department was revamped to include a centralized Pre-Class department.[15]
- In response to the Six Sigma Project, DPS&C also attempted have legislation passed to mandate a time period for the clerks and sheriffs to provide the Pre-Class packet to DPS&C. This legislation did not pass.[16]
- In response to the recommendation of the Six Sigma Project, DPS&C developed a custom computer system. The computer system, which was very costly, ultimately failed. However,  DPS&C took steps to create the new system.[17]
- In 2016, Leblanc requested a meeting with the Executive Director of the Clerks of Court Association, Debbie Hudnall, to address the delay in receiving paperwork and court documents. As stated by Plaintiff in his motion, Hudnall offered to send the court documents electronically to DPS&C simultaneous with the clerks sending the documents to the sheriff. However, after analyzing whether this would be feasible, it was determined that receiving piecemeal documentation from the clerk's office would only cause more confusion, as DPS&C needs the *entire* Pre-Class Packet from the sheriff in order to process time computation.[18] DPS&C did provide Hudnall with an analysis of average number of days DPS&C received Pre-Class information broken out by parish.
- In 2017, the Louisiana Supreme Court issued a memorandum regarding requirements of the Uniform Commitment Order. The memorandum states that: "members of the District Judges Association, DPS&C, and the Clerks of Court Association, met on several occasions with LASC staff to revise and adapt the UCO in accordance with the new law and to improve communication between the sentencing judge and DPS&C."[19] However, despite this Supreme Court requirement, many judges do not follow the UCO instructions.

---

[15] Exhibit 1, Affidavit of Angela Griffin, para. 22.
[16] See Exhibit 1, Affidavit of Angela Griffin; Exhibit 1-C, HB 401.
[17] R. Doc. 109-17, Deposition of Secretary Leblanc, p. 67.
[18] Exhibit 1, Affidavit of Angela Griffin, para 23.
[19] Exhibit 3, November 16, 2019 Memorandum from the Supreme Court to District Court Judges and Court Administrators.

- In 2017, DPS&C cooperated with the legislator in reviewing time computation errors. DPS&C implemented a secondary review of every time computation, and conducts an additional random review of 25 time computations per month by each Pre-Class supervisor.[20]
- In 2019, DPS&C applied for a grant with the Department of Justice. DPS&C sought funds to assist with obtaining the documents required under the law to perform a time computation from the local jails after inmates were sentenced to DPS&C time.[21] While Plaintiff relies heavily on the grant application support its case, the fact that DPS&C was (and is) working to address the issue is the antithesis of deliberate indifference.
- In October 2019, an Interactive Sentencing Workshop was conducted at the fall Judge's Conference though the Louisiana Supreme Court.[22]   DPS&C was a presenter at this conference aimed at implementing consistent sentences.
- DPS&C is currently working with the Office of Technology Services (OTS), which is part of the Louisiana Division of Administration, to overhaul the information technology system of the DPS&C. The new system will replace all electronically-stored information of the Department of Corrections and initially will include a standalone time computation system which will eventually be integrated with the entire system referred to as Corrections Information Program and Records System ("CIPRS").[23]
- DPS&C has a department regulation that requires identification of offenders who are potential immediate releases, and gives those offenders priority for time computation.[24] If immediate release offenders are not released within two days of DPS&C receiving the paperwork, the Pre-Class employees must create a case narrative to explain the problems encountered during the time computation process.

### C.  Time computation for named Plaintiffs

Plaintiffs' complaint and the motion for class certification give an improper and incomplete picture of the circumstances surrounding the named Plaintiffs' time computation and release. As discussed above, each offender's time computation process will be different and unique. The following is a timeline of each named Plaintiff's specific time computation process.

---

[20] Exhibit 1, Affidavit of Angela Griffin, para. 24.
[21] R. Doc. 37-3, ¶ 4.
[22] Exhibit 1, Affidavit of Angela Griffin; Exhibit 1-D, Workshop Presentation, bates labeled Humphrey 908.
[23] Exhibit 2, Deposition of Angela Griffin, pp. 154-158.
[24] Exhibit 1, Affidavit of Angela Griffin; Exhibit 1-B, Department Regulation No IS-B-3.

1. **Brian Humphrey**

- Humphrey was sentenced by the 26th Judicial District on April 16, 2019. The UCO states the sentence is three years, DOC time is "0" years, and there is not indication that the sentence is at hard labor.
- Pre-Class Packet was transmitted to DPS&C by the Bossier Parish Sheriff on April 26, 2019 at the end of the day. It was initially received by the Pre-Class Department at David Wade Correctional Center, which is responsible for processing sentence computations and releases for offenders in certain parishes, included with a group of Pre-Class Packets from the Bossier Parish Sheriffs Office. Because it was received at the end of the day on Friday, Plaintiffs Pre-Class Packet was not sorted and assigned until the following Monday (April 29, 2019), when it was assigned to Carlisa Lewis to begin processing. On that day Lewis accessed CAJUN, which showed that Plaintiff was already reporting to Probation and Parole ("P&P"). Lewis returned Plaintiffs Pre-Class Packet to Cecilia Lawrence for further handling.[25]
- On April 29, 2019 Lawrence began the process of confirming the information relating to Plaintiff in CAJUN and to verify his whereabouts. She also performed a criminal history check on Plaintiff. Because the information in CAJUN, indicating Plaintiff was reporting to P&P, contradicted the information provided in the Pre-Class Packet, Lawrence contacted the Webster, Caddo and Bossier Parish jails by telephone to confirm whether Plaintiff was housed there. She was told by each facility that Plaintiff was not there. Lawrence then sent an e-mail to P&P to verify the information in CAJUN. P&P responded that it had no information but assumed Plaintiff had been released because his case had been assigned as a "no show," indicating he did not appear for his initial meeting with P&P after release. Lawrence then returned the Pre-Class Packet to Lewis because Plaintiff could not be located at that time.[26]
- Between the dates of May 3, 2019 and May 6, 2019, Lewis entered additional information in CAJUN relative to Plaintiff to process his time computation and release. On May 9, 2019, DPS&C Headquarters updated information in CAJUN that indicated Plaintiff was currently at the Bayou Dorcheat Correction Center. Lawrence then notified Lewis of Plaintiffs whereabouts. Lewis then transmitted the Pre-Class Packet to Jeffrey Norred at David Wade Correctional Center for further processing.[27]
- Between the dates of May 9, 2019 and May 13, 2019, Norred was provided with Plaintiffs file by Lewis so that he could run an initial time computation. A release packet, comprised of all information required according to the DPS&C's Release Clearing Checklist and according to the applicable Instructions, was provided by Norred to Sally Gryder on May 13, 2019. Gryder checked the time computation, signed the Release Clearing Checklist and returned it to Norred to process the release. Norred started the releasing process on May 13, 2019 at or about 8:30 AM. The Webster Parish Sheriff sent the residence plan and clearance sheet back to Norred on May 13, 2019 at 11:01 AM. Norred then printed out the release certificate information and presented it to David Wade Correctional Center Assistant Warden Angie Huff. The signed release certificate

---

[25] Exhibit 1, Affidavit of Angela Griffin para. 25; Exhibit 1-F, Humphrey Pre-Class Packet, attached to Angela Griffin's Affidavit.
[26] *Id.*
[27] *Id.*

was then faxed by Norred to the Bayou Dorcheat Correctional Center, where Plaintiff was located. Norred then called Carolyn Douglas, Assistant Warden at Bayou Dorcheat Correctional Center, to confirm the certificate was received.[28] Humphrey was released on May 13, 2019.

## 2.   Joel Giroir

- Giroir's probation was revoked and he was sentenced to one year hard labor on January 26, 2021.[29]

- DPS&C had no knowledge of this revocation or sentencing until February 12, 2021, 17 days after his sentencing date, when St. Tammany Parish emailed Giroir's Pre-Class Packet to the Pre-Class Department at Raymond Laborde Correctional Center at 11:05 am.[30]

- In accordance with the Pre-Class Intake, a Pre-Class employee, Joseph Bordelon, ran Giroir's criminal history on February 12, 2021. It was discovered that the Arrest Tracking Number (ATN) on Plaintiff's fingerprint rap sheet did not match the ATN on Plaintiff's criminal history. Bordelon called to notify St. Tammany Parish Jail of the discrepancy. Bordelon was transferred to the booking department, who advised that they would "re-book" Giroir on the charges and fax the corrected information once it was completed. Bordelon called St. Tammany Parish Jail two more times on February 12, 2021, but was not sent the updated information.[31]

- Due to an ice storm, all state offices in Avoyelles Parish were closed from February 15, 2021 through February 19, 2021. Once Bordelon was able to return to the office on February 22, 2021, he had received the requested updated information from St. Tammany Jail and was able to calculate Plaintiff's time that morning.[32]

- Bordelon sent the packet to DPS&C Headquarters at 8:22 am on February 22.[33]

- Jessica Smith at Headquarters received Giroir's packet at 8:22 am.   Smith then performed the following tasks necessary to process the release: (1) print and send submittal, clearance and residence plan to St. Tammany Parish Prison; (2) request criminal history to begin clearing release; (3) called Jefferson Parish Sheriff Office to determine whether Plaintiff had any active warrants or detainers; (4) called Orleans Municipal Court to check for active warrants or detainers; (5) obtain disposition of charges on criminal history sheet from St. Tammany; (6) updating information in CAJUN; (7) prepare release packet for signature; and (8) send final release packet to St. Tammany.[34]

---

[28] *Id.*

[29] Exhibit 1, Affidavit of Angela Griffin para. 24; Exhibit 1-E, Giroir's Pre-Class Packet, attached to Angela Griffin's Affidavit.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

- Giroir was released on February 22, 2021.[35]

### 3. Bryant White

- On January 10, 2018, White was released on parole on charged of armed robbery, aggravated battery and possession of a firearm.[36]
- On March 12, 2019, White was arrested on new charges of aggravated battery and aggravating robbery.[37]
- On April 25, 2019, White elected to defer his preliminary hearing, and agreed to postpone the final parole revocation hearing before the Parole Board until the pending felony charges were disposed of.[38]
- On March 1, 2021, White pled guilty to aggravated battery.
- On March 12, 2021, after receiving the necessary court minutes and UCO pertaining to White's guilty plea on felony charges,  White's parole officer completed the required report recommendation revocation of White' parole.[39]
- The report was submitted to DOC Headquarters and then to the Parole Board on March 19, 2021.[40]
- On April 15, 2021, the Parole Board issued a letter revoking White's parole.[41]
- On April 19, 2021 the DOC Pre-Class Department received White's parole revocation packet. Melissa Morrison sent the parole revocation letter to the Orleans Parish Sheriff's office requesting the Pre-Class packet for White. The Pre-Class packet was received the same day, and Morrison calculated White's time and scanned and indexed all documents into Oracle. Morrison then email the time computation to Headquarters.[42]
- On April 20, 2021, Amy Caruso received White's information. She sent off the residence plan and release clearance to Orleans Parish Sheriff's office, and discovered that White had a detainer from St. Bernard Parish. On April 20, 2021, White was released from DOC custody to St. Bernard Parish on the detainer.[43]

## III.    Law and Argument

It is well settled that the district court must conduct a "rigorous analysis" of all of the requirements for certification under Rule 23.  *Castano v. American Tobacco Co*., 84 F.3d 734, 740

---

[35] *Id.*
[36] Exhibit 1, Affidavit of Angela Griffin para. 26; Exhibit 1-G, White's Pre-Class Packet, attached to Angela Griffin's Affidavit.
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*

(5th Cir. 1996)(citing *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ). Plaintiffs bear the burden of proving that those requirements are satisfied. *See* e.g. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)(" Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

District courts have broad discretion in determining whether to certify a class, though it must "rigorously analyze" the prerequisites for class certification contained in Rule 23 before doing so. *Prantil v. Arkema Inc*., 986 F.3d 570, 574 (5th Cir. 2021) (quoting *Spence v. Glock, G.m.b.H*., 227 F.3d 308, 310 (5th Cir. 2000)). This analysis requires "the district court to go beyond the pleadings to determine whether the requirements of Rule 23 have been met: 'a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Id*. (quoting *Cole v. Gen. Motors Corp*., 484 F.3d 717, 724 (5th Cir. 2007)). A court cannot "merely 'review a complaint and ask whether, taking the facts as the party seeking the class presents them, the case seems suitable for class treatment.'" *Chavez v. Plan Benefit Servs., Inc.,* 957 F.3d 542, 46 (5th Cir. 2020).

The party seeking certification bears the burden of proof." *Castano v. Am. Tobacco Co*., 84 F.3d 734, 740 (5th Cir.1996) (internal citations omitted). Federal Rule of Civil Procedure 23(a) requires a Plaintiff to prove all of the following: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

In addition to satisfying the four criteria set forth in Fed. R. Civ. P. 23(a), a Plaintiff seeking to certify a class must also satisfy the requirements of Fed. R. Civ. P. 23(b)(1), (2), or (3). *M.D. ex rel. Stukenberg*, 675 F.3d at 837. Plaintiffs seek to certify this class under Rule 23(b), which requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### A.  The proposed class definition is based on flawed legal premise

At the outset, Plaintiffs' flawed theory that DPS&C would legally be obligated to release an offender, whom it has no knowledge of, within 48 hours after sentencing, is unsupported by the law.  In the situation before this Court, where an offender is in the custody of the sheriff until the date of sentencing, DPS&C has no knowledge of the existence, identity, or length of detention of offenders until the local sheriffs transfer the offender and/or provide the necessary paperwork. Therefore, where a sheriff, over whom DPS&C has no control, delays notifying DPS&C of the existence of an offender sentenced to hard labor for more than 48 hours, Plaintiffs' theory would hold DPS&C liable for alleged overdetention, even before DPS&C could legally release an offender.

In addition, the entire basis of the class definition is premised on an incorrect legal standard regarding release within 48 hours of sentencing. Plaintiffs rely on *McLaughlin* for the proposition of a "bright line" 48-hour limit for the purpose of due process. *McLaughlin* stands for no such proposition. In *Mclaughlin*, arrestees brought suit alleging the county violated the Fourth Amendment by failing to provide prompt judicial determination of probable cause to persons arrested without a warrant. *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S. Ct. 1661, 1670, 114 L. Ed. 2d 49 (1991). The Court was tasked with articulating the boundaries of what is

permissible under the Fourth Amendment in relation to the *Gertsien* court's holding that "warrantless arrests are permitted but persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause." The court held that "we believe that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id*. at 56. The Court went on the hold that the 48-hour period is a presumption of reasonableness. If the probable cause determination occurred after the 48 period, the government would then be required to show that the process was reasonable.

The *McLaughlin* decision is not applicable here for many reasons, including: (1) *McLaughlin* concerned a pre-trial detainee's rights to a probable cause hearing following a warrantless arrest; (2) *McLaughlin* analyzed a pre-trial detainee's rights under the Fourth Amendment, not the Due Process violations alleged here; (3) the pre-trial detainees in *McLaughlin* remained in the jailer's custody from the point of arrest, which began the 48-hour time period; and (4) the jailer was not held liable for delays caused by third-parties. Further, the Fifth Circuit has recognized that a determination of whether a jailer violates the Due Process Clause by unduly detaining an individual depends on "the context of this case." *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980); see also *Grant v. Gusman*, No. CV 17-2797, 2018 WL 1532960, at *12 (E.D. La. Mar. 29, 2018)(disregarding plaintiff's theory that jailers have 48 hours to process release).

The flawed class definition attempts to impose liability if an inmate is not released within 48 hours after sentencing, regardless if DPS&C was aware of the inmate's sentencing to hard labor. Plaintiffs' reliance on *McLaughlin* for a bright-line 48-hour rule is misplaced; there is no bright line rule for due process where any alleged delay in release is caused by entities which DPS&C has no control. In fact, the Western District recently refused to hold DPS&C liable for delays

caused by the sheriff's offices, only analyzing the time it took DPS&C to process a release from the time period after DPS&C received the Pre-Class Packet. See *Joseph Babineaux, et. al v. Mark Garber, et al.*, Western District of Louisiana, 18-cv-00233, R. Doc. 64. See also *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968)(finding that a jailer's "duty to his prisoner is not breached until the expiration of a reasonable time for the proper ascertainment of the authority upon which his prisoner is detained.").

Further, a question of liability cannot be used to define the class; this would result in a "fail-safe" class defined in such a way that each class member "either wins, or by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 825 (7th Cir. 2012). Each purported class member must demonstrate a concrete and particularized injury caused by the defendant and redressable by the court. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203, 210 L. Ed. 2d 568 (2021). As such, the flawed purported class definition constitutes an improper fail-safe definition.

The problems with Plaintiffs' improper class definition further show that certification is improper.

**B.  Plaintiffs failed to prove that the class is ascertainable**

It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable. *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). Plaintiffs make conclusory statements that the ascertainability requirement is met in this case. In doing so, Plaintiffs misstate testimony and conflate two separate documents produced by DOC.

In this litigation, Plaintiffs filed a motion to compel production of "pull documents" from April 2019 to present.[44] Plaintiffs argued that the "pull documents" were essential to class certification. DOC objected to production because the "pull documents" were not what Plaintiffs claimed, the burden to produce the documents was great and not proportional to the needs of the case given the individualized review of all records associated with each inmate.[45] Pursuant to this Court's ruling on the motion to compel, DOC produced a total of 13 "pull documents" from April 2019 to May 2020. Plaintiffs do not rely on or cite to those pull documents in its Motion for Class Certification. However, most of the testimony cited by Plaintiffs in their motion is testimony regarding the "pull documents." [46]

In their motion to compel, Plaintiffs also requested a spreadsheet identifying inmates with a negative "must serve" number less than zero.[47] DOC again objected that the burden was great, and that an individualized review of each record was required. Plaintiffs asserted that the raw data could be produced without a DOC employee reviewing or confirming the information.[48] Pursuant to this Court's order, DOC produced a Negative Must Serve spreadsheet, which was not reviewed or audited with the physical records. The Negative Must Serve spreadsheet does not identify individuals who have bee overdetained, as stated by Plaintiffs.

---

[44] R.Doc. 36.

[45] R.Doc. 37 and 58.

[46] See citations on R.Doc. 104-1, p. 18, in which the deposition testimony cited relates to the "pull documents." Plaintiffs then cite to Ms. Gueho's testimony concerning the Negative Must Serve spreadsheet. Notably, Plaintiffs misrepresent the testimony when they assert that "DOC confirmed that using the extracted CAJUN data would permit identification of persons who were entitled to immediate release upon sentencing or parole revocation but were released more than 48 hours later." Ms. Gueho actually testified that that spreadsheet could not provide that information, as many of the individuals on the spreadsheet had admission dates from prior incarceration periods.

[47] R.Doc. 36.

[48] R.Doc. 61.

Regardless, Plaintiffs conflate these two documents, interchanging testimony from the two separate documents. Neither the "pull documents" nor the Negative Must Serve spreadsheet are attached to Plaintiffs' motion. While Plaintiffs cite to the Negative Must Serve spreadsheet to support the ascertainability requirement, the spreadsheet is not attached to the motion and therefore is not considered evidence. Plaintiffs fail to prove that the class members can be clearly ascertainable.

Further, Plaintiffs' improper class definition prevents a finding of ascertainability. Plaintiffs' argument that the class can be determined by answering whether the individual was entitled to release at the time of their sentencing and whether the individual is being detained more than 48 hours past their sentencing is not supported. Other questions to determine ascertainability that would require answers include: (1) when did DPS&C receive the inmate's Pre-Class Packet for each purported class member?; (2) did DPS&C receive a complete packet with all necessary information?; (3) did the inmate have other pending charges that must be cleared prior to release?; (4) did the inmate have a detainer in another matter?; (5) were there other impediments to processing time computation? These questions demonstrate that there are unique facts of each sentence and release, as shown by the named Plaintiffs' circumstances.

Because it would be impossible to require DPS&C to process time computation within 48 hours where DPS&C is not aware of these offenders within 48 hours, ascertaining the purported class members is also impossible.

### C. Rule 23(a) requirements
#### 1. Plaintiffs failed to prove that the numerosity requirement is met

Under Rule 23(a)(1), certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." "[A] Plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott*

*& Co., Inc*., 651 F.2d 1030, 1038 (5th Cir. 1981). This court, however, has repeatedly noted that "the number of members in a proposed class is not determinative of whether joinder is impracticable." *In re TWL Corp*., 712 F.3d 886, 894 (5th Cir. 2013) (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999)). Rather, "a number of facts other than the actual or estimated number of purported class members may be relevant to the 'numerosity' question; these include, for example, the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each Plaintiff's claim." *Zeidman*, 651 F.2d at 1038.

Plaintiffs have failed to submit any evidence of the number of individuals that are similarly situated to the named plaintiffs or that the proposed class is so numerous that joinder of all members is impractical. While Plaintiffs refer to a document indicating that "1,700 were overdetained just between April 2019 to May 2020," it is not attached to Plaintiffs' motion as an exhibit. No documentary evidence was attached to support numerosity. This deficiency alone precludes class certification.

Even further, the Negative Must Serve spreadsheet relied on by Plaintiffs (but not attached to their motion) does not identify inmates who were "overdetained." Ms. Gueho testified that because only the data was produced, and the labor-intensive audit process of reviewing each file did not occur, the data on the spreadsheet cannot determine whether an inmate was "released more than two days after the date of their sentence."[49] For example, CAJUN pulled many inmates' "admit date" from a prior incarceration period. Absent auditing each entry, which would include reviewing the transfer and time computation records, the spreadsheet does not provide a list of

---

[49] R. Doc. 109-19, Deposition of Melanie Gueho, p. 31.

inmates who were eligible for immediate release and were released more than 48 hours after their sentence date.[50]

Thus, while Plaintiffs did not even submit this purported evidence in support of their motion, even if it was submitted, it does not identify a list of inmates who were entitled to immediate release and not released within 48 hours of their sentencing. Nor does the spreadsheet indicate that any particular inmate on the spreadsheet is similarly situated, or that their claims would be similar.

### 2. Plaintiffs failed to show common issues of law or fact

Rule 23(a)(2)'s commonality requirement demands more than the presentation of questions that are common to the class because "'any competently crafted class complaint literally raises common questions.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). Further, the members of a proposed class do not establish that "their claims can productively be litigated at once," merely by alleging a violation of the same legal provision by the same defendant. *Id.* ("[T]he mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.").

In this case, given the time computation process, the numerous courts, clerks and sheriffs involved for each offender, and the myriad of issues the DPS&C could encounter in any given release, the individualized issues preclude a finding of commonality. As discussed at length above, there could be numerous reasons why an inmate was not released within 48 hours of his sentencing, which could include delay in receiving paperwork from the sheriff, missing information required to perform time computation, or various issues encountered during the release process. Any alleged

---

[50] R. Doc. 109-19, Deposition of Melanie Gueho, p. 38.

delay would necessarily turn on individual issues. See *Lopez v. Brown*, 217 Cal. App. 4th 1114, 1127, 159 Cal. Rptr. 3d 86, 94 (2013)(upholding the district court's finding that Plaintiff failed to provide evidence of a policy that caused overdetention which could be the basis for classwide adjudication on liability, finding that even if Plaintiff could establish Defendants' liability based on the unique and individualized facts that gave rise to his overdetention, that liability determination would not operate to adjudicate liability of Defendants to the putative class members).

For example, just looking to the named Plaintiffs' time computation process, individual issues will predominate. For Giroir, once DOC received the necessary paperwork, information was missing from Giroir's pre-class packet, requiring St. Tammany Parish to "re-book" Giroir. Then, an ice storm in Louisiana closed state offices, delaying time computation. Obviously, Giroir's time computation process will differ greatly from other inmates' time computation process. Any delays for Plaintiff Humphrey were associated with information in CAJUN showing that Humphrey was already reporting to Probation & Parole. Even further, for Plaintiff White, his probation officer did not receive the UCO from the court until 12 days after sentencing. The unique facts related to the sentencing and release of the three named Plaintiffs clearly reflects the expectation that the facts and circumstances or the purported class members' releases would be different, precluding certification.

In *Wharton v. Coupe*, No. CV 12-1240-LPS, 2015 WL 5768936, at *4 (D. Del. Sept. 30, 2015), aff'd sub nom. *Wharton v. Danberg,* 854 F.3d 234 (3d Cir. 2017), plaintiffs brought a putative class action against the Delaware Department of Corrections (DDOC) alleging that the DDOC had a practice of overdetaining inmates which constituted deliberate indifference. Plaintiffs sought to certify the following class: "Each person who has been, is, or in the future will be

incarcerated in any Delaware prison from October 1, 2008, forward; and (b) who was not released, or, in the future, will not be released within 12 hours of the time that a court order has been forwarded to [Central Offender Records ("COR") ] releasing the person, or is not released by midnight of the day his or her sentence has ended."

The court found that Plaintiffs failed to prove sufficient commonality among the claims of the proposed class members. The court found that at least some of the alleged overdetentions were caused by court errors or delays, not delays from the DDOC. The court reasoned:

> Because Plaintiffs appear to concede that some of the alleged over-detentions were caused by court errors (see D.I. 71 at 7) (arguing court errors could be minimized, but not necessarily eliminated), rather than errors that could have been controlled or prevented by personnel at the DDOC, it would be improper to certify a class of every inmate who has been or will be over-detained for more than 12 hours past a release date or past midnight of their sentence terminations. Plaintiffs are suing only DDOC officials in this case. If the Court were to certify Plaintiffs' proposed class, and if the proposed class were to prevail on the merits, it would impute liability to Defendants for actions of non-parties—actions that Defendants had no control over. Thus, there is no "common contention" for Plaintiffs' proposed class, the truth or falsity of which would "resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551.

The same reasoning applies here. Plaintiffs' attempt to impose liability on DPS&C for any release after 48 hours, despite the fact that DPS&C would have no knowledge or control over the release of an offender in some instances well past the 48-hour period, cannot circumvent his burden to show commonality. Even based on Plaintiffs' conclusory allegations, it cannot be disputed that each purported class member will have individual issues, and potentially different reasons for the alleged delay. As such, commonality is not satisfied.

### 3.   Plaintiffs failed to show that the claims and defenses are typical

For the same reasons explained above, Plaintiffs fail to meet the typicality requirement. While Plaintiffs argue that "liability in this case is not dependent upon…individual

circumstances,"[51] this argument is without merit. As shown above, the alleged delays are potentially caused by numerous issues. Plaintiffs cannot rely on an alleged "pattern" of overdetention where DPS&C relies on 57 different sheriffs to provide necessary paperwork. In Giroir's case for example, alleged delay caused by an ice storm in Louisiana is atypical from any other purported class members. Accordingly, for the purpose of showing that Plaintiff failed to establish the element of typicality, Defendant herein adopts all arguments set forth in the immediately preceding subsection regarding commonality.

### 4. Plaintiffs failed to show that the named Plaintiffs can fairly and adequately represent the class

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." As shown above, the named Plaintiffs cannot adequately represent the class where each named Plaintiff has unique factual circumstances surrounding their sentence and released. Further, as discuss *infra*., each named Plaintiff will claim unique tort damages, including "loss of income" and mental anguish. Because the named Plaintiffs will necessarily have interests in claimed damages applicable to him only, the named Plaintiffs are not adequate representations of the purported class.[52]

### D. Rule 23(b)(3) requirements

### 1. Individualized issues predominate over any common issues

Federal Rule of Civil Procedure 23(b)(3) requires that, before a class is certified under that subsection, a district court must find that "questions of law or fact common to class members

---

[51] R. Doc. 104-1, p. 21.

[52] Further, the Court has an independent duty to inquire into adequacy of representation, including "the willingness and ability of the representatives to take an active role in and control the litigation," whether the representatives "possess a sufficient level of knowledge and understanding" to do so, and any "conflicts of interest between the named plaintiffs and the class they seek to represent." Id. at 479–80, 482–83. Plaintiffs failed to submit an evidence regarding Brian Humphrey's adequacy, and whether he is willing to take an active role in and control the litigation.

predominate over any questions affecting only individual members." The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124 (2016). Here, Plaintiffs fail to prove that any common issues of fact predominate over the individualized issues and unique factual circumstances surrounding the release and time computation process for each purported class member.

Plaintiffs' own briefing on predominance shows that class certification is improper. Plaintiffs' flawed class definition is premised on a 48 hour period in which Plaintiffs allege an offender must be released, citing to *County of Riverside v. McLaughlin*.  While Defendant asserts the *McLaughlin* case is inapplicable here (see discussion in section III(1) *supra*), Plaintiffs' theory and reliance on *McLaughlin* demonstrates that common issues do not predominate over individual issues. Plaintiffs set forth in their motion:

> Supreme Court in *County of Riverside v. McLaughlin* identified 48 hours as the outer limit of detention that will "as a general matter" comply with due process. 500 U.S. at 57. When the period of detention without authority exceeds 48 hours, on the other hand, "the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id*. at 57.[53]

---

[53] R. Doc. 104-1, p. 25.

As such, even under Plaintiffs' theory, the 48-hour time period is a <u>presumption</u>; a presumption that can be rebutted by the jailer to show that the delay was <u>reasonable</u>. Such a reasonableness standard would necessarily require individual issues, i.e., determining whether any alleged delay for each purported class member was reasonable.[54] Recently, the Fifth Circuit recognized that "timely release" is not the same as instantaneous release, and that it is reasonable to have some administrative delay in processing an inmate's discharge. *Crittindon, et al v. James Leblanc,* No. 20-30304, 2022 WL 2092820 (5th Cir. June 10, 2022. Moreover, the court set forth there is always a question about what amount of delay is reasonable. Judge Oldham, in his dissent, also recognized the absence of a "bright line" on what is a reasonable or unreasonable delay. *Id.* at *19.

The period of delay prior to release, and reason for delay (if any), in this case is unique to every proposed class member. For example, using the named Plaintiff Giroir, was it reasonable that the time computation was delayed because an ice storm shut down all state offices? As such, this unique factual determination would be necessary for <u>every</u> potential class member. These individualized issues preclude class certification.

In *Portis v. City of Chicago*, Ill., 613 F.3d 702, 705 (7th Cir. 2010), the Seventh Circuit reversed the district court's decision to certify a Rule 23(b)(3) class in a case challenging the Chicago Police Department's allegedly unconstitutional detention of individuals arrested for non-jailable offenses. The Seventh Circuit noted that to prevail on their claim, the plaintiffs would need to show "that any particular detention was excessive, and the court must examine not only the length of a given detention but also the reasons why release was deferred." The court further noted

---

[54] See *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 741 (5th Cir. 2003)(finding class certification inappropriate where an individualized fact finding would be required to meet a "reasonableness" standard).

that the rules set forth in *McLaughlin* that "reasonableness" must be assessed one case at a time. The court held:

> The premise of the class certification is that one rule applies to all members. Fed.R.Civ.P. 23(b)(3). Because reasonableness is a standard rather than a rule, and because one detainee's circumstances differ from another's, common questions do not predominate and class certification is inappropriate.

Similarly, in *Ontero v. Dart*, the Illinois Eastern District court analyzed "overdetention" cases in relation to class certification. 301 F.R.D. 276 (N.D. Ill. 2013). In that case, the plaintiff asserted that the sheriff's unlawful detention policy and continued detention after his acquittal violated 42 USC §1983. The court noted that numerous courts refuse to certify overdetention class actions where the only complaint is the alleged unreasonable amount of delay, because reasonableness of delay necessarily implicates individualized issues. While Plaintiff argued that he alleged violations of specific detention procedures, the court held:

> Although Plaintiff alleges generally in the Complaint that Defendants subjected him and other class members to unlawful policies that "result[ed] in class members being detained for unreasonable amounts of time and in an unreasonable manner," most of Plaintiff's allegations focus on the allegedly unreasonable delay in his release, rather than the constitutionality of any specific detention procedures.
> …
> Plaintiff's motion for class certification also focused largely on the unreasonable delay in the release of acquitted detainees, rather than challenges to any specific detention procedures applied to them irrespective of the time those procedures took or the time they added to an acquitted detainee's detention…
>
> Plaintiff attempts to distance his claims from pure "overdetention" claims in his reply brief in order to distinguish this case from *Harper* and *Portis* by arguing that he "is not claiming that the mere length of his or any other class member's detention was unreasonable.... Rather, Plaintiff challenges specific aspects of Defendants' release procedures (or lack thereof) that applied equally to all class members and which, collectively, create an unconstitutional policy or practice."…The allegations in the Complaint, Plaintiff's broad proposed class, and even his arguments in his opening brief, however, undermine Plaintiff's purported new position. Like in *Harper*, Plaintiff fails to explain how any of the specific detention procedures he challenges are unconstitutional "unless [they] take[ ] an unreasonable amount of time or [are] done in some unreasonable manner."

*Id*. at 282. The same fatal problems exist here. Whether any alleged delay in DPS&C receiving the required Pre-Class packets from local facilities for each purported class member is reasonable requires individualized inquiries, which would predominate over any common issues.

In addition, Plaintiffs' flawed class definition overlooks other individual issues that will arise. Depending on the felony on which an offender is convicted, other statutory requirements may prohibit DPS&C from releasing an offender within 48 hours of sentence. For example, in *Kozlowicz v. State, Dep't of Pub. Safety & Corr.*, 2008-1806 (La. App. 1 Cir. 3/27/09), 9 So. 3d 1000, 1006, the First Circuit found that a prisoner's due process rights were not violated, even though he was not released from prison on the date he could have been discharged due to diminution of sentence. The court found that the reason the inmate was not released on the date that he could have been discharged due to a diminution of sentence was that the inmate did not have an approved residence plan, as required by La. R.S. 574.4.3 (formally La. R.S. 15:574.4). The court held:

> The fact that he has a constitutionally protected interest in good time does not deprive the legislature of the right to enact legislation that possibly has the effect of impacting that statutorily created interest. Further, the fact that the Department may not deprive a prisoner of good time without a hearing does not have any legal relevance to the situation here, because the Department did nothing to deprive petitioner of his good time. Rather, the Department was prohibited by statute from releasing the petitioner.

Thus, there are various instances where an offender is not entitled to "immediate release" even though the sentence may be complete, to include sex offenders who have no residency plans approved or offenders who have detainers in other parishes or states. An individualized inquiry with each potential class member is required to identify whether an individual has been "overdetained" or whether that individual's due process rights were violated. These individualized issues predominate over any common issues.

While the named Plaintiffs allege a common issue in that they were "overdetained," this allegation alone does not support liability on a class wide basis. In *Lopez v. Brown*, 217 Cal. App. 4th 1114, 1128, 159 Cal. Rptr. 3d 86, 95 (2013), plaintiff sought to certify a proposed class based on alleged overdentention. The court found that plaintiff failed to show there was predominance of questions of law or fact:

> The fact of the overdetentions, standing alone, was insufficient to show that they were the proximate result of defendants' uniform classwide conduct, and could not, without more, support a finding of liability on a classwide basis. "'What matters to class certification ... is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.' " (*Wal–Mart Stores, Inc. v. Dukes* (2011) —— U.S. ——, 131 S.Ct. 2541, 2551, [180 L.Ed.2d 374]).

The court further noted that while the plaintiff submitted evidence that 594 inmates were overdetained in the class period, plaintiff failed to submit any evidence of whether that number was of significance as to show a policy or practice. Finally, the court held that even if plaintiff showed a uniform policy or practice, there was no evidence that the policy or practice was the result of "deliberate indifference." The court rejected plaintiff's attempt to presume deliberate indifference by the fact that inmates were overdetained, and held that "there must be allegations and some proof reasonably tending to show a specific policy or practice to support an inference that a defendant public entity implemented the policy or practice with deliberate indifference toward the inmates' rights."

In addition to the individualized issues on liability, the individual issues associated with alleged damages preclude certification. Class certification may not be appropriate where damages must be calculated independently for each class member without reference to a common formula. See *Steering Committee v. Exxon Mobil Corp*., 461 F.3d 598, 602 (5th Cir.2006) ("[W]here

individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class."); *Bell Atlantic Corp.*, 339 F.3d at 307 ("[W]here the issue of damages 'does not lend itself to ... mechanical calculation, but requires "separate 'mini-trial[s]' " of an overwhelmingly large number of individual claims,' the need to calculate individual damages will defeat predominance."). "Where the plaintiffs' damage claims 'focus almost entirely on facts and issues specific to individuals rather than the class as a whole,' the potential exists that the class action may 'degenerate in practice into multiple lawsuits separately tried,' In such cases, class certification is inappropriate." *O'Sullivan v. Countrywide Home Loans, Inc*., 319 F.3d 732, 744–45 (5th Cir.2003).

Here, Plaintiffs admit that the damages sought by the purported class members will vary.[55] Plaintiffs claim damages such as loss of income, "extreme mental anguish," emotional pain, as well as compensatory damages.[56] "Compensatory damages for emotional distress and other forms of intangible injury will not be presumed from mere violation of constitutional or statutory rights" and "[s]pecific individualized proof is necessary" to prove such damages.  *Allison v. Citgo Petroleum Corp*., 151 F.3d 402, 416–17 (5th Cir. 1998).

If this class is certified, an individual inquiry would be required for each purported class member to prove the amount of alleged loss income and mental anguish claims (if any). This is exactly the type of individualized damage issues that predominate over common issues and preclude class certification. See *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006), (wherein the Fifth Circuit found that the purported class damages claim were not subject to a formulaic calculation, as many plaintiffs allege emotional and other intangible injuries). See also *Allison v. Citgo Petroleum Corp*., 151 F.3d 402, 416–17 (5th Cir. 1998)( "The

---

[55] R.Doc. 104-1, p. 29.
[56] R.Doc. 43; Exhibit 4, Plaintiffs' Initial Disclosures.

very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy. The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards.").

Plaintiffs admit that the damages sought will vary between each purported class member, but gloss over its burden to show predominance. Where, as here, damages must be calculated independently, and the damages sought by Plaintiffs necessarily "focus almost entirely on facts and issues specific to individuals rather than the class as a whole,"[57] Plaintiffs have failed to meet their burden of proof that common issues predominate over individualized issues. As such, class certification is improper.

### 2. Class action is not superior

Plaintiffs also make conclusory statements that a class action is superior to individual suits. Plaintiffs' counsel is involved in numerous individual claims alleging overdetention.  These cases alone show that individual cases are feasible for the parties and judicial resources. Further, while Plaintiffs attempt to argue that "the claims of its members are small enough that it is unlikely many members' rights will be vindicated in individual suits," this is not an instance where these individual claims are "negative value" lawsuits. Plaintiffs bring §1983 claims, where punitive damages and attorney fees may be available. The Fifth Circuit has noted that the ability of a prevailing party to recover attorney fees is a common basis for finding non-superiority. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996).

### IV.   Conclusion

For all of these reasons, the Court should deny Plaintiffs' Motion for Class Certification.

---

[57] *O'Sullivan v. Countrywide Home Loans, Inc*., 319 F.3d 732, 744 45 (5th Cir.2003).

Respectfully submitted,

JEFF LANDRY
Attorney General

By: /s/ Andrew Blanchfield
Andrew Blanchfield, T.A. (#16812)
Email: ablanchfield@keoghcox.com
C. Reynolds LeBlanc (#33937)
Email: rleblanc@keoghcox.com
Christopher K. Jones (#28101)
Email: cjones@keoghcox.com
Chelsea A. Payne (#35952)
Email: cpayne@keoghcox.com
Special Assistant Attorneys General
701 Main Street (70802)
Post Office Box 1151
Baton Rouge, Louisiana 70821
Telephone: (225) 383-3796
Facsimile: (225) 343-9612

## CERTIFICATE OF SERVICE

I hereby certify that I have this date electronically filed the foregoing with the Clerk of

Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day

forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 22nd day of August, 2022

      /s/ Andrew Blanchfield
ANDREW BLANCHFIELD