UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| HUMPHREY *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>LEBLANC,<br><br>      Defendant. | Civil Action No. 3:20-cv-0233-JWD-SDJ |
| GIROIR, *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>LEBLANC, *et al.*,<br><br>      Defendants. | Civil Action No. 3:21-cv-108-JWD-SDJ |

**PLAINTIFFS' BRIEF REGARDING CLASS CERTIFICATION HEARING**

On March 14, 2023, this Court requested briefing regarding whether and how a class certification hearing might assist in resolving the class certification issues in these cases. For the reasons that follow, Plaintiffs submit that while both classes can and should be certified on the already-robust record, an in-person hearing may be useful to the Court.

### I.    STATEMENT OF THE CASE

These matters arise from a widespread and systemic practice by which the Louisiana Department of Public Safety & Corrections (DOC) unlawfully imprisons thousands of Louisiana residents who have been sentenced to time served or an equivalent adjudication, and who are entitled to immediate release. A growing chorus of federal and state authorities have denounced

1

the DOC and Secretary James LeBlanc for deliberately ignoring administrative failures they knew were leaving prisoners in jail who had aleady served their sentences.

For instance, Fifth Circuit recently held—based on record evidence of LeBlanc's notice and inaction essentially identical to the evidence in this record—that "[a] reasonable factfinder could conclude that [LeBlanc's] awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference." *Crittindon v. LeBlanc*, 37 F.4th 177, 187-88 (5th Cir. 2022), *reh'g en banc denied*, 58 F.4th 844 (5th Cir. 2023). Similarly, the Eastern District of Louisiana has recognized the "disturbing nature" of the "staggering volume of factual evidence of incompetence and indifference [to overdetention] in the Department headed by LeBlanc." *Traweek v. Gusman*, 2021 U.S. Dist. LEXIS 10198, at *11 (E.D. La. Jan. 20, 2021).

Further, the Department of Justice (DOJ) and all three United States Attorney's Offices for the State of Louisiana issued a rebuke of the DOC and LeBlanc for the exact policies and practices at issue here. *See Giroir*, ECF 80-1.[1] Following a multi-year investigation into the DOC's time computation and release practices, the DOJ Report concluded that:

> [DOC] incarcerates **thousands** of individuals each year beyond their legal release dates in violation of the Fourteenth Amendment of the United States Constitution. These violations are pursuant to a pattern or practice of infringements on the constitutional rights of incarcerated persons. . . . **These violations are severe, systemic, and are both caused and perpetuated by serious ongoing deficiencies in [DOC's] policies and practices.** [DOC] has persisted with these unconstitutional practices despite at least a decade of notice and clear recommendations for fixing the problem.

*Id.* at 3 (emphasis added). The DOJ Report details a litany of specific policy failures resulting in this systemic overdetention, including Defendants' failure to adopt policies related to the delivery of sentencing paperwork for individuals housed in parish jails and their failure to adopt adequate

---

[1] The DOJ Report was also filed in *Humphrey* at ECF 158-1.

time computation processes. *See id.* at 4, 11-18. Judge Jackson took judicial notice of these findings—which he characterized as "damning and unequivocal"—in a recent decision denying LeBlanc's motion to dismiss in an individual overdetention case. *See Buchicchio v. LeBlanc*, 2023 U.S. Dist. LEXIS 26595, at *2 n.1, *11 (M.D. La. Feb. 15, 2023).

Against this backdrop, and as Plaintiffs set forth here, class certification is appropriate on the exisiting record in both *Giroir* and *Humphrey*. Still, an in-person hearing featuring testimony from key witnesses—including LeBlanc, DOC employees responsible for the agency's database, and Plaintiffs' experts—may assist the Court in resolving the class certification issues. Plaintiffs therefore submit the following proposed hearing plan.

## II. BACKGROUND

### A. Factual Background

The facts supporting class certification are set forth in detail in Plaintiffs' briefs.[2] For efficiency and ease of reference, Plaintiffs offer the following summary.

When a person is convicted and receives a state sentence of "confinement at hard labor" in Louisiana, he enters DOC's legal custody at the moment the court hands down the sentence.[3] As part of that legal responsibility, which attaches from the moment an individual is convicted of a

---

[2] *See Giroir*, ECF 25 (Motion for Class Certification), ECF 30 (Reply), ECF 80 (Notice of Supplemental Authority - DOJ Report), ECF 82 (Notice of Supplemental Authority - *Crittindon*); *Humphrey*, ECF 104 (Motion for Class Certification), ECF 123 (Reply), ECF 158 (Notice of Supplemental Authority - DOJ Report), ECF 166 (Notice of Supplemental Authority - *Crittindon*).

[3] *Giroir*, ECF 80-1 (hereinafter, DOJ Report) at 6; *Crittindon*, 37 F.4th at 184; La Rev. Stat. §§ 14:2, 15.824.

3

state crime, DOC must ensure that it receives the necessary paperwork (known as "preclass packets"), processes the individual's release, and actually releases him in a timely manner.[4]

The procedures DOC has in place to obtain accurate sentencing information and to perform time computations before releasing an individual from custody involve unreasonable and unnecessary delays.[5] Specifically, the long-standing and widespread overdetention of DOC prisoners is the result of DOC's failures in three areas: (a) failure to adopt adequate policies related to the delivery of sentencing paperwork to DOC for individuals in DOC custody who are housed in parish jails; (b) failure to adopt adequate time computation and data management processes; and (c) failure to adequately train DOC employees.[6]

For instance, "[DOC] had no system in place to ensure it had pre-classification paperwork from local jails for its newly-sentenced prisoners. [DOC] simply waited on the local jail to send the paperwork."[7] As a result, from January through April of 2022, it took an average of 21 days for DOC to receive preclass packets from the courts and Sheriff's offices.[8] And then, during the same four month period, it took an average of an additional 24 days after their preclass packets were delivered to DOC for people designated as immediate releases to actually be released.[9]

---

[4] DOJ Report at 11; *see also Crittindon*, 37 F.4th at 183 (pursuant to the Basic Jail Guidelines, "parish jails housing state prisoners must send pre-classification paperwork to DPSC so that DPSC can enter the prisoner's information into its computer system, calculate the prisoner's release date, and issue the release").

[5] DOJ Report at 10; *see also Crittindon*, 37 F.4th at 188 (discussing Defendants' knowledge of delays in receiving paperwork from local jails).

[6] *See* DOJ Report at 11-18; *Crittindon*, 37 F.4th at 182-84.

[7] *Crittindon*, 37 F.4th at 183.

[8] DOJ Report at 12-13; *see also Crittindon*, 37 F.4th at 188 ("Defendants knew not just of delay, but that there was, on average, a month-long delay in receiving paperwork from the local jails."); *Humphrey*, ECF 104-11 (DOC's Lean Six Sigma Report) (revealing that, on average, DOC took 110 days to determine a prisoner's release date after conviction. This included approximately 31 days for documents to be transmitted from the Clerk of Court to the local jail to DOC's Pre-Classification Department).

[9] DOJ Report at 15.

For more than ten years, DOC has been on notice of its overdetention problem and has failed to take adequate measures to ensure timely releases of incarcerated individuals from its custody.[10] The DOC's 2012 Lean Six Sigma report exposed widespread overdetentions, which it attributed to delays in transmitting local jail pre-classification paperwork and to DOC's own delays in processing this paperwork on its receipt.[11] As the Fifth Circuit has observed, "[t]he relevance of the Lean Six Sigma Study is obvious—that the defendants were each keenly aware of the flaws of the system that failed to timely release prisoners."[12]

Legislative Audits conducted in 2017 and 2019 similarly revealed severe, systemic delays in the processing of the necessary records from courts and local facilities, inefficient data management, poorly defined procedures, and a lack of training and oversight that have all contributed to a consistent pattern of overdetention.[13] Still, Defendants have never implemented the reform that constitutional violations of this magnitude requires.[14]

As a result of these systemic and uniform deficiencies, thousands of individuals annually suffer the significant harm of having their freedom unconstitutionally denied by their overdetention in DOC's custody. According to the DOJ:

> [O]f the 4,135 people released from [DOC's] custody between January and April 2022, 1,108 (or 26.8 percent) were held past their release dates. The median number of days an overdetained individual was held past their release date was 29; 31

---

[10] *See Crittindon*, 37 F.4th at 187-88.

[11] *See* DOJ Report at 18; *Crittindon*, 37 F.4th at 187-88; *Humphrey*, ECF 104-11 (Lean Six Sigma Report).

[12] *Crittindon*, 37 F.4th at 191.

[13] DOJ Report at 19; *Giroir*, ECF 25-5 (2019 Audit), ECF 31-7 (2017 Audit).

[14] *See Crittindon*, 37 F.4th at 187 ("[I]n cases like Plaintiffs', where prisoners were entitled to immediate or near-immediate release upon conviction, it was obvious that a failure to address those processing delays would lead to unconstitutional overdetentions. Despite this awareness, years after the Lean Six Sigma project, Defendants have not pointed to a single effort that any of them took to identify immediate releases more quickly during that month-long delay.").

percent were held over for at least 60 days; and 24 percent were held over for at least 90 days. In just this four-month period, LDOC had to pay parish jails an estimated $850,000, at a minimum, in fees for the days those individuals were incarcerated beyond their lawful sentences. At that rate, this unconstitutional practice costs Louisiana over $2.5 million a year.[15]

### B. Procedural Background

In April 2020, Brian Humphrey filed a class action complaint against Defendant James LeBlanc. ECF 1. Humphrey amended his complaint in May 2020 and again in April 2021 to add Joel Giroir and Brian White as plaintiffs. ECF 11, 43. Against only LeBlanc, *Humphrey* Plaintiffs allege due process violations under the Fourteenth Amendment and Article I, Section 2 of the Louisiana Constitution (Counts 1, 2); false imprisonment (Count 3), negligence (Count 4), and intentional infliction of emotional distress (Count V). *See* ECF 43 at 19-23.

Separately, in February 2021, Giroir filed a class action complaint for injunctive and declaratory relief against both LeBlanc and the DOC. ECF 1. He simultaneously moved for class certification under Rule 23(b)(2). ECF 3. The Court denied the motion for class certification without prejudice, consolidated *Humphrey* and *Giroir* for class discovery, and designated *Humphrey* as the lead case. *See* ECF 20, 23.[16] The parties subsequently engaged in discovery focused on class certification issues.

Giroir renewed his motion for Rule 23(b)(2) class certification in September 2021. ECF 25. In April 2022, he amended his complaint, alleging against both DOC and LeBlanc the same violations of state and federal law as in *Humphrey*. *Compare Giroir* ECF 46 at 16-20 with *Humphrey* ECF 43 at 19-23. Then, to encourage the parties to explore settlement in both cases, the Court denied Giroir's class certification motion without prejudice and stayed the case. ECF 54.

---

[15] DOJ Report at 3.

[16] The order consolidating the cases for discovery was entered only in *Giroir*, and not in *Humphrey*.

In July 2022, while *Giroir* was still stayed, Humphrey moved for class certification under Rule 23(b)(3). *Humphrey*, ECF 104 (Motion), ECF 109 (Exhibits). In November 2022, the Court reopened *Giroir* and vacated its prior order denying class certification in that case. ECF 73. With that, and considering the two notices of supplemental authority recently filed by Plaintiffs, both motions for class certification are fully briefed and ripe for adjudication.[17]

### III.    BOTH CLASSES CAN AND SHOULD BE CERTIFIED ON THE RECORD.

#### A. Class Definitions.

In *Giroir,* Plaintiffs seek to certify the following Rule 23(b)(2) class: "all persons who have been, or will be, sentenced to the custody of the Louisiana DOC, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, for more than 48 hours past their sentencing dates." ECF 25-1 at 3.

In *Humphrey*, Plaintiffs seek to certify the following Rule 23(b)(3) class: "all persons who have been remanded to the custody of the DOC since April 16, 2019, and who were entitled to release at the time of their remand (either pursuant to sentencing or parole revocation), but who were released by the DOC more than 48 hours past the time that they were remanded to the DOC's custody." ECF 104 at 1.

Both classes are ascertainable from the Defendants' own records and from objective criteria. Specifically, all class members may be identified using DOC's database, CAJUN, which indicates which individuals served their required time in custody as of the day they were sentenced

---

[17] *See Giroir*, ECF 25 (Motion for Class Certification), ECF 30 (Reply), ECF 80 (Notice of Supplemental Authority - DOJ Report), ECF 82 (Notice of Supplemental Authority - *Crittindon*); *Humphrey*, ECF 104 (Motion for Class Certification), ECF 123 (Reply), ECF 158 (Notice of Supplemental Authority - DOJ Report), ECF 166 (Notice of Supplemental Authority - *Crittindon*).

or revoked on parole, but who nonetheless remained in DOC custody for more than 48 hours.[18] Throughout this litigation, the parties have referred to this CAJUN data as "Pull Documents"[19] or "negative must-serve" documents. For the Court's reference, some of these documents—which Defendants only recently agreed to de-designate as confidential—are attached to the Declaration of William Most as **Exhibits A through O**.

Both classes allege that Defendants' failure to implement and maintain an adequate process for timely releasing individuals in DOC custody has caused the unlawful and systemic overdetention of thousands of people. And neither class is defined in terms of the ultimate question of liability, *i.e.* LeBlanc's deliberate indifference. *Cf. Rodriguez v. Countrywide Home Loans, Inc.*, 695 F.3d 360, 370 (5th Cir. 2012) (explaining that "our precedent rejects the fail-safe class prohibition").

Other federal courts have certified overdetention classes under Rule 23(b)(3) where, as here, the classes allege a systemic issue with the jailer's release process. *See, e.g.*, *Driver v. Marion Cty. Sheriff*, 859 F.3d 489, 492 (7th Cir. 2017) (holding that class treatment was appropriate because plaintiffs pointed to a "policy or practice [that] caused them to be detained for an unconstitutionally-unreasonable length of time"); *Healey v. Louisville Metro Gov't*, 2021 U.S. Dist. LEXIS 8345, at *73 (W.D. Ky. Jan. 15, 2021) (certifying two subclasses under similar circumstances).[20]

---

[18] *See Humphrey*, ECF 104-15 at 56:20-57:22 (DOC 30(b)(6), Gueho); *see also* ECF 104-1 at 17-18.

[19] *See, e.g.*, *Humphrey*, ECF 161 (Granting in part Plaintiffs' Motion to Remove the Confidentiality Designations from CAJUN Data and permitting Plaintiffs to provide the redacted Pull Documents to the DOJ).

[20] In *Healey*, the district court *sua sponte* modified the proposed class definition "to include what Plaintiffs have affirmatively demonstrated is the cause of a substantial majority of over-detentions: Defendants' failure to implement and maintain an adequate process for timely releasing detained inmates and imprisoned inmates." 2021 U.S. Dist. LEXIS 8345, at *53. In the Fifth Circuit, too, "[d]istrict courts are permitted to limit or modify class definitions to provide the necessary precision." *In re Monumental Life*

**B. The Classes Satisfy Rule 23(a).**

1. <u>Each class likely exceeds 1,000 members.</u>

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see also Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (finding that class of 100 to 150 satisfies numerosity requirement and noting that any class consisting of more than forty members "should raise a presumption that joinder is impracticable"). Numerosity is easily satisfied here, as the DOC overdetains thousands of class members each year. *See, e.g.*, *Giroir*, ECF 80-1 (DOJ Report) at 3 ("According to the most recent available data, of the 4,135 people released from [DOC's] custody between January and April 2022, 1,108 (or 26.8 percent) were held past their release dates. The median number of days an overdetained individual was held past their release date was 29; 31 percent were held over for at least 60 days; and 24 percent were held over for at least 90 days."). Each proposed class is thus sufficiently numerous that joinder of all class members would be impracticable.

2. <u>Common questions of law and fact abound.</u>

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). Plaintiffs make this showing where, as here, they rely on a common contention "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.

---

*Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004); *see also* Fed. R. Civ. P. 23(c) (empowering courts to define an appropriate class, whether by accepting the proposed class, limiting the class to certain issues, or creating subclasses).

Critically, the policies and practices at issue here—including the DOC's failure to adopt policies to mitigate overdetention and ensure the timely release of class members—applies uniformly to every class member and has caused each class member to suffer the same injury (overdetention). As a result, both the *Humphrey* and *Giroir* classes can "generate common answers apt to drive the resolution of litigation," *id.*, including:

(1) Whether DOC detained individuals for longer than was legally permissible;

(2) Whether Defendants knew that individuals in DOC custody were not being timely released;

(3) Whether Defendants failed to adopt, implement, and maintain adequate processes for timely releasing individuals from DOC custody;

(4) Whether Defendants' failure to implement adequate policies and procedures causes systemic overdetentions; and

(5) Whether Defendants have acted with deliberate indifference to the known certainty that not adopting measures to ensure timely release will result in constitutional violations.

Each of these questions apply equally to all class members and can be answered "in one stroke." *See Dukes*, 131 S.Ct. at 2551. The commonality requirement of 23(a)(2) has been satisfied.

3. <u>Named Plaintiffs' claims are typical of the class claims.</u>

The purpose of the typicality requirement is to ensure that the interest of the named representatives align with the interests of the class. *See* Fed. R. Civ. P. 23(a)(3). The Fifth Circuit has explained that "the test for typicality is not demanding" and "does not require a complete identity of claims." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001). If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality. *See id.* Here, the Named Plaintiffs' claims stem from the same legal theory as the class members: Defendants violated their rights by over-detaining them. If the fact finder determines that Defendants have an inadequate process for timely releasing individuals held in DOC custody,

10

such a determination would further the interest of each class member. Thus, Rule 23(a)(3)'s typicality requirement is met.

    4. <u>Plaintiffs and their counsel will fairly and adequately protect the interests of all class members.</u>

The Rule 23(a)(4) adequacy inquiry turns on: (1) whether the representative plaintiffs and class counsel have any conflicts of interest with other class members; and (2) whether the representative plaintiffs and class counsel can vigorously prosecute the action on behalf of the class. *See* Fed. R. Civ. P. 23(a)(4). Plaintiffs will adequately represent the interests of all proposed class members. Because Plaintiffs seek the same relief as all absent class members, there are no potential conflicting interests. Plaintiffs understand their obligation to vigorously pursue the interests of the classes, and their fiduciary responsibility to represent other class members as fairly and adequately as they would represent and consider their own interests.[21] Finally, Plaintiffs' counsel have sufficient resources, experience, and knowledge to litigate this matter on behalf of the proposed classes, and have thoroughly investigated and pursued potential claims in this action. Counsel have no conflicts of interest within any putative class.[22] As a result, the adequacy requirement is satisfied.

**C. The *Giroir* Class Satisfies Rule 23(b)(2).**

Rule 23(b)(2) permits certification of a class seeking declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Here, Plaintiffs complain of a pattern or practice that is

---

[21] *See Humphrey*, ECF 104-21 (Giroir Decl.), ECF 104-22 (White Decl.).
[22] *See Humphrey*, ECF 104-5 (Most Decl.), ECF 104-7 (Montagnes Decl.), ECF 104-17 (Weil Decl.).

11

generally applicable to every member of the proposed *Giroir* class. And if unlawful, that pattern or practice subjects all class members to overdetention and serious harm. Finally, all class members seek the same injunctive relief enjoining Defendants from their current unlawful course of conduct. Rule 23(b)(2) is satisfied.

### D. The *Humphrey* Class Satisfies Rule 23(b)(3).

Rule 23(b)(3) authorizes class certification where (1) "questions common to the class members predominate over questions affecting only individual members," and (2) "class resolution is superior to alternative methods for adjudication of the controversy." *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003). Both requirements are met here.

1. <u>Common issues predominate.</u>

"To predominate, common issues must form a significant part of individual cases." *In re Vioxx Prods Litig.*, 239 F.R.D. 450, 460 (E.D. La. 2006) (citation omitted). The purpose of this requirement is to ensure that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 597 (1997). This "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Bell Atl. Corp.*, 339 F.3d at 302 (citation omitted).

Here, the class issues predominate over individual issues because the *Humphrey* class members share identical claims against Defendants. Plaintiffs do not claim their overdetentions were unreasonable given their particularized (or individual) circumstances, such that each class member's circumstances become relevant. Instead, Plaintiffs allege that they were all intentionally overdetained for the same reason: Defendants' deliberate failure to implement and maintain

12

adequate time computation and release processes. Defendants' potential liability arises from that common question of overdetention. Even if the amount of damages may vary slightly among class members, the operative facts are the same: all proposed class members were detained by DOC beyond their legal release dates and without justification. As a result, common questions predominate.

    2.  <u>Class treatment is superior to any alternate means of dispute resolution.</u>

Class treatment is far superior to any other manner of litigating the claims here. Many putative class members would be unmotivated to prosecute their claims because proving up the DOC's systematic practice of overdetention and LeBlanc's deliberate indifference to it will require considerable resources that are difficult for formerly incarcerated individuals to muster, and would likely outweigh the recovery obtained. And class adjudication resolves the claims and more efficiently than proving LeBlanc's liability, over and over, on an individual basis. For all these reasons, the superiority requirement is satisfied.

## IV.   CLASS CERTIFICATION-RELATED MOTIONS

Defendants have filed four motions to strike Plaintiffs' class certification evidence. Specifically, in *Giroir*, Defendants seek to exclude excerpted deposition testimony of DOC's Rule 30(b)(6) designees, LeBlanc, and other officials;[23] a NOLA.com article; the 2017 report by the Louisiana Legislative Auditor identifying deficiencies in DOC's data management system; statements written by LeBlanc; and correspondence between Plaintiffs' counsel and a DOC official. *See* ECF 28. And in *Humphrey*, Defendants filed three motions to strike. The first, ECF

---

[23] In the alternative to striking the deposition excerpts, Defendants requested that Plaintiffs file the full deposition transcripts into the record. *See Giroir*, ECF 28-1 at 7. Plaintiffs have done so, thus mooting this portion of Defendants' motion to strike. *See Giroir*, ECF 31-1 (LeBlanc); ECF 31-2 (DOC 30(b)(6), Griffin); ECF 31-3 (DOC 30(b)(6), Whittaker); ECF 31-4 (DOC 30(b)(6), Ellis); ECF 31-5 (Hudnall); ECF 31-6 (DOC 30(b)(6), Gueho).

114, seeks to exclude sworn deposition testimony of DOC's Rule 30(b)(6) designees, LeBlanc, and other officials;[24] written statements from LeBlanc, the Lean Six Sigma Report, and a memo entitled "Criminal Justice Data Sharing and Notification Project." Defendants' second motion, ECF 115, challenges the expert opinions of Dr. Dora Schriro and Rita Rossi. And in their third motion to strike, ECF 135, Defendants seek to exclude a printout from CAJUN. Plaintiffs respectfully suggest that all four motions to strike can be decided on the briefs and existing record.

V. PLAINTIFFS' PROPOSED HEARING PLAN

Both the *Giroir* and *Humphrey* classes are ripe for certification based on the robust evidentiary record here. However, the procedural history of the two cases is complex, the pertinent facts and evidentiary record are essentially identical, and the bulk of the Rule 23 analysis will likely be the same. To the extent that argument would be useful, Plaintiffs suggest that *Giroir* and *Humphrey* be consolidated for an in-person hearing on all pending motions.

Plaintiffs anticipate calling the following witnesses for live, in-person testimony:

1. James LeBlanc, Secretary of the DOC. Mr. LeBlanc has knowledge of DOC's policies and practices related to, among other things, time calculation and release, the 2012 Lean Six Sigma Pre-Classification Project, the Basic Jail Guidelines, and the facts contained in the DOJ Report.

2. Angela Griffin, as the 30(b)(6) representative of the DOC. Ms. Griffin is the Administrative Program Director of the DOC's Pre-Classification Department. She has knowledge of the DOC's time computation and release policies and procedures.

3. Melanie Gueho, as the 30(b)(6) representative of the DOC. Ms. Gueho is a Business Analyst for the DOC. She has knowledge of DOC's data collection policies and procedures.

---

[24] Like in *Giroir*, Defendants alternatively requested that the full deposition transcripts be filed into the record, which Plaintiffs have done. *See Giroir*, ECF 31-1 through ECF 31-6.

Plaintiffs may also call the following expert witnesses by remote video:

1. <u>Dr. Dora Schriro</u>. Dr. Schriro has served as the director of the Missouri Department of Corrections, the Arizona Department of Corrections, and the New York City Department of Corrections, and as well the warden of a city jail in St. Louis, Missouri. In her expert report, Dr. Schriro offers a peer-level assessment of LeBlanc's response to the DOC's overdetention problem, particularly in his policy choices, operational responses, and statements about the problem and his response to it over the years. In light of her assessment, Dr. Schriro offers the opinion that LeBlanc has exhibited a lack of effort in fixing the DOC's widespread overdetention problem that is both out of step with normal correctional administration and that reflects an indifference to the problem as a whole.[25]

2. <u>Rita Rossi.</u> Ms. Rossi is a former official in the Illinois Department of Corrections (IDOC) with policymaking responsibility for the IDOC's sentencing calculation function.[26] As the supervisor of the IDOC's record office, Ms. Rossi developed the IDOC's policy regarding sentencing calculation. Her report observes that the IDOC's sentencing calculation function was designed and operated "to accomplish what is understood to be legally required: detention of persons for the exact period of time as the sentence issued by the sentencing court—no shorter, and no longer. It is understood that this is the mission of any department of corrections operating under the U.S. Constitution, whatever state it may be in."[27]

Finally, Plaintiffs intend to invite representatives of the DOJ and the United States Attorney's Offices to attend the hearing, though Plaintiffs will not seek to compel their attendance.

---

[25] *See Humphrey*, ECF 104-8 (Amended Schriro Report) at ¶¶ 63-68.

[26] *See Humphrey*, ECF 104-14 (Rossi Report).

[27] *Id*. at 5.

## VII. CONCLUSION

For the foregoing reasons, and as detailed in Plaintiffs' briefing, Plaintiffs respectfully request that this Court grant their Motions for Class Certification and deny each of Defendants' Motions to Strike.

Dated: April 4, 2023                                          Respectfully submitted,

  /s/ Lydia Wright                                              /s/ Stephen Weil

*One of Plaintiff's Attorneys*

Lydia Wright, La. Bar No. 37926               Mike Kanovitz
The Promise of Justice Initiative                  Stephen Weil
1024 Elysian Fields Avenue                        Maria Makar
New Orleans, LA 70117                              Loevy & Loevy
Tel: (504) 529-5955                                     311 N. Aberdeen, 3rd Floor
Fax: (504) 595-8006                                    Chicago, IL 60607
lwright@defendla.org                                Tel: (312) 243-5900
                                                                    Fax: (312) 243-5902
*/s/ William Most*                                      weil@loevy.com
William Most, La. Bar No. 36914
Caroline Gabriel, La. Bar No. 38224
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com